Exhibit 7



DELAWARE
RIVERKEEPER®

April 27, 2009

Freedom of Information Act Request
Re: Communications over the last 12 months

U.S. Army Corps of Engineers
ATTN: FOIA Officer
100 Penn Square East
Wanamaker Building
Philadelphia, PA 19107-3390

Dear FOIA Officer:

Under the Freedom of Information Act, 5 U.S.C. subsection 552, I am requesting access to any materials in your possession regarding the Delaware River Deepening Project which has been received, created and/or distributed by you anytime within the last 12 months to the present. This includes any documents, writings, materials, correspondence, emails, files, photos, maps and reports, generated, received and or issued pursuant to or regarding the above mentioned project proposal.

We are requesting a waiver of any fees associated with a response to these requests. Section 518.84 (a) states that documents obtained in the interest of the public, because furnishing of these documents is likely to contribute significantly to public understanding of the operations or activities, is under the category of a fee waiver. The Delaware Riverkeeper Network is a non profit organization that speaks on behalf of the public and will use the records in a way that serves the public interest.

If there are any fees for searching for or copying the records, please let me know before you fill my request. Or, please supply the records without informing me of the cost if the fees do not exceed $250.00, which I agree to pay.

If you deny all or any part of this request, please provide a listing of the information in the file and cite each specific exemption you think justifies your refusal to release the information and notify me of appeal procedures available under the law. If you have any questions about handling this request, you may telephone my assistant Shannon Blankinship at (215) 369-1188 x105 , or by email at Shannon@delawareriverkeeper.org .

Sincerely,

Maya K. van Rossum
the Delaware Riverkeeper

Delaware Riverkeeper Network
300 Pond Street, Second Floor
Bristol, PA  19007

tel: (215) 369-1188
fax: (215) 369-1181
drkn@delawareriverkeeper.org
www.delawareriverkeeper.org

Exhibit 8



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
WASHINGTON, D.C. 20314-1000

MAR 1 1 2009

CECW-ZB

MEMORANDUM FOR THE ASSISTANT SECRETARY OF THE ARMY (CIVIL WORKS)

SUBJECT:  Circulation for public comment of the draft Environmental Assessment - Delaware River 45' Channel Deepening Project

1.  This memorandum seeks re-consideration of your earlier determination that the Environmental Assessment (EA) currently being prepared by the Philadelphia District for the subject project should not be circulated for public comment prior to finalization of the EA.  As you will recall, recently I shared with you a legal analysis from the Corps' Chief Counsel, which concluded that circulating the draft EA for public comment would greatly enhance the Corps' legal position in anticipation of litigation, and that such a public comment process could be accomplished with no adverse effect on the Project's construction schedule.

2.  The Philadelphia District is currently finishing an EA that updates the 1997 Supplemental Environmental Impact Statement for the Project.  The EA addresses a variety of changes to the Project and changes to the affected environment that have occurred since 1997.

3.  On December 15, 2008, the Philadelphia District issued a Public Notice identifying the known changes to the Project and to the affected environment.  The Public Notice stated: "The public and all agencies are invited to comment on the attached changes, and to identify any applicable existing and new information generated subsequent to the 1997 SEIS by responding to this Public Notice."

4.  The December 15, 2008 Public Notice did not inform the public that the District was preparing an EA, and since that time the District has not publicly acknowledged that it was preparing an EA.

5.  Corps and CEQ regulations do not specifically require circulation of a draft EA for public comment except in limited circumstances not applicable here.  CEQ guidance, however strongly encourages circulation of a draft EA "when there is either scientific or public controversy over the proposal." (CEQ 40 Questions, 46 Fed. Reg.18026, 1981)

6.  Although the circulation of the subject draft EA is not required by Corps or CEQ regulations, there are numerous reasons why circulating the draft EA for public comment would be a desirable and prudent course of action from both a litigation risk and practical standpoint.



CECW-ZB

SUBJECT: Circulation for public comment of the draft Environmental Assessment - Delaware River 45' Channel Deepening Project

a. The Philadelphia District practice has been to always circulate a draft EA for public comment no matter how small or environmentally insignificant the project may be. To now deviate from that practice for one of the most significant water resources project in the history of the Philadelphia District could undoubtedly lead to the conclusion that the Corps is not circulating the EA because it has something to hide. In fact, since this is not the case, if we fail to circulate for comment the draft EA for this project we would be unnecessarily creating doubt and skepticism about our motives - not just with project opponents but with the public in general and perhaps, with a U.S. District Court judge who eventually will review our administrative process;

b. Circulating the draft EA now for comment will force Project opponents to articulate their specific objections administratively or risk having their failure to comment limit their ability to raise the same issues in a legal forum. The comments that we will receive on the draft EA will, in turn, allow the District to then fine tune the Final EA and address these comments in a way that will be most advantageous to defending our legal position. Given that any NEPA legal action will most likely be limited to a Court review of the Administrative Record, it is desirable that we take advantage of this opportunity;

c. The Corps has already committed to coordinate, at least informally, with both the State of New Jersey and the State of Delaware. The environmental agencies of both states have continued to emphasize the need for supplemental NEPA documentation. It would greatly enhance the District's ability to meaningfully and successfully coordinate with these agencies if they were given the opportunity to comment on the Draft EA;

d. Immediately circulating a Draft EA (assuming a standard 30 day comment period) can be accomplished without *any* adverse effect on even the most optimistic construction schedule. Currently, there are numerous regulatory clearances still outstanding before Project construction can commence. These items include receipt of a Biological Opinion from NOAA concerning the short nose sturgeon which could take several more months; CZM coordination with the State of New Jersey in order to provide "supplemental information" as agreed to by letter dated October 10, 2002 (Chapman to Campbell); coordination with the U.S. Fish and Wildlife Service pursuant to the Fish and Wildlife Coordination Act; receipt of conservation recommendations from NOAA in response to the Corps' Essential Fish Habitat Evaluation; resolution of the Delaware Sub-aqueous Permit controversy; and completion of the Clean Air Act conformity process with USEPA. However, even without regard to these regulatory items, the Philadelphia District and the non-federal sponsor have agreed that it makes sense from a cost-savings standpoint, to initiate construction in August 2003. This will allow the Corps to combine its annual 40' Project maintenance contract (normally awarded in August of every year) with construction of the 45' Project and eliminate mobilization and demobilization costs for separate construction contacts.

CECW-ZB

SUBJECT: Circulation for public comment of the draft Environmental Assessment - Delaware River 45" Channel Deepening Project

Assuming that this Contract will be advertised at the end of June 2009, it would be possible to issue the Final EA as late as June 15, 2009, and still have no impact on the 45" Project schedule. Thus a Draft EA could be circulated for comment as late as April 1, 2009 and still leave time to fine tune the Final EA without impacting the construction schedule.

7. In addition to the reasons set forth above, it is also noted that on January 21, 2009, President Obama issued a Memorandum to all Executive Departments and Agencies entitled "Transparency and Open Government". This Memorandum expresses a strong commitment to engage the public in the decision making process: "Executive departments and agencies should offer Americans increased opportunities to participate in policymaking and to provide their Government with the benefits of their collective expertise and information." The Philadelphia District's general practice of circulating Draft EA is consistent with this policy. Arguably, the Corps could be accused of acting contrary to the Obama administration's strong policy supporting public involvement in the decision making process if the Corps fails to seek public comment on our Draft EA for the most controversial Philadelphia District civil works project in the past 25 years.

8. Based on the above analysis, there does not appear to be any reason that would preclude circulation of a Draft EA for public comment. There is sufficient time to circulate a Draft EA without adversely affecting the construction schedule. Circulation would be consistent with District practice, enhance the District's legal position, build public and agency confidence in the Corps process, and would be the expected course of action based on the Obama administration policy.

9. I would be happy to discuss this matter further with you, and I will proceed in accordance with your written directions regarding this matter.

STEVEN L. STOCKTON, P.E.
Director of Civil Works

Exhibit 9



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

APR 3 0 2009

MEMORANDUM FOR THE DIRECTOR OF CIVIL WORKS

SUBJECT: Memorandum and Finding that, based on Section 404(t) and 511 (a) of the Clean Water Act, the Delaware River 45' Channel Deepening Project will not be subject to any requirement imposed under the authority of the Delaware Subaqueous Lands Act.

1. Today, I have signed the Memorandum for Record (MFR) referenced above, because I am persuaded that the State of Delaware to date has failed to provide the state permit under the Delaware Subaqueous Lands Act for the subject project in a timely manner. Nevertheless, I offer the following policy advice to the Corps regarding this subject.

2. As a Federal official and a prior Commonwealth of Virginia official, I believe the assertion of Federal supremacy as authorized by Subsections 404(t) and 511(a) is a course of action that should not be undertaken lightly by the Federal government. In my five years' tenure in this office, I have not once made a decision to invoke my authority under Subsections 404(t) and 511(a) before today. Moreover, I am aware of only one other instance where any Department of the Army official ever has invoked Federal supremacy under Subsections 404(t) and 511(a); in that instance, Federal supremacy was invoked to protect interstate navigation. In this instance I am persuaded that an invocation of Federal supremacy under Subsections 404(t) and 511(a) is appropriate as a matter of law to prevent a downstream state (Delaware) from interfering with interstate navigation needed by upstream states (Pennsylvania and New Jersey). Nevertheless, from a policy perspective, I urge the Corps to continue and increase its efforts to engage the State of Delaware, and to persuade the State to issue the subject permit. I strongly suggest that the Corps engage particularly the new State of Delaware Department of Natural Resources and Environmental Controls Secretary to influence him to issue the subject state permit expeditiously.

3. If your continued efforts to persuade the State of Delaware to issue the subject permit in a timely manner (i.e., before the Corps is ready to begin construction) ultimately prove to be futile, then the Memorandum and Finding that I signed today will protect interstate navigation.

*John Paul Woodley, Jr.*

John Paul Woodley, Jr.
Assistant Secretary of the Army
(Civil Works)

Printed on Recycled Paper

Exhibit 10



DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

Honorable Byron L. Dorgan
Chairman
Subcommittee on Energy and Water Development
Committee on Appropriations
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

    I am attaching for your information a copy of the Supplemental Environmental Impact Statement (SEIS), for the Delaware River Main Channel Deepening Project (Pennsylvania, New Jersey and Delaware), 1997.

    The project was authorized as part of the Water Resources Development Act of 1992. I direct your attention to the information relating to compliance with the Section 404(b)(1) Guidelines of the Clean Water Act (CWA), on pages 1-21 and 1-25 through 1-33 of the attached SEIS.

    In 1992, Congress granted a CWA subsection 404 (r) exemption. The attached SEIS updates and supplements the CWA 404 (b) (1) information. Please be advised that an appropriation of construction funds after your receipt of this SEIS will invoke the terms of CWA subsection 404 (r).

    In addition, I enclose for your information the Environmental Assessment (EA) that the Corps completed in April 2009, for this project, to update the environmental record preparatory to commencement of construction. The EA also contains a CWA Subsection 404(b)(1) analysis addressing the discharges of dredged or fill material for the Project, as contemplated in CWA Subsection 404(r).

    I am sending an identical letter to the Chairman of the House Appropriations Subcommittee on Energy and Water Development.

        Very Truly Yours,

        *John Paul Woodley, J.*

        John Paul Woodley, Jr.
        Assistant Secretary of the Army
        (Civil Works)

CF:   Ranking Member
      Robert Bennett

Printed on Recycled Paper

Exhibit 11

Frank
Joe Forcina
Cynthia Jester
Mike Arabatzis
Gary Rohn
Roy Denmark
Barny Gale

~~Questions from the field~~

5 Feb 09

strengthen 404(t) status
404(r) — re-establish → to Congress

1997 SEIS → to Congress

→ '92 Kelly Island not in SEIS.
So include in 1997 SEIS →
part 404(r)
out of water quality certification
authorization or appropriation
letter signed 404(r) exp.
of water appropriation

② EA or BA 1st?

③ Schedule can be revised based on final BA or EA.

④ NMFS has taken priority over EA which is more
    the Essential Fish Habitat.                    important

⑤ Letter must be cross-referenced to ensure EA is
    complete.

Frank → you can issue a FONSI without BA.

Gary → Lane opinion? Lane feels that a FONSI is
                                required

Jan 23, PCT
~~strike~~ mtg

EA by end of Feb  ——  ⌐FONSI has to follow
                        Lafter Biological Opinion      ||

time is of the essence

Joe - Help needed?

Exhibit 12

Retzler, Paula L NAP

| | |
|---|---|
| **From:** | Master, Frank R NAP |
| **Sent:** | Monday, March 02, 2009 9:43 AM |
| **To:** | Retzler, Paula L NAP |
| **Subject:** | Re: Comments to EA |


Happy to see a direct email from Barry to Jerry. In what little time we have left they need to work together to produce the best possible EA under the circumstances.
--------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Retzler, Paula L NAP
To: Arabatzis, Minas M NAP; Gebert, Jeffrey A NAP; Master, Frank R NAP
Sent: Mon Mar 02 09:31:02 2009
Subject: Fw: Comments to EA


--------------------------

Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Gale, Barry F NAP
To: Pasquale, Jerry J NAP
Cc: Retzler, Paula L NAP
Sent: Mon Mar 02 09:02:04 2009
Subject: Comments to EA


1.  It appears that sections 4.5 to 4.9 were deleted from the latest version of the EA. Why?  Some of these sections contain (or should contain) critical conclusions 2.  CEQ regs (1508.9) requires that we provide a "listing of agencies and persons consulted" [in preparing the EA.]…don't see it anywhere
3.  The conclusion of section 4.2.3.2 (Horseshoe Crabs) states: "Construction activity on Kelly Island will last six months and is scheduled from April through    September.  As such, there would be some level of impact to spawning horseshoe crabs at both sites.  This level of impact is not considered significant because the studies presented above indicate that horseshoe crab spawning at both sites is low in comparison to other monitored bay beaches."

    a)  The studies relied upon are five to seven years old.  USFWS indicated in their comment letter that there is "new information"  compiled by ASMFC, USGS,  Delaware and New Jersey "regarding horseshoe crab stock assessments."  Since this is one of the most critical environmental issues it seems like this would be important information to have and evaluate.

    b)  Are you sure you are comfortable reaching a conclusion based only on relative use of Broadkill and Kelly.  If so, do we at least have the actual data from the six beaches monitored between 2002 and 2004 by DNERR (whatever DNERR is ???).  If we don't have that data it looks like we are reaching an important conclusion based on second hand information.

Exhibit 13

Retzler, Paula L NAP

| | |
|---|---|
| From: | Arabatzis, Minas M NAP |
| Sent: | Thursday, January 22, 2009 11:29 AM |
| To: | Master, Frank R NAP; Denmark, Roy E NAP; DePasquale, Anthony J NAP; Retzler, Paula L NAP; Gale, Barry F NAP; Rohn, Gary R NAP; Pasquale, Jerry J NAP |
| Cc: | Tickner, Thomas J LTC NAP |
| Subject: | RE: NAD CG ROGER:  Delaware Deepening |

Also, not sure where that 30-60 days NMFS turn around, came from.  All we know is they
will work with us to expedite, but could take up to the full 135 days.


Mike Arabatzis, Chief Planning Div.
US Army Corps of Engineers
Philadelphia District
215-656-6540

-----Original Message-----
From: Master, Frank R NAP
Sent: Thursday, January 22, 2009 11:20 AM
To: Denmark, Roy E NAP; DePasquale, Anthony J NAP; Retzler, Paula L NAP; Gale, Barry F
NAP; Arabatzis, Minas M NAP; Rohn, Gary R NAP; Pasquale, Jerry J NAP
Cc: Tickner, Thomas J LTC NAP
Subject: Re: NAD CG ROGER: Delaware Deepening

I am walking into a meeting in Cape May with State Senator Van Drew and from there to the
LCMM pre-con.

Tony is correct that dredging could occur in August based on the new cost and dredging
schedule. The project schedule sent to NAD 2 weeks ago has a contract awarded in Sep with
dredging in Dec. The sponsor wants to be in position to dredge when all issues are
resolved. Although I personnally believe the schedule we sent NAD is more realistic we
need to point out that there are no windows precluding us from moving forward prior to Dec
as the schedule shows.

Is there a call tomorrow?
--------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Denmark, Roy E NAP
To: DePasquale, Anthony J NAP; Master, Frank R NAP; Retzler, Paula L NAP; Gale, Barry F
NAP; Arabatzis, Minas M NAP; Rohn, Gary R NAP; Pasquale, Jerry J NAP
Cc: Tickner, Thomas J LTC NAP
Sent: Thu Jan 22 10:58:46 2009
Subject: Re: NAD CG ROGER:  Delaware Deepening

I think we should let him know that. I also noticed he got the references to the BA and BO
backward. Any other comments?  Frank/Paula, if yoi can put together a draft message I will
send it to Lloyd.

Roy E. Denmark, Jr.
Deputy District Engineer for
Programs and Project Management
Philadelphia District
U.S. Army Corps of Engineers
(W) 215-656-6505
(C) 267-246-7707
E-mail: roy.e.denmark@usace.army.mil

1

Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


----- Original Message -----
From: DePasquale, Anthony J NAP
To: Denmark, Roy E NAP; Master, Frank R NAP; Retzler, Paula L NAP; Gale, Barry F NAP;
Arabatzis, Minas M NAP; Rohn, Gary R NAP; Pasquale, Jerry J NAP
Cc: Tickner, Thomas J LTC NAP
Sent: Thu Jan 22 10:52:53 2009
Subject: RE: NAD CG ROGER:  Delaware Deepening


One of the major flaws in lloyds email is that we cant dredge until december.  In fact
there are no cutter head / pipeline dredging restrictions above apx del mem bridge, which
will allow dredging to commence this summer if all else were in-line. Our current schedule
shows August 09 dredging commencing in reach C.


Anthony J. DePasquale  P.E.
Chief, Operations Division

U.S. Army Corps of Engineers
Philadelphia District
100 Penn Square East
Philadelphia PA 19107

Phone:  215-656-6720
fax 215-656-6922
cell- 215-313-1120

-----Original Message-----
From: Denmark, Roy E NAP
Sent: Thursday, January 22, 2009 10:08 AM
To: Master, Frank R NAP; Retzler, Paula L NAP; Gale, Barry F NAP; DePasquale, Anthony J
NAP; Arabatzis, Minas M NAP; Rohn, Gary R NAP; Pasquale, Jerry J NAP
Cc: Tickner, Thomas J LTC NAP
Subject: FW: NAD CG ROGER: Delaware Deepening

  FYI


Roy E. Denmark, Jr.
Deputy District Engineer for Programs and Project Management, Philadelphia District, U.S.
Army Corps of Engineers
(w) 215-656-6505
(c) 267-246-7707
e-mail - roy.e.denmark@usace.army.mil

-----Original Message-----
From: Caldwell, Lloyd NAD
Sent: Thursday, January 22, 2009 9:53 AM
To: Stockton, Steven L HQ02; Singh, Mohan HQ02; Coleman, Wesley E Jr HQ02; Petrosino,
Lawrence C NAD; Forcina, Joseph NAD; Vietri, Joseph R NAD; Henn, Roselle E NAD; Williams,
Nancy J NAD; Falcigno, Patsy M NAD; Tickner, Thomas J LTC NAP; Denmark, Roy E NAP;
Stickley, Howard P NAD; Larsen, Christopher J COL NAD; Donohue, Patricia NAD
Subject: FW: NAD CG ROGER: Delaware Deepening

FYI.

-----Original Message-----
From: Caldwell, Lloyd NAD
Sent: Thursday, January 22, 2009 9:44 AM
To: Temple, Bo M MG HQ02
Cc: Semonite, Todd T BG NAD
Subject: RE: NAD CG ROGER: Delaware Deepening


MG Temple---

We are making progress on the Delaware Deepening EA, but some unresolved issues remain to work with the vertical team. You recall that Mr Woodley had set a two week period the end of December for public review of environmental documents on file. He then wanted a completed EA by midJanuary.

We received tremendous pushback from interested stakeholders to extend the review period beyond the Decemebr holiday time. Worked that thru HQ, OASA(CW), and Army General Counsel to finally receive permission on 31 Dec to extend the review period to midJan. The difficulty of that experience confirmed that we cannot do this business in a manner that requires such high level permission for every incremental decision that must be made in the process.

We convened a telecon with the vertical team the first week in Jan, and agreed to hold another every other week. We should have another tomorrow to include Wes Coleman, Lance Wood, Doug Lamont, and Craig Schmauder with NAD and NAP. The telecons are extremely helpful to determine the boundaries for some decisions. In the first telcon we confirmed these key points that had been clouded by the rhetoric and conflicting guidance: - We are indeed performing an Environmental Assessment without prejudging the outcome. (This basic fact had been obscured by direction to not use that term in the public notice.) - The Philadelpia District Commander remains with full delegated authority for the decision regarding the EA outcome. But given the political sensitivity of the issues, close communication with the vertical team is necessary. - The EA will result in either a FONSI or a finding of need to perform a SEIS.

Now we have another key decision. That significant pending decision is whether to permit a public review of the draft EA as is our normal process. It is not mandatory from a regulatory standpoint, we understand that the OASA(CW) said early that we would not delay the process by a public review, but we believe it will not delay the process and is warranted based on the facts of the matter. We've got to talk it thru with the vertical team and someone may find it necesssary to clear with Mr Woodley. Hope to do that tomorrow by phone.

The current status is that NAP has completed their Biological Opinion and provided it to NMFS yesterday. When NMFS is satisfied the BO is complete they have up to 135 days (regulatory) to review and issue a Biological Assessment. The have assured us they will do it faster, but it will likely be 30 to 60 days at best. We'd like to reflect that action in the EA which would mean, of course, that the EA will not be complete this month. Coupled with the fact that the environmental window prevents any dredging before Deeember, we believe we have ample time to permit public review without delaying the project. There may be  some differing legal opinions with the Sponser on this point, which indicate we must work this idea there and vertically.

One other point- Wes provided to the OASA copies of the agency comments that came in during the review period. We hope seeing those comments will help all understand the competing interests and complexity with which we are working. Of course our first objective always is to be collaborrative until/unless a stakeholder demonstrates they are not reciprocal or reasonable, and that takes a bit more time.

One final note: the great Americans on the USACE team that are working this hard matter from the District to the Division, to HQ and beyond, impress me every day with their selfless professionalism and drive to do the right thing. We'll get throught this, and barring court injunction, I expect we'll see the project construction beginning this calendar year.

v/r

Lloyd

-----Original Message-----
From: Semonite, Todd T BG NAD
Sent: Wednesday, January 21, 2009 9:17 AM
To: Temple, Bo M MG HQ02
Cc: Caldwell, Lloyd NAD; Semonite, Todd T BG NAD

Subject: NAD CG ROGER: Delaware Deepening

MG T:  Sorry for late answer - on road today visiting projects at Dover - NAP team is hard at work.  Will hit end of CW DMR in NYC this afternoon.

Will ask Lloyd to flip you a quick SITREP - he is in the lead for NAD and working closely with our CW team, NAP CDR, and the stakeholders.  Comment period closed and Lloyd can give you our assessment on road ahead.

Look forward to giving you a more robust laydown at your hotel prior to Moles dinner on 28th.

Vr. Todd
BG Todd T. Semonite
CG, North Atlantic Div USACE
W: 1-718-765-7000
C: 1-718-207-2549

----- Original Message -----
From: Temple, Bo M MG HQ02
To: Semonite, Todd T BG NAD
Sent: Mon Jan 19 20:10:33 2009
Subject: Re: CG sends CDR note: 19 JAN 2009

Todd:  anything new on the Delaware River front?  Thanks!

----- Original Message -----
From: Semonite, Todd T BG NAD
To: Van Antwerp, Robert L LTG HQ02
Cc: Riley, Don T MG HQ02; Temple, Bo M MG HQ02; Stockton, Steven L HQ02; Dorko, Jeffrey J MG HQ02; Tyler, J Joseph HQ02; Hill, Stephen L COL USACE, HQ
Sent: Mon Jan 19 17:18:37 2009
Subject: CG sends CDR note: 19 JAN 2009

LTG Van Antwerp:

    NAD enjoyed a busy schedule this week highlighted by our 2008 ELDP Graduation ceremony on Tuesday morning, the combined NAD RMB and Command Council in Philly from Tuesday afternoon to Thursday morning, and the US Airways Plane Crash in the Hudson on Thursday afternoon and NAN's response.  Very honored Thursday afternoon to participate with MG Riley in an AWARD CEREMONY for our NAN WHS AWARD team held by Mr. Eastin of accomplishing the monumental feat of getting the $1 Billion WHS project across the start line after so many political, traffic, and contract issues during the last 2 years.  While in the Pentagon has the chance to brief Mr. Eastin, Dr. College, Mr. Calcara and Mr. Prosch on the key projects in the NAD AOR as well as get a GREEN LIGHT on the USMA prep school construction schedule.  Finished the week with a trip to Fort Drum and Waterville on Friday as I visited 10th Mountain Division in 3 feet of snow and attended a dedication ceremony for a fallen hero.  I have listed below information that is in addition to the E-GUIDONS notes prepared by COL Chris Larsen.

1.  ISSUES AND CHALLENGES THAT NEED YOUR ASSISTANCE:  NONE

2.  NAD SUPPORT TO INAUGURATION 2009:  I feel very comfortable with NAD's support to MG Rowe and the JTF-NCR for the Inauguration events next week.  Chris Larsen has been working hard with your team and mine to fully support this monumental ceremony.  As you know we moved RRV#2 from Baltimore to Fort McNair where we assembled a first class team of engineers and ESF#3 cadre to keep the JTF abreast of all EN activities in the NCR and to maintain a robust capability to react if required.  The team has also done some ground-breaking work to line up USACE and NORTHCOM geospatial data sets to assist the JTF CDR in seeing real time the situation on the ground.  We are conducting a daily conference call to synchronize our effort and we look forward to a safe event over the next few days. As of 1800 the night before the event - all remains on track and our team is fully trained and rehearsed for tomorrow's key events.

3.  HUDSON RIVER PLANE CRASH:  The NAN Team continues to do an outstanding job in response to the US Airways Flight 1549 emergency landing in the Hudson.  Nello and his team had 4 workboats and twenty people on the scene within one hour of the crash.  The aircraft was

heavy-lifted out of the river and placed on a transport barge at approximately midnight Saturday 17 January 2009 after over twelve hours of rigging efforts.  DCV HAYWARD was present and collected aircraft parts and luggage.  The District's two state-of-the-art hydrographic survey boats continue searching for the aircraft's two missing engines - mission is about two-thirds complete.  Hydrographic surveys were halted on 17 JAN 2009 because the river's ice floes posed a significant threat to the hydrographic survey transducer heads.  In response to a question during a recent CNN NTSB press briefing, USACE (and NOAA) were mentioned as providing "high-tech" sonar support in the search for the missing port engine.  It's very satisfying to see how the District is leveraging its many strategic partnerships with City, State and Federal agencies during this search and recovery effort.

4.  ARLINGTON NATIONAL CEMETERY (ANC) WALLS:  On 15 Jan, Arlington Cemetery hosted SECARMY on a tour of the boundary walls.  Attendees included Mr. Woodley, Claudia Tornblom, LTC Hurley from ASA-CW; Jack Metzler and Kent Carson from ANC, and Katherine Welton (PM) from Baltimore District.  The tour stopped briefly in Fort Myer to observe the location of the Millennium project wall, then proceeded along Route 110 to the areas north and south of the newly completed niche wall.  The SECARMY had no guidance and little comment on the walls.  He did question the discussion of the completed wall location at the top of the earthen incline to reduce the likelihood of a vehicle off 110 hitting the wall.  The project team will wait for guidance from ANC before proceeding with survey/siting of new walls.  During my visit to the Pentagon on Friday -  I had a chance to personally talk to Claudia about the tour and reminder her that Pete and our NAB team will be very flexible and support whatever COA

5.  COMBINED COMMAND COUNCIL & RMB:  NAD held a "GREAT" combined Command Council and RMB 13-15 Jan. in Philadelphia with the NAD Key Leaders.  Had a chance to sit down with just the Commanders on Tuesday afternoon and discussed some important calendar issues surrounding this summer's Change of Commands as well as officer allocations. The RMB presented their FY09 Annual Work plan for approval and emphasized the connection of their work items to NAD IPLAN execution. They provided situation awareness on NTCS, eQMS, Human Capital Strategy and our effort on CoP refresh. In the  combined session, I was able to discuss my assessment of the Divisions strategic, operational and tactical goals and opportunities.  We received a briefing from Huntsville on their capabilities & from VOCUS on how we can strengthen our STRATCOM, and CDR's signed our regional Voluntary Protection Program charter.  One night we were able to accompany LTC Tom Tickner and Roy Denmark and the Philly team at the Philadelphia SAME meeting.  Overall - an excellent strategic session to work the IPLAN actions as well as critical Program updates and issues.

6.  INTERNAL USACE MDA PARTNERING SESSION:  On 12-13 Jan, COL Kem and District Senior Leadership partnered with team leaders from USACE HQ, NAD, and HNC to clarify important communication and roles and missions for support of the European Missile Defense Program prior to the partnering session with MDA on 2-4 March.  Session was facilitated by Dave Leach of NAD HQ and SESs Pat Rivers and Lloyd Caldwell participated.  We achieved a better understanding of roles and responsibilities and strengthened team relationships - this is an important program to NAD and we are working the relationship with key MDA leaders hard..

7.  FORT DRUM VISIT:  Real exited to visit with Ed Sim and his 1st rate team at Ft Drum who are delivering a master program.  Visited multiple sites; Dental clinic, Warrior in Transition Barracks, and 3 new Brigade complexes: all top quality work - on time and on budget.  Met with the Garrison Cdr and Fort Drum DPW - very complementary of the delivered facilities.  Closed with a super Town Hall, discussed Iraq/Afghanistan, recognized some great people with coins.  Our Drum team is one of the absolute BEST in the Corps - led by Mr. Ed Sim - continues to break new ground on MILCON Transformation and Delivering of Projects.  Understand you have a very busy schedule, but should you find time, it would be worth your while to visit and see this class act.  Traveled 2 hours south of Drum to be the keynote speaker at a US Post Office dedication for CPL Sigsbee - killed in Iraq one year to the day.  I was the General Officer at the funeral and asked by the family to return and participate in this important community and family event.

8.  2008 ELDP CLASS GRADUATION:  I have always been very impressed with the level of commitment, resources and leader time the NAD team has dedicated to the important task of growing the next generation of USACE leaders.  Our Executive Leader Development Plan has been going for over 9 years and immerses one Emerging Leader from our HQ and every District in a year-long development course.  Key tasks are college leadership training, a 4 month leader - development job rotation, and several "Shadowing" assignments with key

senior leaders.   On Wednesday of last week, we graduated 7 Associates from our Executive
Leadership Development Program and welcomed 6 new members.   Present was all the NAD
Commanders, the RMB,  NAD RIT members, other NAD Senior Leaders, former graduates of the
program and current leadership development associates from around the region. The keynote
speaker was Mr. Lloyd Caldwell and the Guest Speaker was Mr. Bruce Tulgan from
RainamkerThinking Inc. who discussed generational difference in the workplace.  Absolutely
one of the best programs I have seen with proven results - pays very high dividends.

9.  WEEK AHEAD:  Following the Martin Luther King Holiday on Monday, I will spend Tuesday
in house at NAD for an Inauguration event in the morning and some staff meetings in the
afternoon; Wednesday on the road to Dover; Thursday on a hiring panel VTC in the morning
followed by the DMR that afternoon; and I will close out the week back here in Brooklyn on
Friday.  NAD stands poised and ready for the Inauguration event on Tuesday as Chris Larsen
has been personally involved with over 20 members of the NAD team committed on site.  We
will also keep you informed on any additional developments with the recovery of US Airways
Flight 1549 as well as the status of our ISRAEL team.  NAD - BUILDING STRONG.

                                                        vr TODD

Exhibit 14

Retzler, Paula L NAP

| | |
|---|---|
| **From:** | Denmark, Roy E NAP |
| **Sent:** | Wednesday, February 11, 2009 9:19 AM |
| **To:** | Retzler, Paula L NAP; Master, Frank R NAP |
| **Cc:** | Tickner, Thomas J LTC NAP; Arabatzis, Minas M NAP; Gale, Barry F NAP; DePasquale, Anthony J NAP |
| **Subject:** | Re: DE Deepening - 404r and 404(t) |

We shouldn't call DNREC at this time.

Roy E. Denmark, Jr.
Deputy District Engineer for
Programs and Project Management
Philadelphia District
U.S. Army Corps of Engineers
(W) 215-656-6505
(C) 267-246-7707
E-mail: roy.e.denmark@usace.army.mil

Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

----- Original Message -----
From: Retzler, Paula L NAP
To: Master, Frank R NAP; Denmark, Roy E NAP
Cc: Tickner, Thomas J LTC NAP; Arabatzis, Minas M NAP; Gale, Barry F NAP; DePasquale,
Anthony J NAP
Sent: Wed Feb 11 09:15:55 2009
Subject: DE Deepening - 404r and 404(t)

Based on Lance Wood's recommendation, explained by Barry below, when should I setup a
meeting with DNREC to explain the 404(t) position the Corps will be taking to deal with
the Delaware permit issue?  I also will be preparing the letter regarding the 404r issue.
These are items that we must take care of immediately before Mr. Woodley is replaced.
Remember that per the PPA no construction can start until the Delaware permit issue is
completed.  I can call DNREC today to discuss who should be invited to this meeting.  Let
me know if we need an internal meeting to discuss these 2 items; I can set it up for
tomorrow when Frank returns.

Thanks,
Paula

-----Original Message-----
From: Gale, Barry F NAP
Sent: Friday, February 06, 2009 10:33 AM
To: Tickner, Thomas J LTC NAP; Denmark, Roy E NAP; Master, Frank R NAP; Retzler, Paula L
NAP; Arabatzis, Minas M NAP
Subject: More Lance Wood

Lance Wood and Pat Falcigno called this morning to further discuss the 404(t) memorandum.
I shared the concern voiced yesterday about how precisely to utilize 404r with the 1997
SEIS if we are not actually seeking an appropriation.  Lance pointed out that all you need
to do is send a cover letter invoking 404r with a copy of the SEIS to the Appropriations
Committee chairmen and that's it.  If at any time subsequent to sending this letter
(attaching the SEIS), Congress appropriates money for this project, then the 404r
exemption is automatically perfected.  We went over the precise language of 404r, and his
analysis does seem correct.  Again 404r only gets us out of the WQC requirement in
Delaware (Kelly Island) and has nothing to do with the Delaware permit.

Lance also reiterated his view that the Delaware Permit issue is best circumvented by
utilizing 404(t)….(this would be the first time 404(t) has ever been utilized in the

1

history of the Clean Water Act).  He again noted that the District needs to meet with Delaware and let them know what we are doing before getting Woodley to make a "finding" under 404(t).  Lance left it to me to come up with a justification for the "finding" (i.e., we need to deepen to 45' in order to "maintain" navigation.).  Lance feels very strongly that this process needs to happen very soon because once Woodley goes – the chance to utilize 404(t) goes with him.  In Lance's view –If we don't either get a Delaware permit or utilize 404(t) the project will be on very thin ice legally.

ATTORNEY WORK PRODUCT

# Exhibit 15

Port Expansion

Retzler, Paula L NAP

From:               Gale, Barry F NAP
Sent:               Monday, January 05, 2009 5:34 PM
To:                 Denmark, Roy E NAP; Master, Frank R NAP; Retzler, Paula L NAP
Subject:            RE: Port Expansion referenced in NMFS letter

Follow Up Flag:     Follow up
Flag Status:        Red


Below is the full article from the PRPA website referencing the 2.5 million in additional
cargo.      It doesn't specifically say where they got the increased cargo tonnage
number.  I also copied some excerpts from other PRPA press releases (only a few of many)
that seem to tie increased cargo and port development to the Deepening project.  If you
read all of the press releases put out by PRPA and Rendell over the past five years (on
the PRPA website) it would be pretty easy to reach the conclusion that new port
development is "reasonably foreseeable" as a result of the Deepening project.  If this is
not our "theory" we need to reconcile our theory with the PRPA/Rendell position or risk a
quick kill when we get sued for not considering "indirect effects" defined by CEQ as
"effects which are caused by the action and are later in time or farther removed in
distance, but are still reasonably foreseeable." 40 CFR 1508.8



REPORT CONFIRMS ECONOMIC BENEFITS
OF DELAWARE RIVER DEEPENING PROJECT

Philadelphia, March 30, 2004-- Proponents of the Delaware River Channel Deepening Project
scored a major victory on Friday, March 19 when an independent review once again supported
the economic benefits of the plan to deepen the Delaware River's main channel from 40 to
45 feet. Most notably, the economic reanalysis of the project identified $24.2 million in
annual benefits, clearly demonstrating that the project would be a prudent investment in
the region's maritime industry.

"This supplemental report by the U.S. Army Corps of Engineers again underscores the
economic viability of this project," said James T. McDermott Jr., Executive Director of
the Philadelphia Regional Port Authority. "As we have said time and time again, we must
modernize this river or else suffer a disastrous decline in river traffic."

"It has been conclusively demonstrated that dredged materials from the Delaware River are
environmentally benign," said Brian Preski, Chairman of the Philadelphia Regional Port
Authority. "Now we have yet another economic reanalysis of the project, which clearly
outlines the dollars-and-cents benefits. The question is, why are we still debating this
issue? We need to deepen this channel now."

A December 2002 report- itself a reanalysis- identified the economic benefits of the $264
million project, which was authorized by Congress in 1991. However, after some concerns
were raised regarding the Corps' data and assumptions, the Corps agreed to again reanalyze
some aspects of the project. It engaged a panel of experts for an independent review of
the reanalysis and results of the December 2002 report. That panel has now found that the
Corps' overall benefits analysis, which demonstrates how a deeper channel would benefit
specific cargoes and commodities at the Port of Philadelphia, to be sound, the Corps said.

The Delaware River needs to be deepened, Preski said, as industries and shippers are
increasingly turning to larger vessels that draw at least 42 feet of water. Moreover, he
added, ports to both the north and south are presently deepening their channels or have
plans to do so. The Port of New York & New Jersey, for example, is deepening its channel
to 50 feet, and at a cost many times higher than the $264 million cost of the Philadelphia
project.

With a deeper channel and the economies of scale that will accompany the larger vessels
it'll be able to service, ships will be able to carry more cargo on the Delaware River,"

Preski said. "This will lead to substantially more direct and indirect economic activity on the waterfront."

The Delaware River Port Authority, a bi-state transportation and economic development agency that frequently supports the efforts of the Philadelphia Regional Port Authority and other maritime agencies along the Delaware River, is the non-federal local sponsor of the project. Economic benefits of the project will begin immediately: during the five years it will take to deepen the channel, the project is expected to produce 1,600 jobs, $200 million in wages and $400 million in revenues. Upon completion, the project is expected to produce 1,300 new jobs and increase cargo tonnage on the Delaware River by up to 2.5 million tons annually.

A recent independent survey found that, by a margin of more than three-to-one, residents in the tri-state area support the project.

This latest report comes on the heels of another piece of good news for the port community. On March 2, the Pennsylvania Department of Environmental Protection concluded that dredged materials from the Delaware River deepening project can be an extraordinarily valuable and effective tool in mine reclamation. Filling abandoned mines with material from the river bed would prevent accidents, as well as halt the discharge of acidic water that has spoiled more than 2,000 miles of streams in the state, officials of the agency said.

The Philadelphia Regional Port Authority (PRPA), a major proponent of the Delaware River Channel Deepening Project, is an independent agency of the Commonwealth of Pennsylvania, charged with the management, marketing, and promotion of publicly owned marine terminals located along the Delaware River in Philadelphia, as well as strategic planning for maritime-industrial activity in the port district.

And for those critics of channel deepening who say that our current successes demonstrate that the Port doesn't need deeper water to get ahead, I respectfully say that those critics don't know what they are talking about. Our current statistics and our higher cargo levels are a wake-up call that ships are getting bigger and more cargo will be moving through the ports that can handle it. If we don't deepen our channel to handle the bigger ships and their dramatically bigger cargoes, other ports will happily accommodate those vessels."

With this agreement, we can say to every hard working man and woman in this region that the jobs on these piers are secure, and that more jobs are on the way. This project will make all of the Delaware River ports more viable in the long term, allowing our ports to retain current customers and to attract new cargo."

In the coming days and weeks, PRPA will release additional information about the timetable for dredging and for the state capital improvements. For now, the capital initiative will include, but not be limited to, improvements to Pier 82, Tioga Marine Terminal, Packer Avenue Marine Terminal, and the Port's Forest Products Center. It also includes additional land purchases outside currently active port areas for the establishment of new maritime operations.

But, during the course of both news conferences by Governor Rendell, everything came back to the 45-Foot Channel Deepening Project. "I want to reiterate," said Governor Rendell, "that none of this state investment would be cost-effective, and that we would not have the private investment interest in this region that we now see, if we were not moving

forward with the Delaware River dredging project."

-----Original Message-----
From: Selsor, Robert E NAP
Sent: Monday, January 05, 2009 4:16 PM
To: Gale, Barry F NAP
Cc: Denmark, Roy E NAP; Arabatzis, Minas M NAP; DePasquale, Anthony J NAP; Master, Frank
NAP; Retzler, Paula L NAP; Pasquale, Jerry J NAP
Subject: FW: Port Expansion referenced in NMFS letter

Barry, the Corps' economic analysis (Comprehensive Economic Reanalysis Report, December
2002/Supplement, February 2004/Economic Update, April 2008) applied the parameter that no
induced tonnage will result from the proposed channel deepening from 40 to 45 feet. Any
future growth in the amount of tonnage through the port over the project life will be an
equivalent amount for both the 40 or 45 foot channel depths. The 45 foot channel depth
scenario would not necessitate any port expansion to handle any tonnage in excess of the
amount to be handled with the current 40 foot channel depth.

I do not know where the expectation of an increase in cargo tonnage of 2.5 million tons
annually from the 45 foot project originated in the below statement, but it is not in
agreement with the Corps analysis.

Thanks, Bob
-----Original Message-----
From: Gale, Barry F NAP
Sent: Monday, January 05, 2009 3:37 PM
To: Denmark, Roy E NAP; Arabatzis, Minas M NAP; Selsor, Robert E NAP; Master, Frank R NAP
Subject: Port Expansion referenced in NMFS letter

Concerning our discussion earlier about whether port expansion was reasonably foreseeable
as a result of the Deepening - The quote below is from the PRPA website extolling the
virtues of the Deepening Project. How can cargo tonnage be increased without expanding
port capacity. Am I not understanding this correctly or do we disagree with the statement
below (I think it was lifted from a Corps study).

during the five years it will take to deepen the channel, the project is expected to
produce 1,600 jobs, $200 million in wages and $400 million in revenues. Upon completion,
the project is expected to produce 1,300 new jobs and increase cargo tonnage on the
Delaware River by up to 2.5 million tons annually.

Exhibit 16



### State of New Jersey
OFFICE OF THE GOVERNOR
PO BOX 001
TRENTON NJ 08625-0001

JON S. CORZINE
*Governor*

KENNETH H. ZIMMERMAN
*Chief Counsel*

May 24, 2007

Maya van Rossum
Delaware River Keeper Network
300 Pond Street
Bristol, PA  19007

Dear Ms. van Rossum:

I am writing in response to your OPRA request #W28699.   In your request, you stated:

> I would like to receive a copy of the agreement that the New Jersey Governor's Office has negotiated with the Pennsylvania Governor's Office regarding the deepening of the Delaware River main navigation channel.
>
> In addition, I would like to receive copies of any written correspondence or emails exchanged as part of the discussions surrounding this agreement.

In response to the first part of your request, please find enclosed a copy of a document denominated "Cooperation Agreement."   That document represents the final agreement between the State of New Jersey and the Commonwealth of Pennsylvania.

With respect to the second portion of your request seeking "copies of any written correspondence or emails exchanged as part of the discussions surrounding this agreement," please be advised that we are withholding all draft versions of the agreement.   In addition, we are not producing email chains exchanged with senior staff to the Governor of Pennsylvania or the Commonwealth's attorney relating to the agreement.   We are also not producing email chains involving senior staff of the Governor's Office and/or emails between Governor's Office staff and executive branch agencies relating to the agreement.

With respect to communications with the Commonwealth of Pennsylvania, the Supreme Court of New Jersey and other courts have long recognized the protections afforded non-public communications between senior public officials and those with

whom they communicate.  These communications are also protected as settlement- and/or negotiations-related and by the deliberative process privilege and the common interest privilege.  In addition, they constitute advisory, consultative and deliberative materials and reflect the deliberative process of executive staff.

Communication within New Jersey's executive branch also implicate protections afforded non-public communications involving senior public officials and/or are protected by the deliberative process privilege, the attorney client privilege, the attorney work product doctrine or as advisory, consultative and deliberative.  As a result, all emails or correspondence responsive to your request are not being produced.

I appreciate your attention to this matter.

Sincerely,

William C. Brown
Senior Associate Counsel

blr

Enclosure

# COOPERATION AGREEMENT

The State of New Jersey and the Commonwealth of Pennsylvania ("The Parties") intend, by the terms of this Agreement, to resolve a dispute concerning the Delaware River Main Channel Deepening Project ("The Project"), as follows:

1. The Parties agree to take all steps necessary to establish the Philadelphia Regional Port Authority ("PRPA") as the local project sponsor of The Project, including adopting a resolution as the first order of business at the next meeting of the Board of Commissioners of the Delaware River Port Authority ("DRPA") approving the transfer of local project sponsor status from the DRPA to the PRPA (the "Project Resolution");

2. Pursuant to the Project Resolution, the DRPA shall transfer to the PRPA copies of all DRPA files related to the Project;

3. The Parties shall participate in a Committee to identify sites for the disposal of approximately 26 Million cubic yards of spoils material (the "Spoils Management Plan"). The Committee shall be comprised of representatives from the State of New Jersey, the Commonwealth of Pennsylvania and the State of Delaware. Additional Committee representatives may be added by agreement of the Parties. The Parties shall designate the Chair of the Committee by mutual agreement. The Committee shall reach an unanimously agreed upon Spoils Management Plan within six months;

4. Notwithstanding paragraph three hereof, it is understood that to date Pennsylvania has agreed to accept all spoils material from the Project, except to the extent that New Jersey seeks spoils materials for New Jersey port facility projects. New Jersey shall pay the costs for disposal of spoils materials used in connection with the construction of New Jersey-based port facilities and makes no other financial commitment at this time.

5. The PRPA, as The Project Sponsor, shall request from the Army Corps an update to the Environmental Impact Study based upon the understanding that the Army Corps shall complete the update within six months. The Parties shall support the effort to obtain an update to the EIS;

6. The Parties agree to proceed as quickly as possible in the consideration and disposition of all regulatory review and permit requirements attendant to the Project;

7. The DRPA shall recommence Board meetings pursuant to a mutually agreed upon schedule;

8. The DRPA shall reallocate in equal shares to New Jersey and Pennsylvania the existing dredging fund in the amount of $38.5 Million for the purposes of dredging, port infrastructure improvements and environmental projects that benefit the Delaware River. Such projects will be identified and, if feasible, undertaken forthwith. That fund may be replenished or expanded when additional funds become available to the DRPA; and

9. The Parties agree to support the expansion of rail systems in Gloucester County, New Jersey and in Philadelphia, Pennsylvania.

# Exhibit 17

US Army Corps of Engineers (USACE)
Not Subject to FOIA

## Delaware River Main Channel Deepening Project
## PPA - In Progress Review Meeting

Meeting Notes
13 March 2008

**Date of Meeting:** 13 March 2008 – 10:00 AM
**Place of Meeting:** USACE, Philadelphia District – Counsel's Conference Room
**Attendees:**

| Name | Office | Telephone |
|------|--------|-----------|
| **In Philadelphia:** | | |
| LTC Gwen Baker | CENAP | 215-656-6501 |
| Roy Denmark | CENAP | 215-656-6505 |
| Mike Arabatzis | CENAP | 215-656-6540 |
| Tony DePasquale | CENAP | 215-656-6721 |
| Gary Rohn | CENAP | 215-656-6511 |
| Frank Master | CENAP | 215-656-6590 |
| Paula Retzler | CENAP | 215-656-6787 |
| Jerry Pasquale | CENAP | 215-656-6560 |
| Barry Gale | CENAP | 215-656-6528 |
| Bob Selsor | CENAP | 215-656-6569 |
| Wes Coleman | HQUSACE | 202-761-5782 |
| Larry Petrosino | CENAD | 718-765-7060 |
| Joe Forcina | CENAD | 718-765-7084 |
| Bill Sutyak | CENAD | 718-765-7061 |
| **By Telephone:** | | |
| Kim Smith | HQUSACE | |
| Cynthia Jester | HQUSACE | |
| Jitka Braden | HQUSACE | |
| Jeanette Gallihugh | HQUSACE | |
| Maria Chin | HQUSACE | |
| Larry Coccheri | CENAD | |
| Peter Doukas | CENAD | |
| John Wright | CENAD | |
| Pat Folcigno | CENAD | |
| Joe Vietri | CENAD | |
| Rich Ring | CENAD | |

US Army Corps of Engineers (USACE)
Not Subject to FOIA

## I. Introductions/Project Overview -

After introductions were concluded, LTC Baker and Roy Denmark emphasized the importance of the DE Deepening Project both national and regionally. They stressed that even though the project is of utmost economic importance to the region, the project must also provide a proper balance to protect the environment. The objective of the meeting was to gather the vertical project delivery team to ensure we are all moving in the right direction. Larry Petrosino and Wes Coleman thanked everyone for working very hard on this project. Mr. Coleman stated that he talked with Senator Specter's staff and Congressman Brady on Tuesday, 12 Mar 2008; both stressed how important this project is and asked for an update of the project status after the meetings scheduled for today. Mr. Coleman agreed that the purpose of this meeting was to get the vertical project delivery team together to discuss HQ's comments on the PPA package and determine how to move forward to achieve a successful execution of the PPA.

## II. Discussion of Disposal Plan -

Mr. DePasquale explained that many questions regarding the disposal plan have developed due to the "Governors' Agreement", therefore it is important to set the Administrative Record straight and address questions regarding the project's disposal plan. Based on the 8 February 2008, letter from the Philadelphia Regional Port Authority (PRPA) to LTC Baker, the sponsor has made clear that the Governors' Agreement has no bearing on the project and the disposal plan has not changed. However, due to recent multi-beam survey results of the Delaware River, quantities are much more accurate and are ~38 million CY less than the projected quantities reported in the previous project documents. Since the current initial and O&M dredge quantities can be accommodated by the existing Federal disposal sites over the project's 50 year life, there may be no need to acquire and develop any new disposal sites. The 2008 Economic Update Report that is currently being prepared will present a sensitivity analysis to compute a BCR based on a disposal plan that does not require any new disposal sites. Mr. DePasquale stressed that there are no new sites added to the disposal plan; the use of Ft. Mifflin is for rock only as presented in the authorized plan. Therefore, the only potential change to the authorized plan is the removal of the 3 (originally 4) previously required new disposal sites located in New Jersey.

If the 3 new sites are not required, a savings of approximately $20 million would result from no need to purchase or develop the sites. The cost impact to moving dredged material to existing Federal sites (instead of the proposed 3 new sites) results with extra costs due to the longer distance to haul approximately 3 million CY at an increased rate of $5 to $6 per CY. Mr. DePasquale still expects to see savings by not acquiring and developing the new sites compared to the increased rate of disposal. Mr. Arabatzis stressed that the project will only use existing Federal sites that have been fully analyzed through the NEPA process for this project.

US Army Corps of Engineers (USACE)
Not Subject to FOIA

Mr. Vietri and Mr. Wright again questioned if only NEPA approved sites are being used in the disposal plan. They referenced past project documentation that required use of the new disposal sites along with the existing Federal sites bringing the total required sites to 11. This change may need an EA. LTC Baker asked what the legal opinion is on the need for an EA. Mr. Gale stated that the 1992 EIS, 1997 SEIS, 2002 Economic Update Report and the GAO Report all say that the 4 (reduced to 3) new sites in New Jersey must be used to meet project disposal capacity needs. Mr. Arabatzis and Mr. Denmark stressed that based on better surveys the project is making more efficient use of existing Federal sites causing less impact to the environment by not developing the new disposal sites. Mr. Gale stated that Lance Wood (counsel for HQ) has implied that he would agree that no EA is needed since the impact only helps the environment rather than harms it as long as the Administrative Record clearly establishes why we no longer need the extra capacity provided in the new disposal sites.

Mr. Coleman explained that by the time we reach year 5 of this project, dredge quantities may change and the need for the new disposal sites may become stronger. Therefore, he felt the new disposal sites must remain in the authorized project even though a sensitivity analysis will look at the BCR without them. Mr. Gale reminded everyone that one of the three sites is no longer available due to it being sold and developed, bringing the available total to only 2. This is an example of how aspects of a project change over time and the actual constructability of a project can only be presented at the time of construction. Mr. Vietri agreed that an EA will not be required to document this potential change to the disposal plan, however the Administrative Record must clearly explain why the new disposal sites are no longer necessary. This information will be entered into the Administrative Record through the Economic Update Report that is currently being prepared.

### III. Discussion of Project Funding -

Mr. Master presented the funding stream for the project. He explained that the funding plan to initiate construction once the PPA has been executed includes a combination of existing Federal funds and non-Federal funds scheduled to be provided during the first year of construction. Existing Federal funds in the amount of $2.5M are currently scheduled as carryover into FY 09. As required by the PPA the sponsor will be required to provide funds in the amount of 25% of the total cost of construction of the general navigation features (including any costs of dredged or excavated material disposal facilities during the period of construction). During the first year of construction the sponsor is required to match the Federal funds received in prior year that were utilized for PED and initial construction. Non-Federal funds in the amount of about $8.0M will be required by the sponsor at that time. The combination of the Federal funds ($2.5M) and non-Federal funds ($8.0M) are adequate to award the first initial construction contract. Additionally, the sponsor has requested that PPA language allow for accelerated contributed funds by the sponsor to assist in expediting construction. The sponsor has indicated that they have approximately $19.0M currently available for this project. Also, total funds reprogrammed out of the project between 1998 and 2005 have totaled

3

US Army Corps of Engineers (USACE)
Not Subject to FOIA

$44,303,000. Congressional interests expect that the Corps will repay this project for previously allocated funds (1998 to 2005). The recovery of these funds will be pursued once the PPA has been executed.

Mr. Rohn and Mr. Sutyak stated they will continue to pursue looking for any payback of reprogrammed funds for this project. Ms. Braden warned that payback may never happen and cannot be counted on. Funds totaling $14.7 M were included in Corps FY08 appropriations for payback, however there were very strict rules on what projects could receive that money, such as priority to projects already under construction. FY09 payback rules are unknown at this time, but the BCR value may not be high enough on this project to gain priority for any payback funds. Ms. Braden reminded everyone that this is a 75%/25% cost share and everything must be in sync in order to keep funds from freezing.

Mr. Petrosino asked how the ASA(CW) office will view the PPA once they get it; what are the rules on BCR and funding stream? Mr. Sutyak reminded everyone that 6-7 years ago the project met all criteria. Mr. Coleman and Mr. Petrosino stressed that NAP must show ability to go directly into a construction contract once the PPA is signed. The funding stream must be written for the ASA(CW) office to review, showing a stream of funding that supports 9 contracts over 5 years. Mr. Coleman will be meeting with Senator Specter's office to go through the funding history of this project. It is anticipated that Senator Specter will add funds to the budget once the PPA is signed since he has in the past. Mr. Denmark explained that the first construction project to award would be in the spring of 2009 (FY09) for the dredging of Reach C. Mr. Coleman reminded everyone that the sponsor, Philadelphia Regional Port Authority (PRPA) has expressed an interest in initiating construction ASAP, hopefully earlier than the spring of 2009.

Mr. Coleman will work with the ASA(CW) office to determine what level of funding stream is acceptable to get the PPA executed. In order to do that Mr. Coleman needs a layout of how construction will be scheduled. As part of NAP's response to HQ's comments, NAP must layout a project schedule with required funding. Required data from NAP can be submitted piecemeal in order to keep things moving. The final NAP submittal can then be a wrap-up document that brings everything together. Mr. Focina felt NAP should send responses to PPA comments directly to HQ. All required data should then be coordinated and reviewed by NAD. Mr. Coleman agreed that the final submittal of data/documents should be transmitted from Brigadier General Semonite to HQ, however responses to comments can come directly to him. Mr. Arabatzis reminded everyone that in order to keep the flow of information under control, all coordination must flow through the NAP Project Manager (Ms. Retzler) and the NAD Project Manager (Mr. LaMoglia).

## IV. Update on HQ PPA –

Mr. Denmark asked how close the PPA is to being 100% complete. Ms. Smith said the only thing she is waiting on is for NAP and PRPA to finalize project details that may

US Army Corps of Engineers (USACE)
Not Subject to FOIA

affect language in the document. Mr. Sutyak stated that if the PPA is final, NAP should officially send it to PRPA so their review can begin. Ms. Smith explained that a place holder for accelerated funds is being left in the PPA for the $19 million that PRPA has indicated will be available. Ms. Smith has explained to PRPA that if and when an official offer is made to accelerate sponsor funds the Corps must still go through appropriate approvals to accept the money. The language being developed for this PPA will become standard language for all future PPAs dealing with accelerated funds. Ms. Smith has made it clear to PRPA that there are specific rules applied to accelerated funds, such as contributed funds can only accelerate up to their cash requirement. Mr. Coleman said PRPA must be careful to offer the funds at the appropriate time, because the Federal funds are not appropriated at this time and we must not appear to be obligating Congress to the project. Ms. Smith warned that when PRPA makes the offer of funds it could take a couple of months to approve acceptance of the funds. It is critical that the PPA be executed prior to any offer of accelerated funds from PRPA. Ms. Smith also warned that in processing the PPA to the ASA(CW) office, the PPA is the simplest part of the execution process; the supporting documents that must clearly answer all questions regarding environmental documents, disposal plan, etc., are the main problem. The Army General Counsel must have all questions fully answered to get the PPA approved.


## V. Discussion of Section 306 & 308 Credits -

Mr. Master discussed the current status of Section 306 and 308 credits. It appears that language for both 306 and 308 is remaining in the PPA. Ms. agreed that the 308 credit language is in the PPA, but 306 should be taken out because a Decision Document must be completed and approved by the ASA(CW) office before the language can be included in the PPA. There is June 2001 implementation guidance that is available to guide the development of a Decision Document for the 306 credits. Mr. Master has this guidance, but asked if the 306 language could stay in the PPA as a place holder. Ms. Smith said no; the PPA can be amended later after the ASA(CW) office approves the Decision Document. Mr. Forcina recommended that we not slow down the PPA at this time trying to get a Decision Document to the ASA office for approval at the same time we are trying to get the PPA approved. It is better to wait and amend the PPA later. Mr. Sutyak agreed that it should not be difficult to modify the PPA later to add the 306 language. Mr. Coleman stated that his initial concern with the lack of 306 documentation was that it could affect the overall BCR. He now understands that the 306 and 308 credits do not affect the BCR and there is no risk to leaving the 306 credits out of the PPA at this time.


## VI. Discussion of Economic Comments -

Mr. Selsor discussed the current 2004 February Economic Reanalysis Report that reported a BCR of 1.15 (discount rate of 5-5/8%). That report was prepared by David Miller & Associates (DMA) from June 2002 to February 2004, at a price of $1 million. The report went on to be reviewed and approved by an internal review by HQ and NAD, and an external review by 3 professors and navigation experts. In order to show a

US Army Corps of Engineers (USACE)
Not Subject to FOIA

snapshot of how the project economics have changed since 2004, Mr. Selsor explained that by leaving the price level benefits and costs unchanged (May 2002), but changing the discount rate of 5-5/8% to the current rate of 4-7/8%, the BCR increases from 1.15 to 1.29 and net benefits increase from $3.2 M to $5.4 M.

Mr. Selsor explained that he has had detailed discussions with Mr. Ring regarding the two options of updating the current economics. The first option is to perform a full reanalysis. This requires retaining DMA to obtain current model inputs and then run the models. This would take approximately 6 months at a cost of up to $300,000, not including time and costs for reviews and approvals. The second and more reasonable option is to update the economics by verifying trends utilizing general commodity trends in the Delaware River terminals from 2004 to the present. These trends would be used to compare to the 2004 model results. This option can be done within one month at a cost of only $20,000. It was jointly recommended by Mr. Selsor, Mr. Ring and Mr. Vietri that this option is the way to handle the 3 year update of the economics data.

Mr. Selsor went on to present the following trends that he has already collected current data on:

    Packer Avenue Terminal Trends -
- Containers:   2004 Projected growth at 3.4%/yr
              2008 Actual growth at 20%/yr
              PRPA projections at 18%/yr (over next 5 yrs)
- Steel slabs:   2004 Projected growth at 1%/yr
              2008 Actual growth at 22%/yr
              PRPA projections at 7.5%/yr (over next 5 yrs)

    Beckett Street Terminal Trends –
- Slag:   2004 Projected growth at 0 tons/yr
              2008 Actual growth shows 1 million tons/yr

The tonnage for crude oil and petroleum products has remained flat due to fixed capacity at the area refineries.

Mr. Ring went on to agree there had been extensive discussions regarding the issue of how to efficiently update the 2004 economic data. A model rerun by DMA would be too time consuming and expensive. It is appropriate to just look at real time vs. model projections. Interest rate change affects the project costs and benefits. With interest rates going down, intuitively this supports the abbreviated product resulting from option 2. Mr. Vietri and Ms. Chin stated they supported the option 2 approach. Mr. Vietri clarified that this report must present a BCR for the authorized project as well as a BCR for the potential to not use the 3 new disposal sites. Mr. Selsor concurred that he will provide BCRs for each scenario.

Mr. Petrosino asked if Brigadier General Semonite would be the approver of the 2008 Economic Update Report. Mr. Vietri said the procedure used at NAD is for Mr. Vietri as

US Army Corps of Engineers (USACE)
Not Subject to FOIA

the Chief of Planning Division to sign the memorandum approving the document for Brigadier General Semonite. Therefore, the 2008 Economic Update Report will be sent to NAD for review and approval. Mr. Vietri will then send the approved document to HQ. Mr. Coleman brought up the commitment to update the economic data every three years through the construction of the project. Ms. Chin felt the project should provide an update every 3 years but not be presented in the form of an Limited Reevaluation Report (LRR) just an update similar to what is being done now.

## VII. Discussion of Environmental Comments -

Mr. Arabatzis discussed the concern that the NEPA documentation of the environmental coordination is old. Mr. Arabatzis stated that NAP has conducted a review of all environmental documentation and has determined that there are no new impacts or circumstances that would warrant further environmental work at this time. Data collection has never stopped for this project. Since the completion of the 1997 SEIS, NAP has continued to work with various Federal and State resource agencies to collect data to establish baseline conditions for the extensive monitoring that will accompany the construction of the project, and to verify previous findings. Mr. Pasquale added that recent coordination in 2007 provided current environmental monitoring reports to the New Jersey Department of Environmental Protection (NJDEP) for the renewal of the Water Quality Certificate for the existing Delaware River Philadelphia to the Sea Project. As part of NJDEP's review process they consulted with U.S. Fish & Wildlife Service, the National Marine Fisheries Service and the State Division of Fish and Wildlife. NJDEP also asked for public comments. The State issued the Water Quality Certificate with no new restrictions. Mr. Arabatzis added that all disposal sites used for the current Philadelphia to Sea Project are the same as the this Project. The only difference in the parameters is the extra 5 feet of depth. Ms. Gallihugh reminded Mr. Arabatzis that the data in the DE Deepening Project is relatively old and must be revisited. She requested that NAP's review of the existing NEPA documents be thorough and documented in an MFR. The MFR should be referenced in the PPA Checklist.

Mr. Forcina questioned if NJDEP can revoke the Coastal Zone Management (CZM) Permit. Mr. Arabatzis answered that NOAA keeps track of all CZMs and they cannot be revoked. Mr. Denmark explained that the issue with the CZM is not technical – it is political. The CZM has been coordinated over the last 10-15 years. We will continue to coordinate any CZM issues with the State of New Jersey. The Administrative Record is complete and will provide all existing data including that NJDEP took care of required public notices.

Ms. Gallihugh asked about the status of the Delaware permit and asked to identify what it is. Mr. Arabatzis explained that it is called a Subaqueous Lands and Wetlands Permit. There is no Federal authority for it, however it has been made a requirement of the PPA and must be issued prior to construction start. NAP and PRPA met with DNREC on 7 March 2008, to start re-coordination of this permit. The outlook from DNREC looks good, but there are issues that NAP will be working through with DNREC, such as

US Army Corps of Engineers (USACE)
Not Subject to FOIA

monitoring during and after construction. DNREC expressed a great desire for the beneficial use of the sand coming out of the bay area. Those bay projects, Broadkill Beach and Kelly Island, must still be reviewed with DNREC. No problems are anticipated with DNREC.

Ms. Gallihugh asked about comment #B.13 that states:

**Comment** - Section 401 Water Quality Certification. Include a footnote explaining how the 404(r) exemption was approved through congressional action, including: verification that the information required in ER 1105-2-100, Appendix C (Section C-6.g) was in the FEIS submitted to Congress; the title and date of the report that included that information; and the date that the exemption was provided through congressional authorization.

Mr. Pasquale read the following response to her:

*Response - In lieu of obtaining Section 401 Water Quality Certification from the States of Pennsylvania, New Jersey and Delaware a 404 (r) exemption was sought through Congressional authorization. The 404 (r) exemption met the requirements of ER 1105-2-100, Appendix C (Section C-6.g) which are:*

*(1) Information on the effects of the discharge of dredged or fill material into waters of the United States, including the application of the Section 404(b)(1) Guidelines, are included in an environmental impact statement (EIS) on the proposed project.*

*The Delaware River Comprehensive Navigation Study Final Interim Feasibility Report dated February 1992 included an Environmental Impact Statement that contained information on the effects of the discharge of dredged or fill material into waters of the United States. Section 5 of the Environmental Impact Statement provided discussions of the environmental effects of plan implementation on groundwater, hydrology/estuarine salinity patterns and water quality. A Section 404(b)(1) evaluation was also prepared and included in the report.*

*(2) The EIS is submitted to Congress before the actual discharge takes place and prior to either authorization of the proposed project or appropriation of funds for its construction.*

*The Final Feasibility Report and Environmental Impact Statement were submitted to Congress before the actual discharge took place and prior to either authorization of the proposed project or appropriation of funds for its construction. The project was authorized for construction by Public Law 102-580, Section 101 (6) of WRDA 1992.*

*(3) District commanders shall clearly document in the feasibility report when the 404(r) exemption criteria have been met, regardless of whether or not the District plans to obtain State water quality certification.*

US Army Corps of Engineers (USACE)
Not Subject to FOIA

*The Syllabus of the Final Feasibility Report included a statement indicating that the requirements of Section 404 (r) of Public Law 92-500, as amended, had been met*

Jeanette stated that under HQ guidance the EIS is to make sure to seek exemption; does the EIS seek this? Jerry explained that the EIS did seek the exemption in the abstract in the front of the EIS. Jeanette asked that Jerry make a notation of this in the PPA Checklist.

## VIII. Summary -

Mr. Denmark concluded the meeting by listing the required tasks as follows:

1) Prepare an abbreviated economic update report to include a BCR for the authorized project and a BCR for the potential project that utilizes a disposal plan that excludes all development and use of new disposal sites. This report will be sent to NAD for review and approval. NAD will then send the final report on to HQ.

2) Prepare an environmental MFR that summarizes NAP's review of their NEPA documentation and current environmental data to strengthen the Administrative Record. This MFR does not have to be submitted but will be referenced in the PPA Checklist.

3) Provide notation in the PPA Checklist that the EIS did seek a 404(r) exemption from obtaining a Section 401 Water Quality Certification from the States of Pennsylvania, New Jersey and Delaware.

4) Prepare funding stream showing funding requirements to support 9 contracts over 5 years. Mr. Coleman will use funding stream to explain to the ASA(CW) office how this project will be funded over the next 5 years. This will be sent to Mr. Coleman in the responses to PPA comments.

5) Provide responses to PPA comments, sent directly to HQ.

Notes prepared by Paula Retzler, Project Manager

Exhibit 18

# Delaware River Main Channel Deepening Project
# PCT – Meeting #4

## Draft Minutes

### November 20, 2008

**Date of Meeting:** November 17, 2008 – 1:00 PM

**Place of Meeting:** Corps of Engineers – Wanamaker Bldg, Philadelphia, PA

**Attendees:**

| Name | Office | Telephone | Email |
|------|--------|-----------|-------|
| Jamie McDermott | PRPA | 215-423-4501 | jmcdermott@philaport.com |
| Don Brennan | PRPA | 215-426-2600 | dbrennan@philaport.com |
| Bob Blackburn | PRPA | 215-426-2600 | rblackburn@philaport.com |
| Lisa Magee | PRPA | 215-426-2600 | lmagee@philaport.com |
| Nicholas Walsh | PRPA | 215-426-2600 | nwalsh@philaport.com |
| B.J. Clark | PA Governor's Office | 215-560-2640 | roberclark@state.pa.us |
| Alex Ficken | PA Governor's Office | 215-560-2640 | aficken@state.pa.us |
| Kate McNamara | PA Governor's Office | 215-965-4276 | kamcnamara@state.pa.us |
| William Gahagan | GBA | 302-652-4998 | wgahagan@gba-inc.com |
| Bob Callegari | GBA | 302-218-7092 | rlcallegari@gba-inc.com |
| Grady Bryant | GBA | 813-477-6541 | gbryant@gba-inc.com |
| Steve C. Shaw | GBA | 410-682-5595 | scshaw@gba-inc.com |
| Stan Lulewicz | GBA | 215-425-6283 | slulewicz@gba-inc.com |
| Mike Arabatzis | USACE | 215-656-6540 | minas.m.arabatzis@usace.army.mil |
| Paula Retzler | USACE | 215-656-6787 | paula.l.retzler@usace.army.mil |
| Frank Master | USACE | 215-656-6590 | frank.r.master@usace.army.mil |
| Roy Denmark | USACE | 215-656-6505 | roy.e.denmark@usace.army.mil |
| Anthony DePasquale | USACE | 215-656-6720 | anthony.j.depasquale@usace.army.mil |

## I. Review Minutes from October 14, 2008 PCT Meeting

The minutes from the PCT meeting #3 were reviewed. Comments will be provided electronically BJ Clark to Paula Retzler.

## II. Status of Action Items from October 14, 2008 PCT Meeting:

### A. Design Team Activities Update

○ Dredging Quantity QA/QC Memo Report Findings

A draft QA/QC memo report was completed by GBA on November 3, 2008. Subsequently, the report was provided to PRPA and Corps. A schedule/cost team meeting was held on November 14, 2008 to go over the findings of report. From that meeting, it was determined that Corps will obtain new hydrographic data survey data for the Reach A wideners as the available data was taken in the 1990's. In addition, it was agreed that the dredging quantities needed to be distinguished (i.e., authorized 40-foot maintenance quantities versus the initial quantities for the 45 foot project).

As a result of the meeting, GBA and the Corps came to an agreement that the quantity of material to be dredged in the Deepening Project template is 15.0 MCY, not including the bend wideners in Reach, A which are to be surveyed by the Corps by November 21, 2008. The volume remaining in the Reach A bend wideners is currently estimated between 0.6 MCY and 1.5 MCY. This results in a total dredging quantity for the Deepening Project ranging between 15.6 and 16.5 MCY, which will be determined once the new Reach A bend widener surveys are completed. Once the new surveys are completed, they will be provided to GBA to finalize the quantities and completion of the final report.

○ Schedule/Cost Completion

Once the QA/QC memo report is finalized, the schedule/cost team will proceed to prepare a schedule and cost for the project employing the current environmental windows with no fiscal constraints. The target for preparing a first cut schedule/cost was set by the meeting of the next PCT mtg., December 16, 2008.

○ Air Mitigation

The air mitigation team met on several occasions to develop a plan of action to move forward on the development of air conformity mitigation plan. The 2004 air conformity report that was prepared by Moffat and Nichol Engineers for the Corps was extensively reviewed by the team and served as the basis for preparing a scope of work. At this point, Paula Retzler stated that the scope of work has been prepared for Moffat and Nichol to update the 2004 report considering current requirements. The cost for this scope is estimated at $100,000.

Mr. Blackburn requested that PRPA be given the opportunity to undertake all future efforts associated with the development of air mitigation plan(s). PRPA would use available on call contractors to perform the work and would ask for credit towards the non-Federal cost share under Section 308. This approach was agreeable to by the Corps. Paula Retzler will provide the current Moffat and Nichol scope of work to Lisa Magee. The scope of work will be modified by Lisa Magee along with a cost estimate and will be submitted to Corps for their review.

- Rock Survey Contract

The Corps has prepared a scope of work to use an A-E firm to re-confirm the rock quantities for blasting (currently estimated at 77,000 cubic yards) using a state of the art technology that has been recently employed for a project in the Corps Jacksonville District. The estimated cost for the survey contract is $135,000. Tony DePasquale indicated the end product from this effort would be a QA/QC report.

It was pointed out that due to the rock blasting windows, the earliest time that a contract for rock blasting can be initiated would be in December 2009. Therefore, an approach is needed that would outline what is needed to prepare Plans and Specifications. Toward that end, it was decided that a Rock Planning Group (RPG) be created to review all the available information/data and along with the current scope of work. GBA has worked on numerous rock contracts with the most recent dealt with the Port of New York 50-foot deepening project and as such have a great deal of expertise in rock blasting. GBA was tasked to be part of the RPG and asked that the current survey scope be provided for their technical review. Paula Retzler will provide this scope to Steve Shaw. If there were no technical issues on the scope of work, then the survey contract (estimated at $135,000) can proceed to be awarded. The status of this effort will be reported at the next PCT mtg.

## B. Governor's Tri-State Advisory Committee

BJ stated that the sponsor intends to work with States of New Jersey and Delaware and the Corps of Engineers. The purpose of the committee is to agree upon a plan to develop beneficial uses for the material that is dredged and placed at federal sites identified in the signed PPA, which will minimize the effect of the Deepening Project on New Jersey.

The committee will be formed and meet once the dredged material is placed in authorized disposal placement sites. The committee role and tasks are:

- To determine the time frame and cost of removing the placed material for beneficial uses.
- Ensuring that any dredged material placed would be used beneficially to the maximum extent practicable in Commonwealth of Pennsylvania.

The placement plan associated with the Deepening Project would not change as a result of any committee actions. Furthermore, the creation of this committee is not a pre-condition to move the Deepening Project forward. A letter prepared by PRPA to the

Corps dated February 8, 2008 articulates the roles and responsibilities of this committee as well as the relationship to the Deepening Project. This letter discusses the role of the committee and its relationship to the Deepening Project and should be used in dealing with Corps NAD and HQ staff. Further, it was decided that this topic would no longer be discussed by the PCT.

### C. Escrow Agreement

The agreement has been signed by the Corps and PRPA and is being processed in Harrisburg.

### D. Accelerated Funds Progress

Frank Master indicated that the District provided responses to move the approval forward. Grady Bryant stated the importance of getting approval in a timely manner. The sponsor wants to start the project now and the Corps has no current funding. The sponsor would be kept abreast of progress, if there were any problems the Corps will inform the sponsor.

### E. Section 308 Crediting Process

It was acknowledged that a process need to be set up that is acceptable to all parties as we move forward.

Grady Bryant provided a draft Section 308 procedure to Paula Retzler. This draft procedure is still being coordinated with the sponsor. Below is the draft procedure.

- As established at the 14 Oct. PCT meeting, PRPA on a quarterly basis will provide to the Corps a list of work activities that it plans to undertake
- Prior to beginning a specific work activity, PRPA will provide a scope of work and a budgetary cost estimate to Corps for approval
- Corps will review scope of work to determine its eligibility for Section 308 credits
- The performance of Section 308 work shall be exclusively within the control of PRPA

Frank Master pointed out scopes of work and costs are needed for all the activities that the sponsor believes is eligible for credits as documented in the signed PPA. This would include all the activities associated with the Project Cooperation Team, which includes the Design team, and its subcommittees as well work activities that are necessary to implement the project.

### F. Corps' Placement of Supplemental Environmental Data on Website

After numerous discussions, it was decided that no action should be taken on posting the supplemental data until a position on performing additional environmental studies is reached. The decision is expected on November 24, 2008 as discussed at the November 14, 2008 meeting.

### G. Meetings

- November 14, 2008 Meeting

Representatives from the Corps (Philadelphia District and New York Regional), sponsor (accompanied by legal and technical staff) and a representative from Senator Specter's office attended the meeting. The main purpose of the meeting was to reach a position on the need for conducting additional environmental studies such as an Environmental Assessment (EA). Toward that end, legal counsel made a power point presentation, which summarized the history of environmental analyses performed for the project, current project, regulatory requirements and case law on the NEPA process.  It was emphasized that project impacts have been reduced since the project was authorized. The presentation concluded that there are no requirements for additional NEPA documentation.  It was stated that the final decision on doing an EA would be made by Mr. Woodley of the ASA office.

- Senator Specter Meeting

At this point this meeting has not taken place. However, if there were a meeting, it would occur with ASA prior or on November 24, 2008 to discuss the decision on the need for preparing an EA.

### H. Status of Responses to Outstanding Letters

- State of Delaware Congressional and NJDEP — Commissioner Jackson

No formal responses were made. Corps will wait for a decision on EA from ASA and will then prepare responses. As per Colonel Tickner's agreement with Mr. Estey – Chairman of PRPA Board, responses will fully be coordinated with the sponsor.

## III. Issues Needing Immediate Resolution

### A. DNREC Permit Options

DNREC is still investigating options on how to proceed forward. It appears to be strictly a legal issue on DNREC's part in moving forward. It was noted that DNREC canceled a meeting that was scheduled with the Corps for November 3, 2008 to go over environmental details of the permit.

### B. NJDEP Issues

In letters to the Corps, Commissioner Jackson provided a list of NJDEP concerns on the project. Corps will prepare a response after the decision is reached on EA.

In addition, NJDEP attorney office has sent a FOIA request to the Corps asking for specific information on the project dating back to 1992 when Congress authorized the project for construction. The Corps has gathered all the available files and will make it available to NJDEP lawyers on November 21, 2008. The Corps is creating an administrative record. A lawyer representing the sponsor will be present at the Corps office on November 21, 2008 when NJDEP lawyers are reviewing the Corps files.

## IV.  Status of 306 Authority Guidance

Corps HQ will provide guidance to the District by end of November 2008.

## V. Other Items

Two additional items were brought up for discussion and subsequent follow-up actions.

- ○  Economic Stimulus

Congress is preparing an economic stimulus package for consideration. As part of this stimulus package construction costs for the Deepening Project can be included. It was stated that would be very useful if the Corps inquiry what is the criteria and guidance for including funds.

- ○  O&M 2009 Budget – Philadelphia to Sea Project

It was requested that Tony DePasquale check the funds that are budgeted by the District for the regular maintenance of the 40-foot Delaware River Project. This would be very useful in the preparation of the Deepening Project contracts. Tony DePasquale will provide this information at the next PCTmtg.

## VI. Action Items, Task Assignments and Responsibilities

- ○ Corps: Obtain hydrographic survey for wideners in Reach A
- ○ GBA: Finalize the QA/QC memo report once Corps provides hydrographic survey data in Reach A and any comments on the draft memo report
- ○ Corps/PRPA: Schedule/Cost team to develop a first cut of project schedule/cost
- ○ Corps: Provide the air mitigation scope of work to PRPA
- ○ Corps: Provide the rock blasting scope of work to GBA
- ○ Corps/PRPA: Establish a Rock Planning Group
- ○ Corps:  Continue tracking progress of Acceleration of Funds
- ○ PRPA: Provide the Section 308 guidance process to Corps
- ○ Corps:  Place Supplemental Environmental Data on Website- after decision on EA is reached
- ○ Senator Specter Meeting with Secretary Woodley –November TBD
- ○ Corps: Provide responses to Delaware Congressional delegation letter and NJDEP letters from Commissioner Jackson – after decision on the EA is reached.
- ○ Corps: Provide Section 306 guidance - end of November
- ○ Corps: Provide guidance and criteria for including funds for Economic Stimulus
- ○ Corps: Provide 2009 0&M Budget and associated work activities
- ○ PRPA to prepare minutes

## VII. Time and Location of Next Team Meeting

December 16, 2008 1:00 p.m. at PRPA Office

Minutes prepared by GBA

Exhibit 19

## Delaware River Main Channel Deepening Project
## Project Coordination Team Meeting #6

### Draft Minutes

#### January 28, 2009

**Date of Meeting:**  January 23, 2009

**Place of Meeting:**  Corps of Engineers, Wanamaker Building

**Attendees:**

| Name | Office | Telephone | Email |
|------|--------|-----------|-------|
| B.J. Clark | PA Governor's Office | 215-965-1108 | roberclark@state.pa.us |
| Alex Ficken | PA Governor's Office | 215-965-1113 | aficken@state.pa.us |
| Kate McNamara | PA Governor's Office | 215-965-4276 | kamcnamara@state.pa.us |
| Jamie McDermott | PRPA | 215-426-2600 | jmcdermott@philaport.com |
| Bob Blackburn | PRPA | 215-426-2600 | rblackburn@philaport.com |
| Don Brennan | PRPA | 215-426-2600 | dbrennan@philaport.com |
| Lisa Magee | PRPA | 215-426-2600 | lmagee@philaport.com |
| Nick Walsh | PRPA | 215-656-6560 | nwalsh@philaport.com |
| Bob Callegari | GBA | 215-425-6283 | rlcallegari@gba-inc.com |
| Grady T. Bryant | GBA | 813-477-6541 | gbryant@gba-inc.com |
| Steve C. Shaw | GBA | 410-682-5595 | scshaw@gba-inc.com |
| Stan Lulewicz | GBA | 215-425-6283 | slulewicz@gba-inc.com |
| Paula Retzler | USACE | 215-656-6787 | paula.l.retzler@usace.army.mil |
| Anthony DePasquale | USACE | 215-656-6720 | anthony.j.depasquale@usace.army.mil |
| Roy Denmark | USACE | 215-656-6505 | Roy.e.denmark@usace.army.mil |
| Frank Master | USACE | 215-656-6590 | Frank.R.Master@usace.army.mil |

Formatted: Font color: Auto

### I.  Minutes of November 17, 2008 Meeting –

The minutes from the PCT meeting from December 16, 2008 were handed out. The
minutes incorporated comments that were provided by the sponsor.

1

II. Status of Action Items from December 16, 2008 PCT Meeting

A.  Design Team Activities Update

○  **Overall Project Schedule.** At the request of the Corps vertical team, Philadelphia District Corps of Engineers prepared a schedule of required tasks starting in December 2008 to initiate construction. This schedule was handed out at the meeting (See attachment #1). It was noted that the sponsor was not involved in the preparation of this schedule. The schedule shows an award of the first contract in December 2009. The award date was based on the assumption that the completion of the Biological Assessment of the Endangered Federal Species and subsequent consultation with the National Marine Fishery Service (NMFS) is the critical task and must be completed and included in the finalization of the Environmental Assessment (EA) that is currently being prepared by Philadelphia District. It was noted that Biological Opinion is scheduled for completion in May 2009 with the finalization of the EA in June 2009. The schedule also shows tasks on reaching resolution on issues raised by NJDEP, State of Delaware permit, update of air conformity, economic update, etc. NJDEP concerns and State of Delaware permit need to be resolved in a timely order to award the first contract.

It was pointed out that based on the meeting that was held in early December 2008 with Mr. Woodley, Corps HQ staff, Attorney General Counsel, Pa Governor's staff, and Congressional delegation was that the understanding was that EA would be completed by January 15, 2009 and provided to Mr. Woodley and the coordination with NMFS would continue on a parallel path (i.e. it would not be linked to the EA) and would not be required to complete/finalize the EA. Furthermore, it was the understating that the Biological Opinion coordination/consultation would continue (as is the case for the existing Delaware River 40-foot project) as a separate parallel task. Since the comment period on the Corps Public Notice was extended by two weeks to January 14, 2009, the EA needs to be completed by end of January 2009 and submitted to Mr. Woodley. Furthermore, the comments received on the public notice would not be included as part of the EA but it would be responded separately.

In view of the above clarifications/misunderstandings, it was agreed that the attached schedule would be reviewed by the District to incorporate the above.

2

○   **Schedule/Cost Completion.** The schedule/cost team held several meetings to review the Corps cost update and schedule of the deepening project. A copy of the schedule and costs developed by the team was provided at the PCT meeting and is included as attachment #2. The update considered the following.

     1. The most efficient way to construct the project based on the updated initial dredging quantities of 16 million cubic yards as per GBA's QA/QC report prepared on January 6, 2009.
     2. Imposing the existing environmental window constraints.
     3. Sponsor's request of awarding a contract in summer of 2009 with no placement in State of New Jersey.

The schedule showed the award of a contract in Reach C in August 2009 with completion in February 2010. A hydraulic dredge will be employed, as there are no environmental windows for hydraulic dredging in this Reach. The silt material would be placed at the Corps' Kilcohook disposal area located within State of Delaware and the sand at Reedy Point South in the State of Delaware. It was stated that the most efficient and least costly option is to place all the material from Reach C at the Killcohook site. Using Reedy Point South for placement of sand would cost an additional $2 million, which would need to be borne entirely by the sponsor. It was suggested that the Corps advertise the contract that allows the contractor to bid the job using hydraulic or hopper dredge then based on the bid decide on the dredge plant and any incremental costs. It was noted that hopper dredging in this reach has an environmental window, which allows dredging to be performed in December to May while there are no windows for hydraulic dredge. The team will further explore this after the completion of the EA as we move forward towards the award of the contract.

The prepared schedule called for awarding of eight construction contracts over five federal fiscal years (note fiscal year starts on 1 October and ends on 30 September) at a cost of about $234 million. It was stated by the Corps that the schedule of contracts beyond the first year of construction is flexible. A map was provided which showed the placement plan for each of the contracts. This map is attached.

○   **Air Mitigation.** The air mitigation team will use the above project schedule and will focus on preparing an air conformity plan for the first year of construction. Corps will provide the type of equipment that would be used for the first contract to Lisa Magee. Lisa Magee will schedule a meeting during the week of January 26, with EPA Region III to discuss the likely purchase of credits to meet conformity mitigation requirements in the first year of construction and reach agreement on a phased approach of developing an air conformity plan for the balance of the project as the project is being constructed. Based on that meeting, a decision will be made on using Moffat & Nichol in performing any updates on the previously prepared air conformity mitigation plan. Once meetings are held with Region II and III regarding credits, follow-up meetings will be scheduled with the States of New Jersey, and Delaware and the Commonwealth of Pennsylvania. It was noted that Pennsylvania has no SIP plan in place.

3

○   **Rock Survey Contract.** The schedule for this contract is shown as attachment #3. The schedule calls for award of the survey contract on January 30, 2009. A telephone conference was scheduled for January 26, 2009 to discuss Corps and GBA's role and work activities in established the rock blasting team. GBA has significant rock blasting experience and the sponsor has requested that GBA be part of the Rock Blasting Group in preparing the plans and specs for the rock blasting/removal contract. GBA through PRPA will submit a scope and cost estimate to show how they plan to participate in the performance of this work.

## B.  Other Items

○   **Biological Assessment.** An assessment responding to National Marine Fishery Letter of December 30, 2009 was prepared by the Corps and submitted to National Marine Fishery on 1 January 21, 2009 for consultation. The consultation clock of 135-days will start once NMFS determines that that the assessment is complete. Corps will work closely with NMFS to expedite the period of review. A copy of the assessment will be provided to the sponsor.

○   **Environmental Assessment.** The District is in the process of preparing an Environmental Assessment. A draft of the EA was completed during the week of January 12, 2009. District internal staff is making their review as well as the sponsor. Sponsor comments have been provided. District received about 150 letters from Federal and State agencies, stakeholders, environmental groups, and citizens on the December 17, 2008 public notice. Copies of the comment letters were provided to Mr. Woodley as well as to Corps HQ and sponsor. At this point, the District does not intend to respond to these individual letters as part of the EA but it will review the comments and incorporate information or discussion in the EA so that these comments are indirectly addressed. It was pointed out the NJDEP comment letter would require a district position (technical issues, Governor's agreement, and federal sovereignty) on how to respond to concerns raised and to develop a path to move forward. Once this is prepared, a meeting should be held between the district commander and acting NJDEP commissioner to establish a mutually acceptable approach to resolve the issues or concerns. A meeting will be held on January 29, 2009 with the Corps of Engineers to go over the status of the EA and establish a path forward in competing the EA in a timely manner for Mr. Woodley's review.

○   **Accelerated Funds Progress.** The approval process is moving slowly and at this point it has not reached the ASA office. HQ has been asking detail questions on the project schedule, etc. Sponsor will follow-up with Mr. Woodley and HQ to see what is the hold up.

○   **Escrow Agreement.** The final escrow agreement is due back from Harrisburg.

○   **Section 306 Guidance.** The Corps is still waiting on HQ to provide formal guidance. Based on recent coordination, guidance should be forthcoming shortly.

Towards that end, HQ asked for a copy of the most recent project schedule that shows the funding requirements. Frank Master will continue to monitor progress and provide progress updates.

o   **Section 308 Crediting Process.**   The crediting process was extracted from the signed PPA and provided as attachment #4. The District requested that the sponsor review the process and provide comments. The process needs to be finalized as credits for work items such as review of dredging quantities, air mitigation, rock blasting, PCT, Design Team meetings as well and sub-committee meetings, etc will be requested by the sponsor

## C.  Corps' Revised Budget for FY 09-11.

The budget follows the project schedule and cost as presented in attachment #2.  That schedule calls for funds to be provided as follows:

- o   FY 2009 -$24 million
- o   FY 2010- $30 million
- o   FY 2011-$65 million

## D. DNREC Permit

On December 30, 2008, the Corps received a letter from Secretary Hughes Department of Natural Resources and Environmental Control (DNREC) regarding the Corps' December 17, 2008 Public Notice on the Delaware River Deepening Project.  That letter asks the Corps to re-submit a new permit application.  In addition, it contained an attachment of specific comments that needed to be addressed as part any Corps environmental update or coastal zone consistency.

The sponsor intends to prepare a response to the above DNREC letter.  Once a response is prepared it will be coordinated with the Corps before being sent.

The sponsor's legal staff will meet with Corps district staff to discuss legal options to proceed forwarded in view of the above letter.  The language contained in the PPA regarding the permit will be revisited to define the timeframes of the clause.

## III. Action Items, Task Assignments and Responsibilities -

- Corps: Review the Overall Project Schedule as shown in Attachment#1.
- PRPA: Set up a meeting with EPA to initiate efforts on air conformity.
- Corps: Provide PRPA with Year 1 equipment list for use in Air Mitigation planning.
- Corps: Provide PRPA with copy of draft EA and NMFS Biological Assessment.
- Corps/GBA: Hold a rock survey contract/team teleconference call on January 26, 2009
- Corps/PRPA: Hold a meeting on January 29, 2009 to go over the EA and to expedite its completion
- PRPA: Coordinate with Mr. Woodley's office, Corps HQ on the status of approval for accelerated funds
- Corps: Continue to check progress on guidance on HQ 306 credits.
- PRPA: Review the attachment for 308 credit approval and provide comments.
- PRPA/GBA: Prepare a draft response to DNREC's December 30, 2008 letter and coordinate with Corps
- PRPA/Corps: Lawyers to meet at Corps District office to discuss legal options on DNREC permit

## IV. Time and Location of Nest Team Meeting

- February 13, 2009; 1:00 at the PRPA Main Conference Room

Minutes prepared by GBA

6

Exhibit 20

# Delaware River Main Channel Deepening Project
## Project Coordination Team Meeting #7

### Draft Minutes

**March 3, 2009**

**Date of Meeting:** February 13, 2009

**Place of Meeting:** PRPA

**Attendees:**

| Name | Office | Telephone | Email |
|---|---|---|---|
| B.J. Clark | PA Governor's Office | 215-965-1108 | roberclark@state.pa.us |
| Alex Ficken | PA Governor's Office | 215-965-1113 | aficken@state.pa.us |
| Jamie McDermott | PRPA | 215-426-2600 | jmcdermott@philaport.com |
| Jack Dempsey | PRPA | 215-426-2600 | jdempsey@philaport.com |
| Bob Blackburn | PRPA | 215-426-2600 | rblackburn@philaport.com |
| Don Brennan | PRPA | 215-426-2600 | dbrennan@philaport.com |
| Lisa Magee | PRPA | 215-426-2600 | lmagee@philaport.com |
| Nick Walsh | PRPA | 215-656-6560 | nwals@philaport.com |
| Bob Callegari | GBA | 215-425-6283 | rlcallegari@gba-inc.com |
| Bill Gahagan | GBA | 215-425-6283 | wgahagan@gba-inc.com |
| Grady T. Bryant | GBA | 813-477-6541 | gbryant@gba.inc.com |
| Steve C. Shaw | GBA | 410-682-5595 | scshaw@gba-inc.com |
| Stan Lulewicz | GBA | 215-425-6283 | slulewicz@gba-inc.com |
| Paula Retzler | USACE | 215-656-6787 | paula.l.retzler@usace.army.mil |
| Anthony DePasquale | USACE | 215-656-6720 | enmark.j.depasquale@usace.army.mil |
| Mike Arabatzis | USACE | 215-656-6505 | Minas.m.arabatzis@usace.army.mil |
| Roy Denmark | USACE | 215-656-6505 | Roy.e.denmark@usace.army.mil |
| Frank Master | USACE | 215-656-6590 | Frank.R.Master@usace.army.mil |

## I. Minutes of January 23, 2009 Meeting -

The minutes from the PCT meeting from January 23 were discussed for possible revisions. There were none, however if any revisions are noted after the meeting they should be e-mailed to GBA (Callegari).

## II. Status of Action Items from January 23, 2009 PCT Meeting

- **Corps - Review the Overall 1st Year Project Schedule (attached):** The overall schedule was discussed and Grady Bryant explained that he will accompany BJ Clark and Alex Ficken to a meeting on Wednesday (February 18) with Mr. Woodley, Governor Rendell, Senator Specter, Wes Coleman and Craig Smouder. The meeting will be nontechnical. They will discuss the following:
  - requirements for the EA (FONSI, etc),
  - DNREC Permit; as the definition of "timely" in the PPA is defined once the first construction contract is announced in the FedBizOpps
  - Status of accelerated funds and 306 credits
  - Stimulus bill/1st contract shovel ready

  The first year overall schedule shows the EA and NMFS preparation. The NMFS 135 day required review started on February 9; 1st Year Project Schedule should show this start. The Corps is still waiting on the official start of the Essential Fish Habitat review of 90 days. The environmental window shown on the 1st Year Project Schedule implies that the window starts on July 1; revisions should be made to show the environmental window continuous throughout the year. This 1st Year Project Schedule will be taken to Mr. Woodley's meeting by Grady with annotated revisions. The 5-year scheduled will not be taken.

  The 1st Year Project Schedule shows Award/NTP of Reach C contract in August 2009. It was requested by GBA that one month be allowed to complete plans and specs (end of March), then advertise as early as April with an award in mid-May, because there is no environmental window constraint. The Corps explained that the cost estimate and schedule for Reach C is based on most efficient dredging due to area shoaling in August and cost savings by combining work with the O&M contract. The Corps can issue the FedBizOpps after the EA is posted. The O&M contract may be scheduled so that the overall contract can be awarded earlier, however the work in Reach C will occur in August.

  The 5-year schedule was looked at. Looking beyond the EA the Corps explained that there are still critical major issues in the way of construction start, such as air mitigation and the DNREC permit.

- PRPA - **Review the attachment for 308-credit approval and provide comments:** PRPA/GBA reviewed the Corps' *308-credits Approval Process and Required Documentation* prior to this meeting. Lisa Magee gave out a revised *308-credits Approval Process and Required Documentation* for the Corps consideration.

- PRPA - **Prepare a draft response to DNREC's December 30, 2008, letter and coordinate with Corps:** A draft response has been provided to BJ for PRPA's signature. The Corps will review and provide comments prior to any letter going out.

- PRPA/Corps - **Lawyers to meet at Corps District office to discuss legal options on DNREC permit:** Corps to coordinate this meeting.

### III. Design Team Activities Update

- **Air Mitigation Status (Moffatt & Nichol Scope of work attached)** – A meeting will be scheduled for PRPA and Corps to discuss path forward on air mitigation work. Moffatt & Nichol is ready to start first phase of air emissions calculations under contract with the Corps. Region III has determined that they will be the lead EPA Agency to work on the air mitigation work. Research by the Corps on buying air emissions credits has shown a current price per ton of $10,000 to $15,000. This must be budgeted into the 1st year contract to ensure proper funds are in place.

- **Rock Survey Contract** – The equipment to start the survey are currently going through customs. Work is scheduled to start February 23. Once survey is completed and report finalized, GBA will be the Independent Technical Reviewer (ITR) for all rock removal plans and specs.

- **Updated Cost Estimate (attached)** – The Initial Project Cost Table is based on the layout of the contracts in the 5 year schedule with costs shown at initial and to the mid-point of construction for each contract. The total GNF to Mid-Point, excluding Local Service Facilities (LSF), is $314 million. Frank explained that the Economic Update of 2008, compared to the current 2009 Report, is showing a saving of $80 million due to the lower dredged material quantities and lower fuel costs. Fuel is currently ~ $3.07/gal.

- **Updated Cost Sharing Table (attached)** – The Federal/Non-Federal Allocation of Funds Table is also based on the 5 year schedule. It shows the final project costs for Federal = $204 million and Non-Federal = $151 million. The O&M costs are still be prepared.

- **GBA and PRPA to be part of Dr. Checks** – GBA and the Corps will ensure all registration is complete in Dr. Checks to ensure all ITR comments will be entered there.

## IV. EA –

- BA – NOAA accepts package and 135 day review starts on February 9th per email from NOAA. NMFS recognizes that Corps needs an expedited, complete review.
- EFH - not yet known if accepted without more information.
- EA to be complete by end of February with concerns from letters incorporated.
  - Normal process is to include each letter in the EA with its letter response.
  - Corps intends to answer each letter after the EA is posted.
  - Corps' path forward is to post EA then meet with States and Agencies.
  - Corps needs direction on EA now; no public review, no FONSI, etc.

## V. DNREC Permit –

- DNREC issues:
  - In March a new Secretary of DNREC should be announced. So far no word of the Secretary has been heard. The Corps will call DNREC to try and determine if a name is available for the new Secretary.
  - DNREC did send an economic question to Mike and an answer was provided. GBA asked that economic type questions should be reviewed by PRPA in the future prior to issuing.
  - There has been no response by Delaware's Attorney General Office to the law suit filed against DNREC for not issuing an answer to the Corps' request for the DNREC permit.

## VI. New Co-Chair of the Project Coordination Team (PCT) –

B.J. Clark is resigning as Co-chair of the PCT. His replacement is Alex Ficken of the PA Governor's Office. Alex has been very involved in this project and will be a very knowledgeable replacement as a Co-chair.

## VII. Action Items, Task Assignments and Responsibilities -

- Minutes of the PCT Meeting #7 will be prepared and sent digitally by Corps for review by the attendees.
- Corps to change 1st year schedule to show continuous hydraulic window & take Reedy Point out; also to show clock start on Biological Assessment
- Alex to complete DNREC response – draft from PRPA, then Corps review
- Roy to contact DNREC to determine status of assignment of new Secretary
- PRPA & GBA to enter into Dr. Checks
- PRPA to submit scopes and estimates for GBA proposed work.
- Corps to complete EA by end of February
- Corps to provide draft EA to PRPA.
- Air Mitigation Meeting between PRPA and Corps
- Cost Estimate for Reach C to be discussed

## VIII. Time and Location of Next Team Meeting -
- March 16, 2009; 1:00 at the Corps, Main Conference Room, 6th Floor

Minutes prepared by Corps

# Exhibit 21

Exhibit 22



December 4, 2001

Public Hearing Officer
c/o William Moyer
Wetlands and Subaqueous Lands Section
DNREC
89 Kings Highway
Dover, DE 19901

Dear Mr. Moyer,

The Delaware Riverkeeper Network would like to submit the following comment regarding the application for a Delaware Subaqueous Lands Act Permit submitted by the Army Corps of Engineers (Corps) for the proposed Delaware River main channel deepening project. Based on the information provided by the Army Corps in its permit application, subsequent materials, and other materials on the public record, the proposed project fails to provide economic benefits to the State of Delaware and threatens Delaware's natural resources as well as the recreation and aesthetic enjoyment of these resources. Therefore, the requested permit should not be given.

The Delaware Riverkeeper Network is part of the Alliance to Dump the Delaware Deepening, an Alliance of over 23 local, state, regional, and national organizations opposed to this project. I would like to go on the record stating that while our comments will focus on a few limited aspects of the permit application, we endorse, support and sign on to the comments being made by other members of the Alliance.

**The Corps has failed to demonstrate that the proposed blasting will not jeopardize the federally endangered shortnose sturgeon that live in the Delaware River.**

The permit application, supporting materials, and subsequent response documents submitted by the Army Corps of Engineers claim that the rock blasting which would be associated with the deepening project, as well as the dredging that will take place, will not jeopardize the continued existence of the Delaware River population of shortnose sturgeon. They claim they will not be "engaging in an action that reasonably would be expected, directly or indirectly to reduce appreciably the likelihood of both the survival and recovery of the listed species in the wild by reducing the reproduction, numbers or distribution of that species." The Corps has utterly failed to prove this claim.

In fact, the project as proposed, without additional research, information and study, does threaten areas that are biologically productive and critical to the life history of the Delaware River's population of shortnose sturgeon.

DELAWARE RIVERKEEPER® NETWORK - *with offices on the main stem Delaware, in the Schuylkill Watershed and in the Delaware Estuary*
PO Box 326 ▫ Washington Crossing, Pennsylvania 18977-0326
Phone: 215-369-1188                                Fax: 215-369-1181
drn@delawareriverkeeper.org        www.delawareriverkeeper.org              Page 1 of 16
*An American Littoral Society Affiliate*                    Delaware Riverkeeper Network Comment

Even despite the fact that the Corps received a biological opinion from the National Marine Fisheries Service (NMFS) which found that the blasting phase of the project could move forward without jeopardizing the continued existence of the Shortnose Sturgeon in the Delaware River, we believe the Corps has failed to demonstrate this is in fact the case. It is important to note that the NMFS biological opinion was issued based primarily upon information provided them by the Corps, according to their biological opinion documents.

The Corps used opinion and educated guesses as the basis for their assertion that the rock blasting, and indeed the deepening project as a whole, would not significantly impact the shortnose sturgeon population living in the Delaware River. A closer look at the record demonstrates that most of the Corps conclusions and assertions regarding their claim that they will not significantly impact the shortnose sturgeon are based on supposition and opinion, and are not based on scientific study or documentation. Even the leading expert whose opinion is the basis for much of the Corps assertions, believes there is not enough science or knowledge to support Corps claims that the blasting and deepening will not impact the Delaware River shortnose sturgeon: "How does one protect the young, one of the critical early life history stages for which preciously little is known from any system? Where and when are the young in the Delaware Estuary? I have provided an educated guess, but without reproducible field documentation it is only a surmise and when dealing with an endangered species that is not enough upon which to base any project." *(Letter, John C. O'Herron, II to John Brady Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)*

We are not seeking to assert here that we know, with a certainty, that the proposed blasting or deepening will impact the shortnose sturgeon population, but we are asserting that the Corps has utterly failed to demonstrate that there will not be significant impacts that jeopardize the Delaware River's shortnose sturgeon population. The record clearly demonstrates that the proposed blasting operations might in fact have significant and serious impacts on juvenile sturgeon and thus have serious ramifications for the population as a whole. At the very least, the record clearly demonstrates that more research is needed to draw a final conclusion on this issue.

✓ "Juvenile shortnose sturgeon may also be in the action area during blasting. Although no scientific research has determined the distribution and/or nursery habitat of juveniles in the Delaware River, in the other river systems, juveniles aggregate just on the fresh side of the oligohaline/fresh water interface. In the Delaware River, this interface ranges from approximately Wilmington, Delaware to Philadelphia, Pennsylvania. As a result, O'Herron (2000, pers. Comm.) believes that juveniles could range from Artificial Island through the Schuylkill River, concentrating closer to the downstream boundary during the winter when fresh water input is greater. Based on this information, it is quite possible that they may be present in the action area and thus could be adversely affected by blasting." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01)*

✓ "This data applies to adult shortnose sturgeon; the location of the juvenile shortnose sturgeon is not known, but is believed to be on the fresh side of the oligohaline/fresh water interface (0.5 ppt) (O'Herron, 2000). *(Army Corps, Biological Assessment: Effects of Rock Blasting the Shortnose Sturgeon, May 2000.)*

✓ John O'Herron, one of the leading experts on the Delaware River population of shortnose sturgeon makes clear "… no assumption can be made that shortnose sturgeon will not be present during blasting operations at Marcus Hook." According to O'Herron, "the wintertime occurrence of young and adult shortnose sturgeon between Cherry Island Flats (River Mile 73.5) and Little Tinicum Island (River Mile 85.5) has never been assessed …" *(Letter, John C. O'Herron, II to John Brady Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement)*

✓ "The proposed project will require dredging in the presumed area of greatest young shortnose sturgeon occurrence for an extended period of time. The impact will be chronic and acute. A *no impact* conclusion is inappropriate until the temporal and spatial occurrence of these young has been clearly documented and it is demonstrated that the project can be accomplished without jeopardy to the species. Loss of an indeterminate number of young constitutes jeopardy to the species, until such time as provision to safeguard the young are put in place. It is impossible to conduct this project with a lack of knowledge regarding the whereabouts of the young and at the same time guarantee no negative impact/jeopardy to the Delaware Estuary's shortnose sturgeon population." *(Letter, John C. O'Herron, II to John Brady, army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)*

The Army Corp, and even the National Marine Fisheries Service (NMFS) in its biological opinion approving the proposed blasting, admit that the data is _not_ present to ensure no significant impact to the shortnose sturgeon population. There are large data gaps surrounding juveniles; and what information is there actually suggests that juveniles are present and may overwinter in the area where the blasting is to take place.

The proposed blasting consists of 18 acres near Marcus Hook , PA, extending from river mile 76.4 to river mile 84.6. It has been speculated by the Corps, NMFS, and experts that the juvenile shortnose sturgeon are located near the oligohaline/freshwater interface (0.5 ppt), and therefore juveniles may range from river mile 54 to river mile 92. "Therefore, shortnose sturgeon may be present in the action area and may be either directly or indirectly affected by blasting operations." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).*

✓ "As mentioned previously, the distribution and abundance of juvenile shortnose sturgeon in the Delaware River has not even been documented or studied. It has been speculated that juveniles could range from Artificial Island (river mile 54) to the Schuylkill River (river mile 92), which includes the blasting area. Therefore, shortnose sturgeon may be present in the action area and may be either directly or

indirectly affected by blasting operations." (NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).

✓ "In the Delaware River, the location of the juvenile shortnose sturgeon is not known, but is believed to be on the fresh side of the oligohaline/freshwater interface (0.5 ppt). ... (O'Herron, 2000)." *(Army Corps, Biological Assessment: Effects of Rock Blasting the Shortnose Sturgeon, May 2000*

✓ "In the Delaware River, the oligohaline/fresh water interface can range from as far south as Wilmington, Delaware, north to Philadelphia, Pennsylvania, depending upon meteorological conditions such as excessive rainfall or drought. As a result, it is possible that in the Delaware River, juveniles could range from Artificial Island (river mile 54) to the Schuylkill River (river mile 92; O'Herron 2000, pers. Comm.). O'Herron (2000, pers. comm.) believes that if juveniles are present within this range they would likely aggregate closer to the downstream boundary in the winter when freshwater input is normally greater. However, due to a lack of data, the exact status of juvenile shortnose sturgeon in the Delaware River has yet to be determined. Hypotheses constructed about juvenile shortnose sturgeon distribution in the Delaware River have been based on comparisons of sturgeon in other river systems." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).*

✓ "The overwintering location of juvenile shortnose sturgeon is not known but believed to be on the fresh side of the oligohaline/fresh water interface (O'Herron and Able 1990). In the Delaware River, the oligohaline/freshwater interface occurs in the area between Wilmington, Delaware and Marcus Hook, Pennsylvania (O'Herron and Able 1990)." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).*

✓ "... blasting does have an adverse impact on fish." (NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).

✓ "... there is evidence that smaller fish are more vulnerable to injury than larger fish " Army Corps, Biological Assessment: Effects of Rock Blasting the Shortnose Sturgeon, May 2000

✓ Referring to shortnose sturgeon, NMFS stated: "... it is apparent from the study results that blasting may injure the species both internally and externally." (NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).

Despite the fact that the speculated location of juvenile shortnose sturgeon includes the blasting range, the Corps has used additional speculation to conclude that the shortnose sturgeon population will not in fact be in the blasting area and therefore their populations will not be jeopardized by the blasting actions. Whether you agree with their speculation or not, the fact of the matter is that the research, studies and data is not available to either confirm or deny this speculation. Everyone seems to agree on this fact.

✓ "Little is known about the movements of larvae and young-of-year shortnose sturgeon in the Delaware River and nursery habitat has not been identified." *(Army Corps, Biological Assessment: Effects of Rock Blasting the Shortnose Sturgeon, May 2000.)*

✓ "Due to the limited information on juvenile shortnose sturgeon, it is difficult to ascertain their distribution and nursery habitat (O'Herron 2000, Pers. Comm..)" *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).*

✓ "… it is possible that in the Delaware River, juveniles could range from Artificial Island (river mile 54) to the Schuylkill River (river mile 92; O'Herron 2000, pers. Comm..) O'Herron (2000, Pers. Comm..) believes that if juveniles are present within this range they would likely aggregate closer to the downstream boundary in the winter when freshwater input is normally greater. However, due to a lack of data, the exact status of juvenile shortnose sturgeon in the Delaware River has yet to be determined." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01.)*

✓ "However, little is known about the specific feeding habits of juvenile shortnose sturgeon in the Delaware River." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).*

✓ "This data applies to adult shortnose sturgeon; the location of the juvenile shortnose sturgeon is not known, but is believed to be on the fresh side of the oligohaline/fresh water interface (0.5 ppt) (O'Herron, 2000). *(Army Corps, Biological Assessment: Effects of Rock Blasting the Shortnose Sturgeon, May 2000.)*

✓ The Corps response document also quotes the NMFS February 2, 2001 Biological Opinion as stating: "Due to the limited information on juvenile shortnose sturgeon, it is difficult to ascertain their distribution and nursery habitat (O'Herron 2000, pers. Comm.) … As a result, it is possible that in the Delaware River, juveniles could range from Artificial Island (river mile 54) to the Schuylkill River (river mile 92; O'Herron 2000, pers. Comm..). … However, due to a lack of data, the exact status of juvenile shortnose sturgeon in the Delaware River has yet to be determined." *(Delaware River Main Channel Deepening Project, Supplemental Information to June 6, 2001 Public Workshop, August 2001.)*

In his 1997 letter, O'Herron expressed strong concern about the lack of data, and the dated information, the Corps used to support its finding of no significant impact. And, he expressed his belief that additional research needs to be done to confirm the various opinions and assertions expressed regarding young of year and shortnose sturgeon activities before the project moves forward.

✓ "The basic information (i.e. original research material) that was utilized in the document regarding shortnose sturgeon in the Delaware Estuary is not only dated (studies ended in 1987), but also does not reflect the current circumstances of shortnose sturgeon occurrence." *(Letter, John C. O'Herron, II to John Brady Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)* According to personal communications with Mr. O'Herron, this statement is still accurate.

✓ "Hence, it is necessary to learn (*learn anew*, not extrapolate from dated, non-targeted, geographically removed studies) about the seasonal movement patterns of shortnose sturgeon in the middle and lower estuary. The studies conducted in the upper estuary (essentially the tidal Delaware River upstream of Marcus Hook) can only hint at what occurs elsewhere in the estuary. To date, no one has resolved, or

even touched upon, the temporal and spatial occurrence aspects of shortnose sturgeon young (young-of-the-year and older juveniles) in the Delaware Estuary. The protection of this life stage(s) is critical to the survival of the population. There is every reason to believe that these young are to be found along the freshwater side of the oligo/mesohaline transition boundary within the federally maintained navigation channel. This puts the young at considerable risk, especially since they likely occur on a seasonal basis in the vicinity of Marcus Hook where both dredging and blasting are planned to occur." *(Letter, John C. O'Herron, II to John Brady Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)*

✓ "Shortnose sturgeon is the only federally listed endangered species that is virtually restricted in its occurrence to the federally maintained navigation channel and associated comparable depths from Trenton to below the Walt Whitman Bridge." "With this information one must recognize that the proposed dredging project will impact a great deal of shortnose sturgeon habitat in one fell swoop, and then again and again as needed to maintain the proposed additional five feet of project depth." *(Letter, John C. O'Herron, II to John Brady, Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)*

The Army Corps and NMFS both rely heavily on studies and personal communications with John O'Herron. In a February 15, 1997 letter from O'Herron to the Army Corps, Mr. O'Herron expressed serious concerns about the potential impact of this project on the shortnose sturgeon. While the Corps relies heavily on O'Herron's studies, private communications, and personal opinions to justify their project, when O'Herron communicated with them in writing expressing serious concerns directly about this project, the Corps reaction was one of complete dismissal. The Corps obviously considers O'Herron to be one of the leading experts on shortnose sturgeon in the Delaware River, and he is, that is why it is such a concern that they have not taken to heart his concerns. We hope the State of Delaware will.

According to NMFS "… the extinction of a single shortnose sturgeon population risks permanent loss of unique genetic information that is critical to the survival and recovery of the species…." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01)* And, "…the current Delaware River DPS of shortnose sturgeon is not considered to be at a sustainable level." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01).* The Delaware River population of shortnose sturgeon are important and in peril. We cannot afford to speculate, guess or rely upon opinions. The studies need to be done to tell us where the juveniles are located and whether or not the blasting will impact them.

In response to questions asked at the June 6, 2001 public workshop, the Corps once again admits that there is little to no information regarding juveniles in the Delaware estuary and uses this lack of information to support a conclusion that juveniles therefore are not located in the blasting reach of the river. In their August 2001 response document *Supplemental Information to June 6, 2001 Public Workshop*, The Corps

asserts that (1) because tagging studies published by O'Herron in 1993 show that the most heavily used portion of the river appears to be between river mile 118 below Burlington Island and the Trenton Rapids at river mile 137, (2) because a few juveniles were found in the early 1980's by O'Herron between Trenton, NJ and Petty Island (River mile 102); and (3) because "no other information on juveniles in the Delaware estuary exists" their conclusion that shortnose sturgeon do not heavily use the blasting area is proven/supported. But these assertions cannot be used to support that conclusion. With regards to point (1), the tagging studies found aggregations of adults in the upper reaches of the river, it did not provide data on juveniles and it did not show that juveniles did not aggregate between river miles 76.4 and 84.6. As to points (2) and (3), the fact that a few juveniles were found upstream of the blasting area and that there are no other studies on juveniles does not lead to a conclusion that therefore juveniles do not use the blasting area (river mile 76.4 to 84.6). This is simply faulty logic, in fact, there is no logic to this argument. The fact is that very little, if any, shortnose sturgeon targeted sampling has ever been conducted in the vicinity of the proposed blasting area and so no one really knows where the juveniles are and, only occasionally, where they are not.

The Corps also points to their May 2000 biological assessment as evidence that the shortnose sturgeon will not be impacted by the blasting. But the very paragraph they quote to make their point begins with "very little data exists about the location of juvenile shortnose sturgeon. In other river systems they are found upstream of the salt water-freshwater boundary. ... In the Delaware River, the location of the juvenile shortnose sturgeon is not known, but is believed to be on the fresh side of the oligohaline/fresh water interface (0.5 ppt)." They then go on to discuss the location of this line and a model the Corps used to predict its average location and in so doing once again admit "Although no information is available, the 0.5 ppt isohaline would likely be downstream of the November location during December through March since larger freshwater inflows enter the river during this period. Nevertheless, it is possible that juvenile shortnose sturgeon could be present in the vicinity of the blasting and could be impacted." *(Delaware River Main Channel Deepening Project, Supplemental Information to June 6, 2001 Public Workshop, August 2001.)* And the Corps had to admit that "The period from December through March was not explicitly modeled in either scenario. However, within the Delaware Estuary there is a well-established seasonal pattern for inflows to increase, and for the salt line to be displaced in the downstream direction, in the December to March interval. ... Note that these are long-term averages derived from over 50 years of daily inflow data, and that any particular year or season can have inflows that differ from the long-term average. Nevertheless, it is 'normal' for the Delaware River to experience increasing freshwater inflows during the November through March time frame, and to experience a downstream displacement of the salt line, even though we did not explicitly model this interval." *(Delaware River Main Channel Deepening Project, Supplemental Information to June 6, 2001 Public Workshop, August 2001.)* In response to questions the Corps seems to state that it did not run their 3D-hydrodynamic/salnity model that shows the location of the isohaline (0.5 ppt) during the key winter months. They provide drought information, August through November information and April and May runs. But I did not see any model runs during the period when actual blasting is intended to occur. And it seems highly

relevant that during the last several years this region has experienced various stages of drought, and therefore reduced freshwater inflows which are necessary to push the salt line further down river.

According to NMFS "Shortnose sturgeon in the action area may be adversely affected by the Delaware River Main Channel Blasting Project. However, the degree of the impact depends on the number of individuals in the action area." (NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01) And Mr. O'Herron points out that shortnose sturgeon in the Delaware Estuary are "very frequently found in aggregations ranging in numbers of a few to thousands…. The predisposition to occur in aggregations makes a large number of individuals vulnerable to negative impacts at any one place or time. So much so, that when one encounters a dead shortnose sturgeon the first question to ask is "how many others?", and not, "were there any others?"" (Letter, John C. O'Herron, II to John Brady, Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)   If the juveniles may be present in the blast zone, and they "very frequently" aggregate, large numbers of juveniles may be present in the blast zone when the explosions take place – the result would be tremendous impacts to the juvenile population, and therefore the whole population, of shortnose sturgeon in the Delaware River jeopardizing their continued existence.

It is asserted that one reason the sturgeon will not be found around the blast zone is because the "blast zone would be void of preferred sturgeon prey" (Corbicula manilensis).  It is also asserted that the blasting is unlikely to have a significant impact on the food source of shortnose sturgeon because their "favorite food source" Corbicula is wide spread in the Delaware Estuary.  We have yet to see the requested studies that support the assertion that Corbicula is the primary food source in the estuary portion of the River, particularly the area where the blasting is to take place.  And we have yet to see studies showing  that Corbicula occur at the same level in the blasting portion of the river as upriver.  If Corbicula is not found to be in the blasting portion of the river then we would want to know what food source is there and its role as a possible food source for shortnose sturgeon.

The Corps asserts in Delaware River Main Channel Deepening Project, Supplemental Information to June 6, 2001 Public Workshop, August, 2001, that it is in the process of conducting a study to obtain an estimate of the shortnose sturgeon population in the Delaware River and that this study will also include sampling for juveniles.    But this present study is only to provide a population estimate and is not designed to specifically locate where shortnose sturgeon are, where they go or what areas are especially important on an estuary and watershed basis.  We believe the current status of science and knowledge regarding shortnose sturgeon demands that we not only wait for this study to conclude but that additional studies on the location of the sturgeon population, particularly juveniles, including study of their habits, movements and important habitats, be conducted, completed and analyzed before the deepening project and associated blasting be allowed to move forward.

**NMFS conditions for protection of shortnose sturgeon are not enough....**
The measures being required to try and exclude shortnose sturgeon from entering the blast zone -- including scare charges, four sinking gillnets, and monitoring for schools of fish with sonar fish finders – are simply not enough. The Corps has yet to show that sinking gill nets can withstand the force or speed of the River which is very strong in this reach. And they have not demonstrated that sonar fish finders are effective at locating shortnose sturgeon. The Corps has not provided any documentation regarding these issues. While we agree with the Corps that gill nets have been used in fish studies in the Delaware River, our concern was about their use in this particular reach where the speed and force of the current is very high. Likewise, the Corps has not presented any studies to demonstrate that sonar fish finders can accurately locate shortnose sturgeon and would therefore be helpful in efforts to avoid blasting while sturgeon are in the blast zone – it is our understanding that they are not reliable in this regard.

With regards to the dredging operations, according to John O'Herron, the recommended dredging windows were not designed to protect the shortnose sturgeon, and are more geared towards fully-anadromous species (the shortnose sturgeon is potamadromous, is a resident of the Delaware River with a spawning migration that takes place within the system). "Shortnose sturgeon in the upper Delaware Estuary have demonstrated a strict affinity to the federal navigation channel and comparable depths ... If this behavior holds true, even in part, within the middle and lower estuary, then the dredging project will also acutely impact shortnose sturgeon habitat on a large scale." O'Herron is not confident that the search for shortnose sturgeon bodies in ongoing dredging activities accurately reflects the level of take by dredging hoppers. *(Letter, John C. O'Herron, II to John Brady, Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)*

The NMFS take limit of 2 sturgeon is simply not reasonable – the low quantity is reasonable, but the expectation that compliance can be monitored is not. First, NMFS points out that one would not expect all of the fish injured by the blast to float to the surface of the water, instead they talk about those that were killed or severely injured being captured in downstream channel nets. But, the studies also point out that many of the seriously impacted fish do not die immediately – "many of the fish that exhibited no outward signs of stress or physical discomfort had extensive evidence of internal damage. It would seem that this type of internal damage would be far more debilitating than it appeared to be. While sturgeon placed in holding tanks exhibited no greater long-term mortality (two months) than fish not exposed to blasting, Moser (1999) reported that many of the injuries documented would have likely resulted in eventual mortality." *(NMFS Biological Opinion, Delaware River Main Channel Blasting Project, 2/2/01)* As a result, many more fish may be "taken" but never identified as such, thus rendering the NMFS take limit a farce.

NMFS states that it is difficult to quantify the amount of shortnose sturgeon that will be incidentally taken from "harass, trap, capture, or collect" as a result of the sinking gillnets and therefore sets no limit associated with this activity. That is inappropriate. The result could conceivably be that the Corps wipes out hundreds of shortnose