sturgeon without any accountability as a result. Failure to set a limit is also problematic because the Biological Opinion states that if the level of incidental take is exceeded then consultation must be reinitiated. But, because no incidental take limit is established, this clause is rendered meaningless.

As part of the biological opinion, NMFS lays out a series of conservation recommendations, essentially asking for at least some of the research and the answers that are not now available for making a sound decision about potential impacts to shortnose sturgeon from the current proposal or future activities. We think Delaware should order that this work take place in advance of issuing a permit or allowing any blasting to take place. I will also point out that the Corps' position regarding these studies is that they are "...not required under the terms of the Biological Opinion..." *(July 1997 SEIS)*. So the Corps may never undertake this work.

**There are still outstanding questions on the public workshop record.**
I attended the public workshops held by the Army Corps a few months ago. At that hearing my organization and others asked many important questions, both orally and in writing. From the answers given to our questions regarding the shortnose sturgeon and from the materials presented as a result of the workshop it seems clear that the answer to most of those questions is, we don't have the research necessary to answer those questions or to back up our assertions regarding the shortnose sturgeon and the potential impacts of this project on their populations. Most of the responses cite the SEIS, the NMFS Biological Opinion, or the Corps' own documents which acknowledge that there is little data on juveniles in the estuary and the potential impacts of the blasting. Some of the Corps responses avoid providing direct answers or fail to answer questions altogether. For example,

- ✓ When asked "what studies does the Corps have to support the assertion that *Corbicula* is the primary food source in the estuary portion of the River, particularly the area where the blasting is to take place" the Corps says that *Corbicula* is considered to be the primary food source for shortnose sturgeon because of a 1985 study titled *"A Study of the Shortnose Sturgeon (Acipenser brevirostrum) population in the upper tidal Delaware River ..."* They did not reference any studies regarding the Delaware Estuary or the blasting site, which was the focus of our question.
- ✓ When asked "What studies do you have that sonar fish finders can accurately locate shortnose sturgeon?" the Corps says that the use of sonar is intended to detect schools of <u>any</u> fish. This response is troubling. The requirement regarding sonar fish finders was part of the NMFS biological opinion written regarding shortnose sturgeon, not just <u>any</u> fish. And considering that the entire biological opinion referenced is focused on shortnose sturgeon a reasonable person would read "schools of fish" in this document to be referencing schools of shortnose sturgeon. The Corps goes on to admit that there is little precedent for using acoustics to detect the presence of sturgeon. In fact there are no studies to support the suggestion that sonar fish finders can be used to detect shortnose sturgeon near the blast site to trigger a delay in blasting in order to prevent blasting impacts to the sturgeon.

These are just two examples of many. Almost all of our questions focused on obtaining the research, studies and data that would confirm the Corps assertions regarding shortnose sturgeon. The Corps has been unable to provide that information, in every instance, to our questions.

The Corps claims it will not jeopardize the shortnose sturgeon populations of the Delaware River, an already endangered species. Their responses to our questions can almost all be boiled down to a repeated and common theme – what little data we have suggests there may be an impact, but we don't have the data or studies to conclusively determine if there will be an impact, therefore we conclude that there is no information to demonstrate that we will jeopardize the population so we conclude there will be no significant impact.

The record reflects that the proposed blasting could have serious impacts on the Delaware River's population of shortnose sturgeon, and that at the very least the Corps has not been able to demonstrate that they will not have a significant adverse impact. Therefore the requested permit must be denied.

"...the gaps in knowledge regarding the temporal and spatial occurrence and use of the Delaware Estuary, from Philadelphia to the sea, by all free swimming life stages of shortnose sturgeon are as massive now as they were a century ago. Routine navigation channel maintenance dredging has likely been impacting shortnose sturgeon young since the advent of hydraulic dredging on the freshwater side of the oligo/mesohaline transition boundary. The dredging has certainly created and destroyed shortnose sturgeon habitat; not a mixed blessing since the shortnose sturgeon's affinity to the deepest water available in a given area subjects them to chronic negative impacts from dredging. The presentations within the ... draft supplemental environmental impact statement that indicate no impact/jeopardy to shortnose sturgeon as a consequence of the proposed channel deepening or that suggest the protective efficacy of the DBF&WMC dredging restriction are ill founded at best; because they are based upon a lack of knowledge, rather than upon facts that are consistent with the present day environmental conditions/quality of the Delaware Estuary. The gaps in knowledge need to be resolved in order to satisfactorily ensure that the proposed project will be conducted in such fashion that the rare (extremely so, relative to the other fishes of the Delaware Estuary) and the endangered shortnose sturgeon remains protected from negative impacts that will destroy its young and reduce its numbers thereby jeopardizing this species' continued existence." *(Letter, John C. O'Herron, II to John Brady, Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement.)*

With all of the conclusions NMFS made regarding lack of data, high potential for juveniles to overwinter in, around, and near the blasting zone, and the lack of studies cited for many of the opinions expressed, it is incomprehensible that they could make a finding that the proposed blasting "is not likely to jeopardize the continued existence of the Delaware River subpopulation of shortnose sturgeon." But, frankly, these fish don't belong to NMFS, and obviously don't mean as much to them as they do to us. These fish are part of our River system and we ask the State of Delaware to take the action

necessary to protect them. We ask you to deny any permit that allows the Corps to conduct the proposed blasting before they have conducted the studies and provided the data needed to support their contention that the shortnose sturgeon population in the Delaware River will not be jeopardized by this project.

NMFS has not taken the necessary steps to either protect the shortnose sturgeon or even to understand them – therefore we urge the State to do so.

**We question the continued focus and investment on the proposed Kelly Island mitigation.**
In *Supplemental Information to June 6, 2001 Public Workshop, August 2001*, the Army Corps explained that the "shoreline history at Kelly Island has been characterized by persistent erosion for at least the past century. ... this area has experienced one of the highest shoreline erosion rates of any location on Delaware Bay. The erosion rate at Kelly Island over the past century has averaged between 15 and 20 feet per year." With this in mind, and the likelihood that erosion will continue to be a persistent problem at Kelly Island, I question why so much energy and money is being focused on the Kelly Island restoration. Are we simply pressing for this project so the Corps has somewhere to dump some of its spoils?

Has there been any consideration of mimicking mitigation proposals occurring elsewhere, such as in the New York/New Jersey Harbor where rock blasted as part of the project is being used to create improved fisheries habitat. Presently the rock to be blasted in the Delaware is going to be dumped in CDFs.

**The Corps continues to avoid the issue of economic loading – this issue must be decided conclusively before a permit can be granted.**
While the Corps has said that "as currently planned, the project would not include economic loading" it has also stated that "there would be a cost savings with economic loading" and "The Corps will consider the benefit of using economic loading when a final determination has been made with the State of Delaware regarding which beaches will be nourished." Clearly, the door is still open for use of economic loading. (*Response to Questions, State of Delaware DNREC letter dated 29 June 2001 from Mr. Bill Moyer, US Army Corps of Engineers Philadelphia District.*)

Use of economic loading raises a number of issues, economic as well as environmental. The Corps must affirmatively commit to whether or not it intends to use this process in Delaware waters. If it does plan on using this approach, thorough analysis, review and public input must be provided. It is not appropriate for the Corps to ask the State to make a decision on this project without knowing the full extent of what the project will entail and the ramifications that might result.

**Potential toxic impacts of new proposed confined disposal facilities (CDFs) continues to be a concern.**
Dr. Thomas Fikslin with the Delaware River Basin Commission (DRBC) analyzed data from two existing dredge spoils disposal facilities -- Money Island and Fort Mifflin.

According to his findings, these sites are a significant source of toxic pollution to the Delaware River. Among the toxics discharged to the River during the de-watering process are Cadmium, Lead, Copper, Zinc and total suspended solids. In some instances, the discharge concentration exceeds the DRBC's acute and/or chronic criteria, although the DRBC criteria are for dissolved metal. According to Dr. Fikslin the two disposal facilities are the eighth largest discharger to the estuary and in the case of lead discharge more lead than all 78 point source dischargers to the estuary combined. *(Presentation November 4, 1998 before the DRBC's Toxics Advisory Committee.)*

Dr. Fikslin also found that the CDFs are a source of DDE to the River, and a potential source of PCBs that have been documented in the sediments of the estuary. According to Dr. Fikslin: his preliminary evaluation "indicates that CDFs have the potential to impact aquatic life through acute and chronic toxicity, and human health through the bioaccumulation of organic compounds such as PCBs and DDX." *(Presentation November 4, 1998 before the DRBC's Toxics Advisory Committee.)*

The Corps has responded with data from other Corps CDFs demonstrating that much lower concentrations of toxins are discharged during dewatering from these facilities and that in fact most toxins remain on site. Despite this Corps response concerns remain.

First, the Corps is unable to demonstrate that proposed CDFs will be constructed and placed so as to avoid toxic discharges, or potential concerns to drinking water supplies from leaching of toxins (a concern expressed by the University of Delaware's Sea Grant Program in their December 1998 White Paper) because they have yet to demonstrate where these new CDFs will in fact be located. The Corps has made some projections on location but is unable to confirm them because the DRPA has not yet acquired the land for disposal purposes. And in fact some parcels projected as locations for needed CDFs have already been removed from possibility because of purchases and actions by local governments. And, even for projected sites, the Corps has not provided details on the CDF operations in order to address concerns of toxic discharges. Details on the location, operation, size, and potential impacts must be provided for the locations where the new CDFs will actually be located before Delaware gives the requested permit. It is very possible that the proposed NJ sites are not secured for this project and so new sites need to be identified and secured – this could open the door for new site locations in New Jersey or Delaware.

In addition, we are unaware of any response by the Army Corps to a June 8, 1999 letter from the US Fish and Wildlife Service *(Letter from Clifford G. Day, Supervisor, USF&W NJ Field Office to Robert L. Callegari, Army Corps of Engineers, June 8, 1999)* expressing concerns about "wildlife exposure to hazardous sediments placed in CDFs". The USF&W requested additional information and stated that dependent upon the information received they may recommend alternative CDF management strategies to minimize the potential exposure of trust resources.

Clearly, there remain outstanding questions and concerns regarding disposal of dredge spoils in confined disposal facilities – questions about location, environmental impact, and CDF management. These issues must be conclusively resolved before a final decision can be made regarding this project and the proposed permit.

### An Updated EIS is Necessary Before this Project Moves Forward.

"The Council on Environmental Quality regulations impose a duty on all federal agencies to prepare supplements to either draft or final [EISs] if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" South Trenton Residents Against 29 v. FHA, 176 F.3d 658, 664 (3rd Cir. 1999)

The proposed Delaware Deepening project has changed dramatically since the last supplemental EIS was issued in 1997. Therefore, we believe the law, good decisionmaking, and common sense dictate that a new EIS, or at least a supplemental EIS, is necessary before any further decisions can be made on this project.

For example:

✓ The Corps continues to consider a variety of options for disposal of spoils including dumping, various beneficial reuse alternatives, and beach disposal of spoils at Fort Mahon, Broadkill, Rehobeth and Dewey beaches. A final plan still is not in place. And many of the new options now under consideration have never been subjected to the NEPA process.

✓ Delaware raised significant and justified concerns regarding potential impacts on the ecologically and economically important blue crab populations in the River and as a result is requiring a biological window regarding allowable periods of dredging. The potential impacts to blue crab need NEPA review.

✓ New concerns issued by the US Fish and Wildlife Service about potential impacts to the ecologically and economically important horseshoe crabs that live in the River and are already experiencing a decline in their numbers, have been raised. Among the concerns raised is a belief that the Corps has failed to fulfill the requirements of NEPA as it pertains to potential impacts to horseshoe crabs.

✓ As far as we are aware, the letter from EPA Region II asserting that the Corps has failed to fulfill the requirements of NEPA on both economic and environmental grounds remains outstanding: "... there may be a need for additional environmental analyses for certain issues not fully covered in the prior EIS documentation. For example, impacts related to the dredging of the private facilities discussed above and several port facilities owned or operated by local sponsors, and potential impacts associated with the development of new sites for dredged material disposal were not fully evaluated in the original EIS. Accordingly, these activities will have to be evaluated under NEPA." *(Letter from Robert W. Hargrove, Chief, Strategic*

*Planning and Multi-Media Programs Branch, EPA Region II to Robert Callageri, Army Corps of Engineers, June 30, 1999.)*

- ✓ Economic loading is still an option for this project. If there is the possibility that economic loading (which has economic, water quality, and other environmental ramifications) will become part of this project, thorough NEPA analysis including opportunity for public input needs to be conducted.

- ✓ While the Corps has identified areas where the new needed CDFs could be located, there is no reason to believe that these sites will actually be acquired and utilized for this purpose. Proposed CDF sites have already been removed from the realm of possibility by local governments who have purchased them for open space and other community purposes. The fact is that the Corps has not provided NEPA type analysis regarding the new, proposed CDFs that will necessarily be part of this project (either those that they have already identified or those that they may have to identify anew in the future). The Corps has made a number of assertions about the environmental ramifications of the presently proposed sites but has never provided the detail necessary to assess those assertions and has certainly never subjected their CDF proposals to thorough NEPA review.

- ✓ The Corps has failed to include the impacts or costs of biological windows that are being necessarily placed on this project. Many of these biological windows are only now under construction. The result is that they have not been fully considered/included in the NEPA analysis conducted for this project (neither economically or environmentally).

These issues have not been the subject of full and fair NEPA review. We believe that before Delaware provides any permits to this project, it needs to ensure that the requirements of NEPA have been fulfilled.

**We urge Delaware to wait until it has had the opportunity to review and consider the final GAO report before making a final permit decision.**
Finally, the GAO continues to thoroughly review this project. The information that will be included in their findings are critical to this permit decisionmaking. We urge you again to hold off on final permit decisionmaking until you have had the opportunity to review and consider the final GAO report.

We thank you for your consideration of this input.

Yours sincerely,

Maya K. van Rossum
Delaware Riverkeeper

Attachments:

*Letter from Robert W. Hargrove, Chief, Strategic Planning and Multi-Media Programs Branch, EPA Region II to Robert Callageri, Army Corps of Engineers, June 30, 1999*

*Letter from Clifford G. Day, Supervisor, USF&W NJ Field Office to Robert L. Callegari, Army Corps of Engineers, June 8, 1999*

*Letter, John C. O'Herron, II to John Brady, Army Corps of Engineers Philadelphia District, February 15, 1997, regarding the Draft Supplement Environmental Impact Statement*

# Exhibit 23



THIS IS NOT A PAID ADVERTISEMENT

# Public Notice

Date: CENAP-PL-E-09-01     17 December 2008

In Reply Refer To:
Environmental Resources Branch

Internet Homepage: http://www.nap.usace.army.mil

NOTICE IS HEREBY GIVEN, that the Philadelphia District, U.S. Army Corps of Engineers, is conducting an environmental review of all applicable, existing and new information generated subsequent to the Supplemental Environmental Impact Statement (SEIS) of 1997 prepared for the Delaware River Main Stem and Channel Project that will deepen the existing Delaware River Federal Navigation Channel from 40 to 45 feet from Philadelphia Harbor, PA, and Beckett Street Terminal, Camden, NJ, to the mouth of the Delaware Bay, and provide appropriate bend widening, partial deepening of the Marcus Hook anchorage, and relocation of and addition of aids to navigation. At present, the Philadelphia District has found no factors precluding the project from moving forward based on previous studies. A summary of the project changes and environmental changes known to date is attached.

The public and all agencies are invited to comment on the attached changes, and to identify any applicable existing and new information generated subsequent to the 1997 SEIS by responding to this Public Notice. A copy of the SEIS of 1997 and other environmental studies performed since the completion of the SEIS, are among the information available on the District's website. The environmental review referenced above will be used to update the environmental record, and to determine whether further environmental work and analyses are needed. All comments on the work described in this public notice should be directed to Mr. Minas M. Arabatzis, ATTN: Environmental Resources Branch, U.S. Army Corps of Engineers, Wanamaker Building, 100 Penn Square East, Philadelphia, Pennsylvania 19107-3390 by 31 December 2008.

Thomas J. Tickner, Lieutenant Colonel
District Commander
Philadelphia District
U.S. Army Corps of Engineers

**DELAWARE RIVER MAIN CHANNEL DEEPENING PROJECT  (Project)**

**SUMMARY OF CHANGES TO THE SELECTED ALTERNATIVE SINCE THE 1997 SEIS**

1.  Decrease in estimated dredged material quantities in cubic yards (cy):
The 1992 EIS   Initial construction  50,100,000 cy    Maintenance Dredging (50 years)  307,800,000 cy
The 1997 SEIS  Initial construction  32,887,510 cy    Maintenance dredging  (5o years)  289,074,000 cy

The Corps has performed new surveys in 2008, identifying the following dredged material quantities:
             Initial construction    16,400,000 cy   Maintenance dredging (50 years)    215,850,000 cy

Quantity changes since 1992 are the result of significant advancements in hydrographic survey equipment and methodologies for obtaining data, advancements in methods used for calculating quantities, change in datum levels for the Delaware River and Bay due to sea level rise, and past mining operations in the channel for construction of a new runway the Philadelphia International airport.

2.  Elimination of new disposal sites:
The 1997 SEIS identified four new disposal sites that would need to be constructed in order to accommodate the dredged material quantities estimated at that time.  These sites were:   17-G, Raccoon Island, 15-D and 15-G (locations and information concerning these sites are available in the 1997 SEIS). Due to the reduction in estimated dredged material the Corps is considering eliminating construction of all four of these sites from the Project and utilizing only  existing dredged material disposal sites  (locations and information concerning the existing disposal sites are available in the 1997 SEIS).

3.  Placement of sand directly onto Broadkill Beach:
In the December 18, 1998 Record of Decision supported by the 1997 SEIS it was stated that due to fishery and habitat related concerns expressed by resource agencies, the Corps would consider the direct placement of sand dredged from the Delaware Bay navigation channel onto Delaware beaches instead of stockpiling dredged sand at an offshore location.  The Corps is now considering placing dredged sand from the Project directly onto Broadkill Beach and eliminating any stockpiling at offshore locations.

4.   Deferment of Egg Island Point:
The Recommended Plan supported by the 1997 SEIS proposed to restore approximately 145 acres of intertidal habitat adjacent to Egg Island Point utilizing approximately 2,600,000 cubic yards of material dredged from the Delaware Bay navigation channel.  Due to the reduction in estimated quantities of dredged material the Corps is considering deferring this element of the Project until such time as sufficient dredged material quantities are available to support this element of the Project.

**KNOWN CHANGES TO THE AFFECTED ENVIRONMENT  SINCE THE 1997 SEIS**

5.  Athos Oil Spill:
On November 26, 2004 the T/S Athos I (750 foot-long tank ship) released an estimated 265,000 gallons of oil impacting the Delaware River and approximately 214 miles of shoreline (including creeks) in Pennsylvania, New Jersey, Delaware and Maryland.  A detailed description of the event can be found at http://www.darrp.noaa.gov/northeast/athos/pdf/USCG%202005b.pdf .

6. Shortnose Sturgeon:
As a result of consultation under Section 7 of the Endangered Species Act (ESA), the following documents were provided by the National Marine Fisheries for the Project:   1996 Biological Opinion (BO) covering all of Philadelphia District's dredging activities; a 1999 Amendment to the BO and revised Incidental Take Statement for shortnose sturgeon; and a 2001 BO for the shortnose sturgeon in the rock blasting portion of the Project.

Attachment                                                 1

In March, 2005 the Corps conducted surveys in the Marcus Hook to Tinicum reach of the Delaware River to determine if sturgeon adults and juveniles inhabit this reach of the Delaware River during the winter months when rock blasting will be required. The surveys confirmed that sturgeons are using this area in the winter months.

The 2001 BO required states that reinitiation of consultation is required if a) the amended Incidental Take Statement is exceeded; b) new information becomes available that reveals effects to listed species or critical habitat not considered previously; c) project activities are modified that causes an effect to listed species that was not previously considered in the B.O.; or d) a new species is listed that may be affected. The Corps is coordinating with NMFS regarding the 2001 BO and subsequent information on the shortnose sturgeon to determine if consultation under Section 7 of the ESA is warranted.

## ADDITIONAL DOCUMENTATION

1992 EIS
1997 SEIS
1999 ROD
http://www.darrp.noaa.gov/northeast/athos/pdf/USCG%202005b.pdf
1996 BO
1999 Amendment to the BO
2001 BO

Attachment                                              2

# Exhibit 24

**DUMP THE DEEPENING**

**Alliance to Dump the Delaware River Deepening**
Organizations from throughout the Delaware River Watershed
Against the Main Channel Deepening project

December 30, 2008

Mr. Minas M. Arabatzis,
ATTN: Environmental Resources Branch,
U.S. Army Corps of Engineers,
Wanamaker Building,
100 Penn Square East,
Philadelphia, PA, 19107-3390

*Re:  Delaware River main channel deepening
      public notice CENAP-PL-E-09-01*

Dear Army Corps,

The public notice released December 17, 2008 regarding the Delaware Deepening fails to comply with the procedural requirements of the National Environmental Policy Act (NEPA), and does not appear to be issued pursuant to any alternative legal or regulatory regime.  Pursuant to NEPA it is the Army Corps' obligation to articulate, clearly and conclusively, the elements of the project for which it is seeking comment; to provide easy access to project documentation; and to identify the kind of document for which it is seeking review and response whether it be an Environmental Assessment, a Finding of No Significant Impact or an Environmental Impact Statement.  The public notice provided does not clearly define the project, it merely provides options that are under consideration; it places the burden on the public to identify, articulate and secure the issues, documents and materials necessary for effective input; and it does not state clearly the goals it is trying to achieve or the kind of document for which it is seeking input.  This is a flawed implementation of NEPA; one that does not comply with the law.

The spoil disposal plan discussed in the notice is not a final plan – it is merely additional options that are being considered.  The Army Corps needs to clearly identify and describe any spoil disposal plans it might propose for the proposed deepening project and solicit input on such options or alternatives.  Not only does the Army Corps fail to articulate a clear and final disposal plan, but it continues to assert publicly that it is open

**For more information or to join Contact:**
**Delaware Riverkeeper Network**
**300 Pond Street 2nd Floor  Bristol, PA 19020**
keeper@delawareriverkeeper.org
215-369-1188 ph  215-369-1181 fax
www.delawareriverkeeper.org

to even more options, for instance an option that could come from a PA-NJ-DE committee which has yet to meet or even be formed.  Any such options or alternatives must be fully described and made available to the agencies and the public for comment in a new draft environmental impact statement.

The Corps' suggestion of an option that would eliminate the use of sites 17G, Raccoon Island, 15D and 15G thus far fails to fully articulate the alternative which is to use existing upland confined disposal facilities for all spoils to be disposed of in CDFs, an alternative that would require that the Army Corps significantly increase the height of the dikes that create the usable space found in those sites.  The dikes would have to be raised 10 to 44 feet higher than originally planned for, resulting in dikes as high as 60, 66, 74, 80 even 94 feet as opposed to the original plan of 50 feet.  Raising these dikes raises significant questions regarding engineering and technical feasibility, environmental impacts, community impacts, economic costs for the project and cost sharing with the local sponsor.  Resource regulatory agencies at the State and Federal level have raised questions and concerns about the ramifications of confined disposal facilities for water quality in terms of heavy metal and toxic inputs, the health and safety of wildlife, Bald Eagle and Peregrine Falcon.  None of these issues are articulated, presented or discussed in the notice document.  As a result the public, agencies and experts are unable to provide informed comment on the options.  Clearly, even the basic level of information that we have learned from other sources demonstrates the ecological, economic and community threats that must be discussed and considered.

Consideration of spoil disposal on Broadkill Beach raises numerous significant issues which are not identified or articulated in the public notice, and as a result agencies, experts and the public are unable to provide informed comment on this possibility.  We are aware that at a minimum such an effort will harm Saballaria vulgaris communities which are unique to the Delaware Bayshore and provide critical habitat for a variety of sportfish including black sea bass, summer flounder, scup, weakfish, black drum, and others.   Saballaria vulgaris meets the definition of Essential Fish Habitat, another element of the harm that is neither mentioned nor discussed in the notice documentation.  The public notice also fails to mention the threat to horseshoe crabs, and indirectly to migrating shorebirds, as a result of the Broadkill Beach spoil disposal option.  The ramifications of this proposed change to the spoil disposal plan are significant ecologically and economically as there are a number of ecotourism and recreational businesses that would be harmed by a loss of sportfish, horseshoe crabs and/or migrating shorebirds.   The Army Corps fails to mention any of these associated issues, or others that a Broadkill Beach option would raise.  As a result they have failed to provide the agencies, experts and/or public even the basic information they would need to comment.  Clearly, even this basic level of information that we have learned

from other sources demonstrates the tremendous ecological, economic and community threat this option poses.

Deferment of the Egg Island project also fails to provide details needed for informed comment.

The Army Corps' assertion that changed calculations reduce the volume of spoils to be disposed of leaves out any detail that would be necessary for informed review or comment.  The Army Corps fails to articulate key assumptions such as the figure used for sea level rise and the source for that figure, whether it has included a change in the management of the New York City reservoir system and the fresh water flows that would join with sea level in regulating the movement of the salt line, the level of over-dredge the Army Corps is using (1 feet or 2 feet, both have been used in the past) and the ramifications with regards to the volume of annual maintenance dredging depending upon the depth used, how their calculations are impacted by the airport project it mentions and exactly what is that project.  These are but a few of the obviously missing facts and figures that would be required for informed review and comment by the agencies, experts and the public.

The studies the Army Corps notice mentions in the summary document that was attached when the notice was first released but was removed from public access shortly thereafter, are based on outdated data and fail to capture recent changes in the Delaware River ecosystem or communities, fail to address the multitude of issues raised during the 11 years since the 1997 Supplemental Environmental Impact Statement was finalized, fail to include the details or level of analysis necessary for understanding how the Army Corps was incorporating those findings in their decisionmaking, and are targeted towards future mitigation rather than assessing and understanding potential impacts of the deepening and/or other alternatives.   The new studies provided do not provide the level of information or analysis needed for an up to date understanding of this project in order to support informed decisionmaking.

The public notice document fails to reflect real world changes that could have significant affect on understanding the potential ramifications of the proposed deepening including new PCB regulatory requirements, new non-structural alternatives including shallow draft tankers that have emerged for the oil industry, additional evidence that all 6 oil facility beneficiaries will not participate, concrete evidence that the lightering company will continue to operate with a 3 ship fleet (a reality that dramatically alters the cost benefit analysis of the project even according to the Army Corps' calculations – conclusively bringing it to well below 1), changes in the horseshoe crab and migrating shorebird populations of the Estuary and Bay which have been very well studied and documented, and more.

The public notice is clearly deficient. It does not provide even the basic details required for informed review and input.

The comment period – a mere 14 days over the biggest holiday season of the year (December 17 to December 31, 2008) – will likely result in deficient public and agency review and comment, both in terms of quantity and quality of input.

The Supplemental Environmental Impact Statement for the deepening was completed in 1997, 11 years ago. By virtue of the fact that the Army Corp has undertaken two EIS' for the deepening, it clearly acknowledges that the deepening will have the significant adverse affect on the human environment that requires full EIS review, documentation and process. It is clear that since 1997 a wealth of agency, expert and scientific data and information, as well as a wealth of physical change and knowledge has taken place in Estuary environments and communities. Agencies and experts have documented and questioned the impacts the deepening poses for drinking water supplies, to ecologically important sturgeon (both shortnose and atlantic), for ecologically and economically important horseshoe crab and oyster populations, for a variety of birds including migrating shorebirds and raptor species such as the Bald Eagle and Peregrine Falcon, for reintroducing toxins and heavy metals into the water column, for critical animals and habitats including the Sabellaria vulgaris and the wetlands and marshes of the estuary and Bay, just to name a few. The record is clear, an updated EIS is required for the proposed deepening. A decision to not undertake such a review would clearly be arbitrary and capricious and not in accordance with law.

This comment is submitted by:

Maya K. van Rossum, the Delaware Riverkeeper
Delaware Riverkeeper Network

Tim Dillingham, Executive Director
American Littoral Society

Robert V. Martin

Amy Goldsmith, State Director
New Jersey Environmental Federation

Jeff Tittel, Executive Director
NJ Sierra Club

Mable Granke, President
Citizens Action Foundation

Richard Anthony, Director
Plan Delaware

Harry Haon, V Chair
Sierra Club S. DE Group

William Moyer
Moyer Environmental Consulting

Eric Stiles, Vice President for Conservation and Stewardship
New Jersey Audubon Society

Christine Nolan, Director
South Jersey Land & Water Trust

Andrew Fellows, Chesapeake Regional Director
Clean Water Action (State of Delaware)

Christine Whitehead, Member
Delaware Civic League

Myron Arnowitt, Pennsylvania State Director
Clean Water Action

Richard A. Fleming, Ph.D.

Coralie Pryde

Nicholas A. DiPasquale, Conservation Chair
Delaware Audobon

David R. Conrad, Senior Water Resources Specialist
National Wildlife Federation

# Exhibit 25



December 30, 2008

Mr. Minas M. Arabatzis,
ATTN: Environmental Resources Branch,
U.S. Army Corps of Engineers,
Wanamaker Building,
100 Penn Square East,
Philadelphia, PA, 19107-3390

*Re:  **Delaware River Main Channel Deepening, Public Notice CENAP-PL-E-09-01***

Dear Mr. Arabatzis:

Please accept these comments on behalf of the Delaware Riverkeeper and the Delaware Riverkeeper Network ("DRN").

    **I.**       **Comments Regarding Procedural Defects**

On December 17, 2008, the United States Army Corps of Engineers ("the Corps" or "the Army Corps") issued a public notice providing fourteen days for agency and public review and comment on matters related to the proposed Delaware River Main Channel Deepening Project ("the Project").  However, the notice fails to specify what law, regulatory requirement or goal the Army Corps seeks to fulfill or achieve as a result of this effort.  Instead, the public notice merely states that the information collected during the comment period will be used to "determine whether further environmental work and analyses are needed."  From this scant description, it appears that the Army Corps may be seeking to achieve some level of compliance with the National Environmental Policy Act ("NEPA") – perhaps to determine whether additional environmental analyses and/or a Supplemental Environmental Impact Statement ("SEIS") for the Project are needed – although that is not totally clear.  If NEPA compliance is indeed the objective, the approach taken by the Army Corps in this notice is not in conformance with the legal requirements of NEPA.  The notice fails to describe a complete project for which it is seeking review and comment; fails to identify the relevant legal or regulatory obligations spurring the notice; fails to provide all of the materials, issues, information, studies and analyses in a completed form for public review and comment; fails to provide a meaningful document as described and required by law that will allow the public to fully and fairly assess the impacts of the project and potential alternatives; fails to provide up to

Delaware Riverkeeper Network
300 Pond Street, Second Floor
Bristol, PA  19007
tel: (215) 369-1188
fax: (215) 369-1181
drkn@delawareriverkeeper.org
www.delawareriverkeeper.org