IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| STATE OF NEW JERSEY, | ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| DELAWARE RIVERKEEPER NETWORK, the DELAWARE RIVERKEEPER, DELAWARE NATURE SOCIETY, NATIONAL WILDLIFE FEDERATION, NEW JERSEY ENVIRONMENTAL FEDERATION, CLEAN WATER ACTION, | ) ) ) ) ) ) ) | |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) ) | Civ. No. 09-821-SLR |
| UNITED STATES ARMY CORPS OF ENGINEERS (USACOE), the HONORABLE JOHN MCHUGH, Secretary of the Army, in his official capacity, the HONORABLE JO-ELLEN DARCY, Assistant Secretary of the Army, in her official capacity, LT. GEN. ROBERT L. VAN ANTWERP, JR., Commander, USACOE, in his official capacity and LT. COL. THOMAS TICKNER, Commander, USACOE, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| PHILADELPHIA REGIONAL PORT AUTHORITY, | ) ) ) | |
| Defendant-Intervenor. | ) | |

Joseph R. Biden, III, Attorney General, Jennifer D. Olivia, Deputy Attorney General, Kevin P. Maloney, Deputy Attorney General and Devera Breeding Scott, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware. Counsel for Plaintiff.

Allison E. Reardon, Deputy Attorney General and Patricia Davis Murphy, Deputy Attorney General of Delaware Department of Justice, Wilmington, Delaware.  Counsel for Plaintiff-Intervenor.  Of Counsel: Anne Milgram, Attorney General, Rachel Horowitz, Deputy Attorney General, Eileen P. Kelley, Deputy Attorney General, Kristen D. Heinzerling, Deputy Attorney General and Lauren J. Trasferini, Deputy Attorney General of the New Jersey Office of the Attorney General, Trenton, New Jersey.

Mary A. Jacobson, Esquire of the Mid-Atlantic Environmental Law Center, Wilmington, Delaware.  Counsel for Plaintiffs-Intervenors.  Of Counsel: Elizabeth K. Brown, Esquire of the Delaware Riverkeeper Network, Bristol, Pennsylvania.

Patricia C. Hannigan, Assistant United States Attorney of the Office of the United States Attorney, Wilmington, Delaware.  Counsel for Defendants.  Of Counsel: Ignacia S. Moreno, Assistant Attorney General, Kent E. Hanson, Attorney, and Kristofor R. Swanson, Attorney of the United States Department of Justice, Washington, District of Columbia.

Beth Moskow-Schnoll, Esquire and Sean J. Bellow, Esquire of Ballard, Spahr, Andrews & Ingersoll, LLP, Wilmington, Delaware.  Of Counsel: Barry N. Kramer, Deputy Attorney General of the Pennsylvania Office of the Attorney General.

Peter C. Hughes, Esquire of Dilworth Paxson LLP, Wilmington, Delaware.  Counsel for Senator Arlen Specter, Amicus.

## MEMORANDUM OPINION

Dated:  January 27, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This action follows the decision of the United States Army Corps of Engineers

("the Corps") to proceed with the deepening of the Delaware River pursuant to its

Delaware River Main Stem and Channel Deepening Project ("the Deepening Project").

According to the Deepening Project, the Corps will dredge the Delaware River to

deepen the channel from its established depth of forty feet to a depth of forty-five feet

from the mouth of the Delaware Bay to the ports of Philadelphia and Camden.  In its

complaint, the Delaware Department of Natural Resources and Environmental Control

("DNREC") alleges that the Corps' decision to proceed without obtaining the requisite

federal and state approval violates numerous provisions of the federal and state

regulatory process governing such activities including, inter alia, the Clean Water Act

("CWA"), the Clean Air Act ("CAA"), the Coastal Zone Management Act ("CZMA"), as

well as Title 7, Chapters 72 (Wetlands), 66 (Water Quality) and 60 (Subaqueous Lands)

of the Delaware Code.  (D.I. 1)  DNREC seeks to enjoin the Corps from proceeding with

the Deepening Project until the Corps demonstrates its compliance with all applicable

state and federal requirements.  (Id.)

Currently pending before the court is DNREC's motion for a preliminary

injunction, filed on November 2, 2009.  (D.I. 3)  A hearing addressing DNREC's motion

was held on December 8, 2009 and the parties submitted post-hearing briefs.[1]  The

court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346 and 2201.

Venue is proper pursuant to 28 U.S.C. § 1391.  For the following reasons, the court

---

[1]The court granted several motions to intervene, (D.I. 10, 11, 13, 14, 28, 29), but limited participation to briefing.  (D.I. 39)

denies in part and grants in part DNREC's motion to enjoin the Deepening Project.

## II. BACKGROUND

### A. Project Feasibility and Congressional Authorization

The combined ports of the Delaware River currently support an estimated 75,000

jobs, generate billions in terms of economic revenue and payroll wages, and contribute

more than $150 million in state and local taxes.  (D.I. 34, ex. B at ¶ 8)  In an effort to

sustain these vital economic contributions, the Corps ensures that the ports remain

active by maintaining the Delaware River's main navigation channel ("the channel") at a

sufficient depth to allow vessel navigation.  Without sufficient channel depth, larger

vessels would divert to other ports on the east coast, thus threatening the market share

of the Delaware River ports.[2]  The Corps has consistently maintained the channel at a

depth of forty feet since World War II.[3]  *See* U.S. ARMY CORPS OF ENGINEERS,

PHILADELPHIA DISTRICT, DELAWARE RIVER MAIN STEM & CHANNEL DEEPENING PROJECT,

*available at*  http://www.nap.usace.army.mil/cenap-pl/drmcdp/drmc.htm (last visited

---

[2]Recent trends have indicated that larger container vessels from the Far East are diverting from west coast ports to east coast ports via the Suez Canal. (D.I. 34, ex. B at ¶ 13)  Both the Suez Canal and the Panama Canal (undergoing renovations until 2014) have the capacity to handle vessels drafts exceeding forty-five feet.  (*Id.* at ¶¶ 14,15) Vessel design, in turn, has oriented towards the construction of larger vessels that can take advantage of the enhanced clearance provided by these canals.  (*Id.* at ¶ 14)  In light of these circumstances, ports up and down the east coast have deepened, or are in the process of deepening, shipping channels to accommodate drafts of forty-five feet or greater (Port of New York and New Jersey: dredging from forty-five to fifty feet; Port of Baltimore: at fifty feet; Hampton Roads: at fifty feet; Port of Charleston: dredging from forty-five to forty-seven feet; Port of Savanah: dredging from forty-two to forty-eight feet.).  (*Id.* at ¶ 16)

[3]The Corps began using hydraulic dredges to maintain this depth in 1973. (D.I. 33, Decl. of Pasquale at ¶ 5)

January 19, 2010).

Mindful of the continual evolution of ship design, which favors deeper drafts,[4]

Congress directed the Corps to explore whether it was in the federal interest to deepen

the channel in 1983. *Id.* After years of study, the Corps submitted to Congress a *Final*

*Interim Feasibility Report and Environmental Impact Study* ("the EIS").[5]  (D.I. 4, ex. A)

The EIS concluded that a depth of forty-five feet was necessary to accommodate the

current trend of vessel drafts. (*Id.*) The Corps supported this conclusion with its

findings that the Deepening Project was environmentally sound, economically justified

and technically advisable. (*Id.*) In 1992, pursuant to the recommendations made in the

EIS, Congress authorized the Corps to deepen a 102-mile segment[6] of the channel to

forty-five feet. *See* Water Res. Dev. Act of 1992, Pub. L. No. 102-580, § 101(6), 106

Stat. 4797, 4802.[7]  To this end, Congress has appropriated significant funds towards

---

[4]The draft refers to the vertical distance between the waterline and the bottom of the ship's hull.  Draft varies according to both vessel size and load carried.

[5]The Corps prepared the EIS pursuant to its obligations under the National Environmental Policy Act of 1969 ("NEPA").  NEPA has an "action-forcing purpose" in that it ensures that a federal agency "will carefully consider, detailed information concerning significant environmental impacts," and then make this information available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (U.S. 1989).  Included among the procedural aspects of NEPA is the requirement that federal agencies "to the fullest extent possible" prepare an environmental impact statement for "every . . . major Federal actio[n] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

[6]This segment runs from the mouth of the Delaware Bay through Philadelphia Harbor, and on to the Beckett Street Terminal in Camden, New Jersey.

[7]Congress has since authorized certain modifications to this project, including the widening of the channel's bends. *See* Water Res. Dev. Act of 1999, Pub. L. No. 106-53 § 308, 113 Stat. 269, 300; Water Res. Dev. Act of 2000, Pub. L. No. 106-541, § 306, 114 Stat. 2572, 2602.

3

the project's estimated total cost of $300 million.[8]

The Corps addressed certain residual concerns raised by the EIS and subsequent environmental investigations in its 1997 *Supplemental Environmental Impact Statement* ("the SEIS"). (D.I. 33, ex. 2) In 1998, the Corps issued its *Limited Reevaluation Report*, which reflected adjusted costs and benefits for the Deepening Project. After vetting the SEIS through a notice and comment period, the Corps signed a *Record of Decision* ("the ROD") in December 1998. *See* U.S. ARMY CORPS OF ENGINEERS, PHILADELPHIA DISTRICT, DELAWARE RIVER MAIN CHANNEL DEEPENING PROJECT, *available at* http://www.nap.usace.army.mil/cenap-pl/drmcdp/overview.html (last visited January 19, 2010).[9]

## B. Delaware Subaqueous Land and Wetlands Permits

In addition to this federal oversight, the Deepening Project was subject to various state regulatory regimes, including Delaware's Subaqueous Lands Act, 7 Del. C. Ch. 72, and Wetlands Act, 7 Del. C. Ch. 66.[10] Consistent with these obligations, the Corps submitted an application to DNREC for a subaqueous lands and wetlands permit in January 2001. (D.I. 33, Decl. of Pasquale at ¶ 8) In October 2001, DNREC provided

---

[8]Corps. projects of this size are subject to a cost-sharing requirement. *See* Water Res. Dev. Act of 1986, Pub. L. No. 99-662 § 101. While Congress supports the brunt of the load, a non-federal partner must pay a percentage of the costs in relative to the scope of the project. *See* 33 U.S.C. 2211. In this case, the Philadelphia Regional Port Authority has agreed to serve as the non-federal partner. (D.I. 34, ex. H)

[9]According to the Corps, the ROD "signif[ies] completion of the . . . NEPA process." *Id.*

[10]Delaware enacted these programs in accordance with the Clean Water Act ("CWA").

4

notice that the application was complete.  (*Id.*)  DNREC subsequently hired Timothy

Bureau ("Bureau"), an independent environmental consultant, to preside over a two-day

public hearing regarding the application on December 4 and 5, 2001.  (*Id.*)  At the

conclusion of the public hearing, DNREC provided a notice and comment period to

generate discourse between the public and the Corps.  (*Id.*)

In June 2002, the General Accounting Office ("GAO") issued an audit of the

Deepening Project, noting that a number of "material errors" plagued the Corps'

economic analysis.  U.S. GEN. ACCOUNTING OFFICE, DELAWARE RIVER DEEPENING

PROJECT: COMPREHENSIVE REANALYSIS NEEDED, *available at*

http://www.gao.gov/products/GAO-02-604 (last accessed January 19, 2010).  The GAO

concluded by recommending that the Corps comprehensively reanalyze the Deepening

Project.  (*Id.*)  The Corps immediately requested that DNREC suspend the permit

review process so that the Corps could address the indicated errors; it submitted an

economic reanalysis[11] to DNREC on December 20, 2002.  (D.I. 33, Decl. of Pasquale at

¶ 8)

After consideration of the information generated by the notice and comment

period, Bureau reported his findings and recommendations to DNREC in December

2003.  (D.I. 4, ex. G)  Bureau recommended the denial of the Corps' application, citing

both to a lack of documentation tending to demonstrate that the "adverse effects [of the

Deepening Project] have been minimized," and a failure to meet "the regulatory

standards and requirements necessary to approve the project as proposed."  (*Id.* at

---

[11]The Corps' economic reanalysis resolved each of the errors identified by the
GAO.  *Id.*

5

125) Bureau concluded with a recommendation that DNREC provide the Corps with the opportunity to modify its application to address these concerns. (*Id.* at 127)

With no final decision from DNREC, on December 17, 2008, the Corps publically noticed an *Environmental Assessment* ("the EA") containing a review of the information generated since the 1997 SEIS and provided roughly one month for public comment. (D.I. 4, ex. I) The then-DNREC Secretary John A. Hughes notified the Corps that, while the EA addressed certain of the concerns raised in Bureau's report, DNREC would not provide technical commentary because of the short comment window. (*Id.*, ex. J) Rather, Secretary Hughes proposed that DNREC would consider the contents of the EA within the context of a new subaqueous lands and wetlands permit and a supplemental consistency certification. (*Id.*) Secretary Hughes concluded by proffering a list of additional information that the Corps would need to submit to complete its submission. (*Id.*) The Corps issued its final EA in April 2009, concluding that any changes to the Deepening Project would have "no significant adverse effects" over those previously enumerated in the EIS, SEIS, and ROD.[12] (*Id.*, ex. K)

On April 30, 2009, the Assistant Secretary of the Army issued a *Memorandum of Record* finding that "the State of Delaware's refusal to provide the subject State permit in a timely and responsible manner would interfere with navigation for the 'upstream states,'" and "has impaired the Secretary of the Army's authority to maintain navigation

---

[12]The Corps analyzed, among other events, the effects of the Athos Oil Spill of November 26, 2004, concluding that it would not have any significant adverse effect on sediment quality. (*Id.*)

6

as specifically directed by Congress in Public Law 102-580, section 101(6).[13] (D.I. 33, Decl. of Depasquale, ex. 5) Three months later, on July 23, 2009, more than five years after Bureau's report and recommendation issued,[14] DNREC Secretary Collin P. O'Mara issued an order denying the Corps' 2001 application for Delaware subaqueous lands and wetlands permits. (D.I. 34, ex. I)

Secretary O'Mara based his denial upon both Bureau's recommendations and the alleged substantial changes to the Deepening Project since the application's inception. (*Id.*) Secretary O'Mara concluded that "[s]hould the [Corps] choose to submit a new permit application, I pledge that my agency will conduct a thorough scientific review and that the permitting process will be efficient, timely and transparent." *Id.*

## C. Consistency Determination

Contemporaneous with its efforts to obtain these permits from DNREC, the Corps also sought to comply with the requirements of the CZMA. Among other requirements, the CZMA mandates that certain federal actions that affect coastal resources achieve consistency with state guidelines. *See* 16 USCS § 1456(c)(1)(A). The federal agency must then certify the consistency determination to the state. *Id.* In December 1996, the Corps provided a consistency determination for the Deepening

---

[13]This finding invokes the "navigation exception" found in CWA section 404(t), which exempts the Corps from regulation under the CWA and affiliated state programs. *See In re Operation of the Mo. River Sys. Litig.*, 418 F.3d 915, 918 (8th Cir. 2005).

[14]It is unclear to the court the degree of persistence exhibited by the Corps with respect to the prosecution of its application. The Corps identifies at least three meetings with DNREC between 2004 and 2008 aimed at "reinvigorating" the permitting process. (D.I. 33, Decl. of Pasquale at ¶ 9)

7

Project to both DNREC and the New Jersey Department of Environmental Protection ("NJDEP"). (D.I. 33, exs. 5, 6) DNREC identified several concerns, which the Corps agreed to address in the implementation of the Deepening Project. (Id., ex. 7) DNREC subsequently concurred with the Corps' consistency determination, certifying the Deepening Project as "consistent with [Delaware Coastal Management Program ("DCMP")] policies . . . ." (Id., ex. 8) NJDEP likewise concurred after it signed a memorandum of understanding with the Corps. (Id., ex. 9)

In 2002, however, NJDEP informed the Corps that it was "revoking" its concurrence due to alleged substantial changes that had occurred since NJDEP initially concurred five years earlier. (D.I. 34, ex. G) Likewise, in his July 2009 order denying the Corps' application for subaqueous lands and wetlands permits, Secretary O'Mara posited that "substantial project modifications" have occurred since DCMP's consistency concurrence issued over ten years prior. (D.I. 34, ex. I) Accordingly, Secretary O'Mara agreed with Secretary Hughes' December 2008 conclusion that these modifications required the Corps to issue a supplemental consistency determination in accordance with 15 C.F.R. § 930.46(a). (Id.; D.I. 4, ex. J) The Corps has since determined that no substantial changes in the Deepening Project exist as to require the issuance of a supplemental consistency determination. (D.I. 33, ex. 10)

## D. Conformity Determination

Pursuant to Section 176 (c) of the CAA, the Corps also evaluated whether the Deepening Project would conform to each applicable State Implementation Plan ("SIP"). In August 2009, the Corps submitted a draft *Conditional Statement of Authority*

8

("the Statement"), as well as a *General Conformity Analysis and Mitigation Report* ("the Report") for DNREC's review.  (D.I. 4, exs. O, P)  DNREC responded to the Corps' Statement and Report by refusing concurrence with the Corps' conformity determination, noting that the Report was incomplete and inadequate.  (*Id.*, ex. R) Specifically, DNREC objected to the Corps' alleged failure to:  (1) consider the indirect emissions generated during construction of the project; (2) acknowledge nitrogen oxide ("NOx") emissions as a fine particulate matter precursor; and (3) provide details about how the Corps intended to implement its emission reduction strategies.  (*Id.*)  The United States Environmental Protection Agency ("EPA") and NJDEP also raised several similar issues with the Report.

The Corps purportedly addressed these concerns in its November 2009 revision of the emissions analysis upon which the Report relied.  (D.I. 33, ex. 4)  In this revision, the Corps concluded that the Deepening Project conforms to the applicable SIPs.  (*Id.*, ex. 3 at 4)  The Corps subjected this proposed determination to a notice and comment period.  After considering the commentary, the Corps made a final determination on December 30, 2009 that the Deepening Project would conform with the applicable SIPs, pending the purchase of emission reduction credits ("ERCs") to offset the NOx emissions generated during the dredging.  (D.I. 56, ex. A)  DNREC persists in its objection to this conformity determination, noting a lack of clarity with respect to whether "these credits will be surplus to the states' ozone and fine particulate matter SIPs.  Although the purchase of such credits is not prohibited, that method of mitigation will neither improve the region's air quality nor assist the region in attaining ozone and fine particulate standards."  (D.I. 56)  New Jersey voiced a similar complaint in its

9

January 6, 2010 letter from Attorney General Anne Milgrim. (D.I. 58)

### E. Reach C and the Instant Suit

In October 2009, the Corps entered into a contract for the annual maintenance dredging along portions of the Delaware River ("the contract"). (D.I. 33, Decl. of Depasquale at ¶¶ 2, 4, 7) The contract authorizes maintenance dredging in Reach B and Reach C of the Delaware River. (Id.) In addition to the maintenance component, the contract also contains an option clause which, if exercised by the Corps, would authorize dredging in portions of Reach C to the forty-five feet needed for the Deepening Project. (Id.) Reach C runs from south of Wilmington, Delaware, to just south of the Chesapeake & Delaware Canal. (Id., ex. 2-B) The contract designates that all dredged material from Reach C is to be deposited in the Killcohook Confined Disposal Facility ("CDF").[15] (Id.) Both Reach C, in its entirety, and the CDF are located in Delaware. (Id.) The Deepening Project does not call for the deepening of any other portion of the Delaware River until December 2010. (Id. at ¶ 3)

DNREC filed a complaint for declaratory and injunctive relief, alleging violations of the CWA, CAA, CZMA and the state regulatory regimes associated with these statutes. (D.I. 1) On November 2, 2009, DNREC filed this motion for preliminary injunction. (D.I. 3, 4) The court heard oral argument regarding DNREC's motion on December 8, 2009. Since the hearing, the Corps negotiated a 45-day extension of the option, originally set to expire on December 28, 2009. (D.I. 54) The Corps has indicated that it stands poised to proceed with the deepening of Reach C pending the

---

[15]The Corps maintains that the CDF has historically contained the dredged material from the annual maintenance dredging of Reach C. (Id. at ¶ 7)

10

resolution of this motion. (*Id.*)

## III. STANDARD OF REVIEW

### A. Preliminary Injunction

According to the Supreme Court's recent opinion in *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008),

> [a] plaintiff seeking a preliminary injunction must establish that he is
> likely to succeed on the merits, that he is likely to suffer irreparable
> harm in the absence of preliminary relief, that the balance of
> equities tips in his favor, and that an injunction is in the public interest.

*Id.* at 374. Because "[a] preliminary injunction is an extraordinary remedy never awarded as of right," *id.* at 376, an applicant seeking such a remedy must make a clear showing that he is likely to prevail on the merits and "likely to suffer irreparable harm before a decision on the merits can be rendered." *Id.* at 375. In other words, "'a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury.'" *Id.* (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995)). "In each case, [therefore,] courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* at 376 (quoting *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

### B. Statutory Framework

#### 1. Clean Water Act

11

The CWA established a comprehensive program designed to "restore and

maintain the chemical, physical and biological integrity of the Nation's waters." 33

U.S.C. § 1251(a).  To implement this goal, section 313(a) of the CWA provides that any

federal agency

> engaged in any activity resulting, or which may result, in the discharge or
> runoff of pollutants . . . **shall be subject to, and comply with, all Federal,
> State, interstate, and local requirements**, administrative authority, and
> process and sanctions **respecting the control and abatement of water
> pollution in the same manner, and to the same extent as any
> nongovernmental entity** including the payment of reasonable service
> charges.  The preceding sentence shall apply . . . to any requirement
> whether substantive or procedural (including any recordkeeping or
> reporting requirement, any requirement respecting permits and other
> requirement, whatsoever) . . . .

33 U.S.C. § 1323(a) (emphasis added).  Section 404 of the CWA is the only section of

the statute that specifically addresses discharges of dredged or fill material.  It states in

relevant part:

> Nothing in this section shall preclude or deny the right of any State . . .
> agency to control the discharge of dredged or fill material in any
> portion of the navigable waters within the jurisdiction of such State,
> including any activity of any Federal agency, and each such agency
> shall comply with such State . . . requirements both substantive and
> procedural to control the discharge of dredged or fill material to the
> same extent that any person is subject to such requirements.  **This
> section shall not be construed as affecting or impairing the
> authority of the Secretary to maintain navigation.**

33 U.S.C. § 1344(t) (emphasis added).[16]  Therefore, although Congress, through the

CWA, has subjected federal dredging activities to state water quality standards, this

---

[16]The CWA defines "navigable waters" as "waters of the United States" which, in
turn, is defined by regulation to include waters used in interstate or foreign commerce
and certain wetlands.  33 C.F.R. § 328.3(a).

limited waiver of sovereign immunity has been further limited both by the language of §
1344(t) and by the language of § 1371(a), which provide that the CWA generally "shall
not be construed as . . . affecting or impairing the authority of the Secretary of the Army
. . . to maintain navigation." *See In re Operation of the Mo. River Sys. Litig.*, 418 F.3d
at 918.

The State of Delaware has implemented a state-wide regulatory program
(administered by DNREC) that controls and abates water pollution via the Subaqueous
Lands Act. 7 Del. C. Ch. 72. Chapter 72 provides that "[n]o person shall deposit
material upon or remove or extract materials from . . . submerged lands or tidelands
without first having obtained a permit . . . ." 7 Del. C. § 7205(a).[17]  DNREC regulations
specifically provide that a permit is required for "dredging, filling, excavating, or
extracting of materials" if that activity will occur on private or public subaqueous lands.[18]
7 Del. Admin. C. § 7504(1.3-1.4). The regulations direct that "[a]ll dredging is to be
conducted in a manner consistent with sound conservation and water pollution control
practices." 7 Del. Admin. C. § 7504 (4.7). The permitting process is an extensive
administrative process that culminates in a Report and Recommendation issued by a
state hearing officer, pursuant to the Delaware Administrative Procedure Act, 29 Del. C.
§ 10126(a), and submitted to the Secretary of DNREC for final approval. The

---

[17]DNREC regulations include "governmental agencies" within the definition of
"person." 7 Del. Admin. C. § 7504(1.0).

[18]Under Delaware law, "subaqueous lands" are defined as "submerged lands and
tidelands." 7 Del. C. § 7202(c). In tidal rivers and bays, the term "submerged lands"
means "lands lying below the line of mean low tide in the beds of all tidal waters within
the boundaries of the State." 7 Del. C. § 7202(d)(1).

13

administrative record closes 20 days after the Report and Recommendation is served on the applicant. *See* 29 Del. C. § 10126(b). At this point, all that remains is for DNREC to make a final decision issuing or denying the permit. *See* 29 Del. C. § 10128.

### 2. Clean Air Act

The CAA establishes a joint state and federal program to control the Nation's air pollution. Section 109 of the CAA, 42 U.S.C. § 7409, requires the EPA to establish primary and secondary National Ambient Air Quality Standards ("NAAQS") necessary to protect public health and welfare for certain "criteria pollutants." *See* 40 C.F.R. Pt. 50. Section 110 of the CAA requires that each state develop a "State Implementation Plan" ("SIP"), which is subject to EPA review and approval, to establish the measures necessary to attain the NAAQS in each air quality control region within the state. 42 U.S.C. § 7410. The conformity process required by CAA section 176(c)(1), 42 U.S.C. § 7506(c)(1), serves to ensure that federal agencies will work with the states in implementing the SIPs.

More specifically, the conformity process provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title." *Id.* A conformity determination is required for federal activities in an air quality region that has not attained the NAAQS ("nonattainment area") and for each pollutant for which the area is designated as a nonattainment area or maintenance area. 42 U.S.C. § 7506(c)(1). The statute defines conformity to a SIP as:

14

(A) conformity to a [SIP's] purpose of eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expedited attainment of such standards; and

(B) that such activities will not -

(i) cause or contribute to any new violation of any standard in any area;
(ii) increase the frequency or severity of any existing violation of any standard in any area; or
(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

42 U.S.C. § 7506(c)(1)(A)-(B).

In order to implement the conformity program, Congress required the EPA to promulgate "criteria and procedures" for determining conformity. 42 U.S.C. § 7506(c)(4)(A). The regulations (codified at 40 C.F.R. Pt. 93, Subpt. B) require that any federal agency taking action in a nonattainment area must make a conformity determination for each criteria pollutant or precursor for which the NAAQS has not been attained, where the total pollutant or precursor emissions would exceed specific levels set in the rule ("de minimis levels"). 40 C.F.R. § 93.153(b).

The federal agency's responsibility to maintain a current conformity determination continues throughout the life of a project. 40 C.F.R. § 93.157. Unless the agency has a continuous implementation program, a new conformity determination must be made every five years. Id. Should the federal agency make changes to the project that will increase the total direct and indirect emissions, it must submit a new conformity determination. 40 C.F.R. § 93.157(c). If a planned project does not conform, the federal agency may demonstrate conformity by incorporating mitigation measures to offset emissions sufficiently to avoid any net increase in emissions. See

15

40 C.F.R. § 93.158.

The states were also required to revise their SIPS to include conformity

requirements, as follows:

> A State's conformity provisions must contain criteria and procedures
> that are no less stringent than the requirements described in this
> subpart. A State may establish more stringent conformity criteria and
> procedures only if they apply equally to nonfederal as well as Federal
> entities.

40 C.F.R. § 93.151. Once a SIP revision has been approved by the EPA, the SIP,

rather than EPA's regulations, govern. *Id.*

Delaware has revised its SIP to include conformity provisions. *See* 7 Del. C.

Regs. § 1000, 1135. More specifically, regulation 1135 states as follows:

> The purpose of this regulation is to implement § 176(c) of the Clean Air
> Act . . . and regulations under 40 C.F.R. Part 51 Subpart W . . . with
> respect to the conformity of general federal actions to the applicable
> implementation plan. Under those authorities, no department, agency
> or instrumentality of the Federal Government shall engage in, support
> in any way or provide financial assistance for, license or permit, or
> approve any activity which does not conform to an applicable implementation
> plan. This regulation sets forth policy, criteria, and procedures for
> demonstrating and assuring conformity of such actions to the applicable
> implementation plan.

7 Del. Admin. C. § 1135. The Delaware regulations require federal agencies to report

their conformity determinations to the EPA, DNREC, and other regulatory agencies. 7

Del. Admin. C. § 1135-5.0. Because these regulations apply only to federal agencies,

however, Delaware could not adopt requirements that were more stringent than those

promulgated by the EPA. *See* 40 C.F.R. § 93,151. Accordingly, Delaware's conformity

requirements are essentially the same as the federal rules,[19] and the court will cite to only the federal regulations for the remainder of its analysis.

### 3. Coastal Zone Management Act

The CZMA provides for a voluntary partnership between the federal government and the coastal states to encourage prudent use of coastal resources through state-developed and federally-approved coastal zone management programs. *See* 16 U.S.C. §§ 1452, 1455. The CZMA is administered by the National Oceanic and Atmospheric Administration ("NOAA," a division of the United States Department of Commerce), and Delaware, which is a partner coastal state (through the DCMP).

Section 307 of the CZMA requires that any federal agency carrying out an activity "within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone" provide the state with a determination that the activity "shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 U.S.C. §§ 1456(c)(1)(A), 1456(c)(1)(C); 15 C.F.R. §§ 930.34(a)(1), 930.39(c). The state must then either concur with, or object to, the federal agency's consistency determination. 15 C.F.R. § 930.41(a). A state may not place an expiration on any concurrence. 15 C.F.R. § 930.41(d). The federal agency, however, must supplement a consistency determination for a proposed activity not yet begun "if the proposed activity will have effects on coastal uses or resources 'substantially different' than those originally described" in the coordination process. 15 C.F.R. § 940.46(a). If the state objects to

---

[19]Because New Jersey has not revised its SIP, the federal conformity rules apply in this state as well.

17

the consistency determination, the project may still proceed if the federal agency nonetheless "conclude[s] that its proposed action is fully consistent with the enforceable policies of the management program." 15 C.F.R. § 930.43(d)(2).

## 4. The Administrative Procedure Act

The Administrative Procedure Act ("APA") provides for the judicial review, subject to several requirements and limitations, of certain federal administrative agency actions. See 5 U.S.C. §§ 701-706. Judicial review is generally afforded to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702. The APA, however, circumscribes this remedy, limiting the inquiry of the reviewing court to a determination as to whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). During this narrow inquiry, a reviewing court may not supplant the judgment of an agency. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Rather, this highly deferential mode of review presumes valid an agency action that stems from a consideration of all relevant factors, as well as an articulation by the agency that includes a "'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

"It is not the role of a reviewing court to 'second-guess the scientific judgments of the [agency].'" Southwestern Pa. Growth Alliance v. Browner, 121 F.3d 106, 117 (3d Cir. 1997) ("SPGA") (quoting American Mining Congress v. E.P.A., 907 F.2d 1179, 1187 (D.C. Cir. 1990)). "A reviewing court 'must generally be at its most deferential'

18

when reviewing factual determinations within an agency's area of special expertise." *Id.*

(citing to *New York v. E.P.A.*, 852 F.2d 574, 580 (D.C. Cir. 1988)). This deference

acknowledges the "informed discretion of the responsible federal agencies," and

extends to the "technical documents, studies and other relevant scientific information" in

the record. *South Trenton Residents Against 29 v. FHA*, 176 F.3d 658, 666 n.6 (3d Cir.

1999) (internal citations omitted).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

DNREC argues that the alleged statutory violations present in the Corps'

decision to proceed with the Deepening Project compel the conclusion that DNREC is

likely to prevail in this litigation. The court analyzes each alleged violation in turn within

the strictures of the APA.

#### 1. Clean Water Act

DNREC alleges that section 313 (a) of the CWA results in an explicit waiver of

the Corps' sovereign immunity with respect to the Deepening Project. Specifically, it is

averred that section 313(a) of the CWA applies because: (1) the Corps has engaged in

an activity which may result in the discharge of a pollutant; and (2) Delaware has

implemented a program governing the control and abatement of water pollution in Title

7, Chapters 72 (Wetlands), 66 (Water Quality) and 60 (Subaqueous Lands) of the

Delaware Code. *See* 33 U.S.C. § 1323(a). DNREC submits that this waiver subjects

the Corps to the regulatory process contained in these chapters, and that the Corps

must obtain the necessary permits prior to the commencement of construction related

to the Deepening Project.

"Pollutant" is defined to encompass dredged material, 33 U.S.C. § 1362(6), thus falling within the ambit of CWA section 313(a). As noted above, however, a waiver of a more limited nature appears in CWA section 404(t), which specifically governs the discharge of dredged material. *See* 33 U.S.C. § 1344(t). Because both sections effectively speak to the same activity, it is axiomatic that the more specific provision, section 404(t), governs the Corps' dredging activities in the Deepening Project. *Lee v. Ashcroft*, 368 F.3d 218, 223 (3d Cir. 2004) (employing the "commonplace [rule] of statutory construction" that the "specific governs the general."). Accordingly, the Deepening Project is subject to Delaware's substantive and procedural requirements governing the discharge of dredge materials so long as the Secretary of the Army's authority to maintain navigation remains unimpaired.

The Assistant Secretary of the Army's finding that DNREC's delay impaired this authority effectively abrogated any waiver of sovereign immunity present in CWA section 404(t). *In re Operation of the Mo. River Sys. Litig.*, 418 F.3d 915, 918 (8th Cir. Minn. 2005) (finding no ambiguity in section 404(t) which "on its face . . . exempts the Corps, which operates under the authority of the Secretary of the Army, from complying with the CWA when its authority to maintain navigation would be affected.").[20] Such a

[20]DNREC seeks to limit the scope of the sovereign immunity retained in CWA section 404(t). DNREC argues that, because this section only prohibits impairment of the Secretary's authority to "maintain navigation," sovereign immunity cannot be invoked where, as here, the project consists not of the maintenance of navigation, but of the expansion of such. The court finds no reason (or caselaw) to suggest that Congress intended such a narrow reading.

In fact, the plain meaning of this phrase suggests otherwise. Merriam-Webster's Online Dictionary includes among its definitions of "maintain," "preserve from failure or

20

finding is highly technical and involves considerations exclusively within the purview of

the Corps' expertise regarding this nation's waterways. Consequently, the court must

afford great deference to this finding. SPGA, 121 F.3d at 117.

Regardless of the high degree of deference attributable to the factual findings

underpinning the decision to invoke the navigation exception, the record does not

suggest that the decision itself was arbitrary or capricious. The Corps maintains a

national presence, invariably working within the diverse regulatory schemes present in

each of the fifty states. That the navigation exception has received such sparse judicial

treatment emphasizes the infrequency with which a serious conflict arises between the

Corps' Congressional mandate and these regulatory schemes.[21] And contrary to

DNREC's assertion otherwise, this scenario should assuage any lingering doubts that

the Corps, pursuant to its Congressional grant of authority, lightly engages in activities

that would result in the frustration of state policy. Nor does it seem that, on the basis of

DNREC's unexplained and prolonged delay, the Secretary of the Army's decision to

invoke the navigation exception defies logic. In sum, DNREC has failed to demonstrate

_____

decline." http://www.merriam-webster.com/dictionary/maintain (last visited January 21, 2010). "Navigation" is a fluid concept, referring to "the science of getting ships . . . from place to place." Id., http://www.merriam-webster.com/dictionary/navigation (last visited January 21, 2010). As vessel design continues to change, the science of moving vessels from place to place must adapt as well. It follows that as navigation acquires a new meaning over time, so too must any efforts to prevent the failure or decline of such. Nothing in this factual scenario suggests that the Deepening Project is the result of anything other than the Corps' assessment that, in order to prevent the failure or decline of navigation, the Delaware River must be dredged to the new depth of forty-five feet.

[21]The parties agree that In re Operation of the Mo. River Sys. Litig. is the first and only case to construe the navigation exception. 418 F.3d 915.

the absence of a rational connection between the finding of delay and the decision to

invoke the navigation exception contained in CWA section 404(t). *Motor Vehicle*, 463

U.S. at 43.

### 2. Clean Air Act

The Corps has made its final determination that the Deepening Project will

conform to the applicable SIPs.  In this conformity determination, the Corps identified

that the Deepening Project will exceed the *de minimis* threshold for NOx, a criteria

pollutant.[22]  (D.I. 59, ex. 2 at 3)  These excess emissions require the Corps to employ a

mitigation measure in order to demonstrate conformity.  *See* 40 C.F.R. § 93.158(a)(2).[23]

The Corps concluded that the purchase of ERCs represented the most appropriate

mitigation measure to demonstrate conformity.  (D.I. 59, ex. 2 at 4)

Notably absent from the Corps' final conformity determination is the enforceable

measure pursuant to which the ERCs will be obtained.  *See* 40 C.F.R. § 93.158(a)(2).

In the Report, the Corps notes that,

> [b]ased on discussion with a local broker, several thousand credits are expected

---

[22]The Corps estimates that the Deepening Project will produce an annual peak of
607 tons of NOx, which exceeds the *de minimis* threshold of 100 tons.  (*Id.*)  A total of
3,038 tons of NOx emissions is expected to occur over the life of the Deepening
Project.  (*Id.*)

[23]The statute provides that a project will conform to the SIP

> [f]or ozone or nitrogen dioxide, [if] the total of direct and indirect emissions from
> the action are fully offset within the same nonattainment or maintenance area
> through a revision to the applicable SIP or a **similarly enforceable measure**
> that effects emission reductions so that there is no net increase in emissions of
> that pollutant.

(emphasis added)

22

> to be readily available in the Philadelphia area (the five counties in PA that are part of the 18 county, 4 state ozone nonattainment area). The anticipated market price is roughly $10,000 per ton. However, specific availability of credits and actual sale price are subject to negotiation when the project sponsors are ready to make an offer to purchase. Credits from New Jersey are likely to be both more available and less expensive (on the order of $3,000 to $4,000 per ton).

(D.I. 4, ex. P) While a degree of imprecision seems unavoidable in such a transaction, the Corps' failure to sufficiently identify a specific source and amount of ERCs does not rise to the level of commitment contemplated by a "similarly enforceable measure." 40 C.F.R. § 93.158(a)(2). Without this additional information, the record does not support a finding that the Corps has made a rational determination that the Deepening Project conforms to the applicable SIPs in compliance with the CAA for the life of the project.

### 3. Coastal Zone Management Act

Notwithstanding DNREC's initial concurrence with the Corps' consistency determination, DNREC argues that the Corps has failed to certify that the Deepening Project is consistent with the DCMP "to DNREC's satisfaction." (D.I. 4 at 24) Specifically, DNREC claims that substantial changes to the Deepening Project since its initial concurrence mandate that the Corps engage in a supplemental consistency determination. See 15 C.F.R § 930.46.

Initially, the court notes that DNREC's satisfaction in this respect is inapposite to whether the Corps has complied with the requirements of the CZMA. The Corps may proceed with the Deepening Project over the objections of DNREC, as long as the Corps has concluded that the Deepening Project is "fully consistent" with the management program. 15 C.F.R § 930.43(d)(2). Moreover, and most germane to this

23

analysis, DNREC has already concurred in the Corps' consistency determination. Once DNREC concurred, it waived any objections to the Deepening Project with respect to the DCMP. *See* 15 C.F.R. § 930.41(d). For the same reasons, NJDEP may not revoke its concurrence with the Corps' consistency determination. *Id.*

As noted above, for the Corps' initial consistency determination to pass muster under the CZMA, any interim changes to the Deepening Project must not have resulted in effects substantially different from those described in the initial determination. *See* 15 C.F.R. § 940.46(a). The Corps identified no such effects. (D.I. 33, ex. 10) In reaching this conclusion, the Corps considered three differences between the present Deepening Project and that to which Delaware and New Jersey concurred in 1997: (1) a reduction in dredged material and removal of the need for new disposal sites; (2) plans to place sand directly onto Broadkill Beach in Delaware; and (3) deferral of the Egg Island Point beneficial use project in New Jersey. (*Id.* at ¶¶ 5-11) The Corps determined that these differences affected neither the dredging plan nor its impacts on the coastal zone. (*Id.*)

The Corps similarly considered whether new circumstances or information relevant to coastal uses or resources would trigger the need for a supplemental consistency determination. Among the factors relevant as new circumstances or information, the Corps studied the effects of the 2004 Athos oil spill and the increase in shortnose sturgeon. (*Id.* at ¶¶ 12, 13) The post-spill sediment analysis found no change in sediment quality. Likewise, the Corps had already considered the presence of sturgeon in its initial consistency determination. Accordingly, the Corps found that

24

neither factor presented a substantial effect that would warrant a supplemental consistency determination. (Id.)

In light of the foregoing, the court finds that the administrative record supports the Corps' determination that no substantial effects existed so as to warrant a supplemental consistency determination.

### B. Likelihood of Irreparable Injury

DNREC proffers two potential mechanisms through which allowing the Corps to proceed with the Deepening Project would likely result in irreparable harm. First, allowing the Corps to bypass the state regulatory process allegedly runs afoul of Delaware's sovereign authority. Second, it is asserted that the Corps' activities will result in harm to the environment, such as water pollution and the destruction of subaqueous lands or wetlands.

With respect to its allegation of sovereign harm, DNREC has failed to cite to any precedent which would lend credence to this theory. Under each of the CWA, CAA and CZMA, the states enjoy environmental authority concomitant with the federal government. And the states certainly have an interest in the regulation and control of activity on state land. Ultimately, however, the federal supremacy principles apparent in each of these regimes require that state law yield in certain statutorily defined circumstances. With respect to the CWA, this principle arises in the Corps' Congressional charge to maintain navigation. See 33 U.S.C. § 1344(t). Accordingly, a federal agency's employment of a federal statutory mechanism to bypass state control cannot result in harm relevant to the Winter inquiry.

25

Injury to the environment constitutes irreparable harm. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (U.S. 1987); *Natural Resources Defense Council v. Texaco Ref. & Mktg.*, 2 F.3d 493, 506 (3d Cir. 1993). Indeed, courts have recognized that "there is no adequate remedy at law to compensate the public for the harm caused by the disposal of fill material into tidal wetlands." *United States v. Ciampitti*, 583 F. Supp. 483, 498 (D.N.J. 1984). However, environmental harm must be substantiated, as it would be "contrary to traditional equitable principles" to presume irreparable injury from an agency's alleged failure to evaluate thoroughly the environmental impact of a proposed action. *Amoco*, 480 U.S. at 545. The burden of substantiating this harm is implicit in DNREC's general burden of clearly justifying its request for relief prior to a full examination of the merits of its case. *Winter*, 129 S. Ct. at 375.

It is especially telling that DNREC has failed to support its claims of environmental injury with any physical evidence tending to show such injury. While the Deepening Project will eventually result in wetlands discharges, the spoils from the dredging of Reach C will be deposited in the Killcohook CDF. Accordingly, Delaware will suffer no injury associated with wetlands discharges until after December of 2010, when the Deepening Project will move beyond Reach C. The court further finds that these discharges, occurring almost one year in the future, are sufficiently remote to discount under the *Winter* analysis. *Id.*

Likewise, New Jersey has failed to adduce any convincing evidence of environmental injury which demonstrates a likelihood of irreparable injury. As an initial matter, Reach C and the Killcohook CDF are located entirely in Delaware.

26

Consequently, New Jersey is insulated from any discharges until after December 2010. The remainder of the harms alleged by NJDEP do no more than suggest that there **might be** environmental harm from dredging and disposal of potentially contaminated sediment.[24] The mere possibility of harm, of course, does not rise to the requisite level of likelihood. *Id.*

Indeed, the Corps has proffered the only study of sediment samples before the court. (D.I. 45) The Corps conducted a study of soil sediments taken from twelve locations in the three bends of Reach C. (*Id.* at ¶ 1) From these sediment samples, the Corps found that: (1) there were no exceedences of any heavy metal; and (2) minor exceedences existed in three of the samples. (*Id.* at ¶ 3) Both the EPA and the United States Fish and Wildlife Service have agreed with the Corps' conclusion that sediment contamination will not cause any adverse impact. (*Id.* at ¶ 4)

The court is mindful of the increased potential for environmental harm that accompanies the failure to adequately investigate a project of this size and stature. However, the Deepening Project, while different in scope, is not vastly different from Delaware River maintenance dredging that the Corps has engaged in for decades. The lack of evidence in the record demonstrating environmental harm, when considered along side the Corps' sediment study, is consistent with the Corps' conclusion that

---

[24]NJDEP has asserted, inter alia, that: "Sediments . . . have significant potential to be contaminated . . . ." (D.I. 17 at ¶ 8); ". . . impacts to surface water quality and the aquatic ecosystem that could result from the discharge of dewatering effluent . . . ." (*Id.* at ¶ 11(d)); ". . . analysis is required to evaluate the potential adverse impacts to surface water quality, groundwater quality, the aquatic and terrestrial ecosystems, and public health that could result from the dredging operations and the disposal of 'reach specific' dredged material." (*Id.* at ¶ 11(h)).

27

impacts from the deepening of Reach C will be largely identical to impacts that have
been occurring since 1973 with regular maintenance dredging.

### C. Balance of Equities and Public Interest

The court acknowledges the substantial weight accorded to the public interest by
the Supreme Court in *Winter*. The public's interest in both the derivation and
consequences of this litigation are significant. On one hand, the public holds a vested
interest in the nation's environmental preservation efforts. Congress has manifested
the public interest in this regard in environmental statutes such as the CWA. *Ciampitti*,
583 F. Supp. at 499 (noting that "[i]t is axiomatic that the public interest under the
[CWA] requires strict enforcement of the statute so as to clean up the nation's waters
and preserve the surrounding ecological environment").

On the other hand, the public holds an equally compelling stake in the continued
economic vitality of the Delaware River ports. Based on the volume of business
passing through these ports, any loss in market share due to the ports' incapacity to
handle ships of a certain draft will harm the local economy. In light of these factors,
Congress has made the determination that it is in the public interest to proceed with the
Deepening Project.

### V. CONCLUSION

Through its motion for a preliminary injunction, DNREC requested the
extraordinary relief of enjoining a federal agency from proceeding with a project
approved and funded by Congress (to maintain navigation on the Delaware River),
under circumstances where neither the activities being examined (dredging the

Delaware River under the complex environmental regime at play) nor the parties to the activities (the Corps and the States of Delaware and New Jersey) were new. It was DNREC's burden to clearly prove that it would likely succeed on the merits and be irreparably harmed before a decision on the merits can be rendered, and that the balance of equities and the public interest weighed in its favor. In support of its petition, DNREC primarily relied on the fact that the Corps had not successfully completed DNREC's administrative process, despite the fact that DNREC itself had conspicuously failed to administer the process in a timely, efficient and efficacious way.

The court concludes that DNREC has not carried its burden of clearly demonstrating that the deepening of Reach C should be enjoined prior to a full examination of the merits of its case. To that extent, DNREC's motion is denied. However, given the Corps' representations that the next stage of the Deepening Project will not commence until December 2010, and given DNREC's representation that, this time around, its administrative review will be completed within a year, DNREC's motion is granted as to the remainder of the Deepening Project which, but for the deepening of Reach C, is hereby preliminarily enjoined until further order of the court. This decision reflects the competing interest of the environment and the economy, and gives the parties the opportunity to satisfy their respective obligations to govern responsibly.