IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE DEPARTMENT OF NATURAL RESOURCES AND ENVIRONMENTAL CONTROL, | ) ) ) | |
| Plaintiff, | ) ) | |
| STATE OF NEW JERSEY, | ) ) | |
| Plaintiff-Intervenor, | ) ) | |
| DELAWARE RIVERKEEPER NETWORK, the DELAWARE RIVERKEEPER, DELAWARE NATURE SOCIETY, NATIONAL WILDLIFE FEDERATION, NEW JERSEY ENVIRONMENTAL FEDERATION, CLEAN WATER ACTION, | ) ) ) ) ) ) | |
| Plaintiffs-Intervenors, | ) ) | |
| v. | ) | Civ. No. 09-821-SLR |
| UNITED STATES ARMY CORPS OF ENGINEERS (USACOE), the HONORABLE JOHN MCHUGH, Secretary of the Army, in his official capacity, the HONORABLE JO-ELLEN DARCY, Assistant Secretary of the Army, in her official capacity, LT. GEN. ROBERT L. VAN ANTWERP, JR., Commander, USACOE, in his official capacity and LT. COL. THOMAS TICKNER, Commander, USACOE, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| PHILADELPHIA REGIONAL PORT AUTHORITY, | ) ) ) | |
| Defendant-Intervenor. | ) | |

Joseph R. Biden, III, Attorney General, Jennifer D. Oliva, Deputy Attorney General, Kevin P. Maloney, Deputy Attorney General and Devera Breeding Scott, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware. Counsel for Plaintiff.

Allison E. Reardon, Deputy Attorney General and Patricia Davis Oliva, Deputy Attorney General of Delaware Department of Justice, Wilmington, Delaware.  Counsel for Plaintiff-Intervenor.  Of Counsel:  Anne Milgram, Attorney General, Rachel J. Horowitz, Deputy Attorney General, Eileen P. Kelley, Deputy Attorney General, Kristen D. Heinzerling, Deputy Attorney General and Lauren J. Trasferini, Deputy Attorney General of the New Jersey Office of the Attorney General, Trenton, New Jersey.

Mary A. Jacobson, Esquire of the Mid-Atlantic Environmental Law Center, Wilmington, Delaware.  Counsel for Plaintiffs-Intervenors.  Of Counsel:  Elizabeth Koniers Brown, Esquire of the Delaware Riverkeeper Network, Bristol, Pennsylvania.

Patricia C. Hannigan, Assistant United States Attorney of the Office of the United States Attorney, Wilmington, Delaware.  Counsel for Defendants.  Of Counsel:  Ignacia S. Moreno, Assistant Attorney General, Kent E. Hanson, Attorney, and Kristofor R. Swanson, Attorney of the United States Department of Justice, Washington, District of Columbia.

Beth Moskow-Schnoll, Esquire and Sean J. Bellow, Esquire of Ballard, Spahr, Andrews & Ingersoll, LLP, Wilmington, Delaware.  Of Counsel:  Thomas W. Corbett, Jr., Attorney General for the Commonwealth of Pennsylvania; Barry N. Kramer, Deputy Attorney General of the Pennsylvania Office of the Attorney General; Glenn L. Unterberger, Esquire, Harry Weiss, Esquire and Marlene S. Gomez, Esquire of Ballard Spahr LLP, Philadelphia, Pennsylvania; and Barry P. Steinberg, Esquire of Kutak Rock LLP, Washington, D.C.

## MEMORANDUM OPINION

Dated:  November 16, 2010
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Delaware Department of Natural Resources and Environmental Control ("DNREC") brought this action pursuant to Administrative Procedure Act ("APA") section 706, 5 U.S.C. § 706, to challenge decisions made by the U.S. Army Corps of Engineers ("Corps") pursuant to the Clean Water Act ("CWA"), the Clean Air Act ("CAA"), and the Coastal Zone Management Act ("CZMA") in connection with a project to deepen the main navigation channel of the Delaware River from 40 feet to 45 feet ("the Deepening Project"). In its complaint, DNREC alleges that the Corps' decision to proceed without obtaining the requisite federal and state approval violates numerous provisions of the federal and state regulatory process governing such activities including, inter alia, the CWA, the CAA, the CZMA, as well as Title 7, Chapters 72 (Wetlands), 66 (Water Quality) and 60 (Subaqueous Lands) of the Delaware Code. (D.I. 1) The court has previously granted in part and denied in part DNREC's motion for a preliminary injunction. (D.I. 63) DNREC now moves for summary judgment seeking final resolution of its claims. (D.I. 85) The State of New Jersey Department of Environmental Protection ("NJDEP"), which has intervened as a plaintiff, joins in DNREC's motion. Also pending before the court is a motion for summary judgment filed by plaintiff-intervenors Clean Water Action, Delaware Nature Society, Delaware Riverkeeper Network, National Wildlife Federation, New Jersey Environmental Federation, and The Delaware Riverkeeper (hereinafter, "environmental plaintiffs") (D.I. 89), as well as defendant-intervenor the Philadelphia Regional Port Authority's ("PRPA's") cross-motion for summary judgment (D.I. 94). The court has jurisdiction

over this action pursuant to 28 U.S.C. §§ 1331, 1346 and 2201.  Venue is proper

pursuant to 28 U.S.C. § 1391.  For the following reasons,    .

## II. BACKGROUND

### A.  Timeline of Events

The court incorporates by reference its prior opinion discussing in detail the

background of the present action, and will reiterate those facts most critical to the

motions at bar herein.[1]  As discussed by the court previously, the Corps consistently

maintains the Delaware River channel at a depth of 40 feet.  Due to the increasing size

of modern vessels, which favors deeper drafts, Congress directed the Corps in 1983 to

explore whether it was in the federal interest to deepen the Delaware River channel.

After years of study, the Corps submitted a *Final Interim Feasibility Report and

Environmental Impact Study* ("the EIS")[2] in 1992, which concluded that a depth of 45

feet was necessary to accomodate the current trend of vessel drafts.  The Corps

supported this conclusion with its findings that the Deepening Project was

environmentally sound, economically justified and technically advisable.  In 1992,

pursuant to the recommendations made in the EIS, Congress authorized the Corps to

deepen a 102-mile segment of the channel to 45 feet, and has appropriated significant

funds towards the project's estimated total cost of $300 million.

---

[1]The facts regarding the relevant events are not disputed in the motions before the court and, as such, the court omits citation to those facts discussed in the court's prior opinion. *See State of Delaware Dept. of Natural Resources and Environmental Control v. U.S. Army Corps of Engineers (USACOE)*, 681 F. Supp. 2d 546, 549-54 (D. Del. 2010) (hereinafter, "*Prelim. Inj. Opinion*").

[2]An EIS is a document required by NEPA for actions "significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(C).

In December 1996, for purposes of compliance with the CZMA,[3] the Corps provided a consistency determination for the Deepening Project to both DNREC and the New Jersey Department of Environmental Protection ("NJDEP"). After identifying certain concerns, which the Corps agreed to address in the implementation of the Deepening Project, DNREC concurred with the Corps' consistency determination. NJDEP likewise concurred after it signed a memorandum of understanding with the Corps.

The Corps addressed certain residual concerns raised by the EIS and subsequent environmental investigations in its 1997 *Supplemental Environmental Impact Statement* ("the SEIS"). In 1998, the Corps issued its *Limited Reevaluation Report,* which reflected adjusted costs for, and benefits of, the Deepening Project. After vetting the SEIS through a notice and comment period, the Corps signed a *Record of Decision* ("the ROD") in December 1998.

In January 2001, the Corps then submitted its application to DNREC for a subaqueous lands and wetlands permit pursuant to Delaware's Subaqueous Lands Act, 7 Del. C. Ch. 72, and Wetlands Act, 7 Del. C. Ch. 66. In October 2001, DNREC provided notice that the application was complete. DNREC subsequently hired Timothy Bureau, an independent environmental consultant ("the consultant"), to preside over a two-day public hearing regarding the application, which hearing was held on December 4 and 5, 2001. DNREC subsequently provided a comment period to generate discourse between the public and the Corps.

---

[3]*See* 16 U.S.C. § 1456(c)(1)(A).

3

In 2002, NJDEP informed the Corps that it was "revoking" its concurrence due to alleged substantial changes that had occurred in the previous five years. In June 2002, the General Accounting Office of DNREC ("the GAO") issued an audit of the Deepening Project. The Corps requested that DNREC suspend the permit review process so that the Corps could address the indicated errors; it submitted an economic reanalysis to DNREC on December 20, 2002. In December 2003, the consultant issued findings and recommendations to DNREC, wherein he recommended the denial of the Corps' 2001 application ("the 2003 Report"). The consultant cited both a lack of documentation tending to demonstrate that the "adverse effects [of the Deepening Project] have been minimized" and a failure to meet "the regulatory standards and requirements necessary to approve the project as proposed" by the Corps. The consultant concluded with a recommendation that DNREC provide the Corps with the opportunity to modify its application to address these concerns.

No action on the 2001 application was taken by DNREC subsequent to the 2003 Report. Five years later, in December 2008, the Corps publicly noticed an Environmental Assessment ("the EA") containing a review of the information generated since the 1997 SEIS, and provided roughly one month for public comment.[4] The then-DNREC Secretary John A. Hughes notified the Corps that, while the EA addressed certain of the concerns raised in the 2003 Report, DNREC would not provide technical commentary because of the short comment window. Rather, Secretary Hughes proposed that DNREC  would consider the contents of the EA within the

---

[4]The court previously noted that the degree of persistence exhibited by the Corps with respect to the prosecution of its application during this timeframe is unclear.

4

context of a new subaqueous lands and wetlands permit and a supplemental consistency certification. Secretary Hughes concluded by proffering a list of additional information that the Corps would need to submit to complete its submission.

The Corps took several significant steps in April 2009. During that month, the Corps issued its final EA (hereinafter, the "2009 EA"), concluding that any changes to the Deepening Project would have "no significant adverse effects" over those previously enumerated in the EIS, SEIS, and ROD. Additionally, the Corps sent the 1997 SEIS and 2009 EA to two members of Congress. On April 30, 2009, the Assistant Secretary of the Army for Civil Works, John Paul Wooley, Jr., issued a Memorandum of Record finding that "the State of Delaware's refusal to provide the subject State permit in a timely and responsible manner would interfere with navigation for the 'upstream states,'" and "has impaired the Secretary of the Army's authority to maintain navigation as specifically directed by Congress in Public Law 102-580, section 101(6).[5] This finding invokes the "navigation exception" found in CWA section 404(t), which exempts the Corps from regulation under the CWA and affiliated state programs. *See In re Operation of the Mo. River Sys. Litig.*, 418 F.3d 915, 918 (8th Cir. 2005).

Three months later, on July 23, 2009, new DNREC Secretary Collin P. O'Mara issued an order denying the Corps' 2001 application for Delaware subaqueous lands and wetlands permits. Secretary O'Mara based his denial upon both the 2003 Report and the alleged substantial changes to the Deepening Project since the application's inception. Secretary O'Mara also pledged that, should the Corps choose to submit a

---

[5]The court will hereinafter address this determination as that of the "Secretary." Mr. Wooley issued the preceeding statement on his last day in office.

5

new permit application, DNREC "will conduct a thorough scientific review and [ ] the permitting process will be efficient, timely and transparent." Specifically with respect to the CZMA, Secretary O'Mara stated that DNREC required a supplemental consistency determination in view of "substantial project modifications" occuring since the 1996 consistency determination (in which DNREC concurred). The Corps has since determined that no substantial changes in the Deepening Project exist as to require the issuance of a supplemental consistency determination.

In August 2009, the Corps issued a *Draft Conditional Statement of Authority* ("the draft CSA") addressing the Deepening Project's compliance with state implementation plans ("SIPs"), as required by the CAA.[6] After reviewing objections by environmental plaintiffs, NJDEP and others, the Corps prepared a new proposal in November 2009, entitled the *General Conformity Analysis and Mitigation Report* ("the GCAM Report"). The Corps determined therein that the Deepening Project conforms to the applicable SIPs. A final determination was issued on December 30, 2009 following a public comment period ("the final Conformity Determination"), stating that the Deepening Project would conform with the applicable SIPs pending the purchase of emission reduction credits ("ERCs") to offset pollutant nirtogen oxide ("NOx") emissions generated during the dredging.

In October 2009, the Corps entered into a contract with the PRPA for the annual maintenance dredging along portions of the Delaware River ("the PRPA contract"). The contract authorizes maintenance dredging in Reach B and Reach C of the Delaware

---

[6]42 U.S.C. § 7506(c)(1).

6

River, and also contains an option clause which, if exercised by the Corps, would authorize dredging in portions of Reach C, an area south of Wilmington, Delaware to just south of the Chesapeake and Delaware Canal, to the 45 feet needed for the Deepening Project.

The present litigation was filed by DNREC on October 30, 2009.

Commensurately with its complaint, DNREC filed a motion to preliminarily enjoin the Corps from engaging in any deepening activity on the Delaware River until the Corps demonstrates compliance with all applicable state and federal legal requirements. In its January 27, 2010 opinion, the court denied DNREC's request with respect to Reach C, however, granted an injunction with respect to the other phases of the Deepening Project in view of: (1) the Corps' representation that the next stage of the Deepening Project would not commence until December 2010; and (2) DNREC's representation that, this time around, its administrative review would be completed within a year. *Prelim. Inj. Opinion,* 681 F. Supp. 2d at 563. On July 15, 2010, the court denied DNREC's motion to expand the administrative record beyond that lodged by the Corps. (D.I. 80) The parties have since filed summary judgment motions addressing the merits of DNREC's claims.

## B. The CWA's "Maintain Navigation" Exception

The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). CWA section 313(a) establishes a limited waiver of soverign immunity with respect to the states' regulation of pollutants by federal agencies, as follows:

7

>Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in **any activity resulting, or which may result, in the discharge or runoff of pollutants**, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.

33 U.S.C. § 1323(a) (1977) (emphasis added). This waiver of soverign immunity is

limited by CWA section 511(a), which states that:

>This chapter shall not be construed as (1) limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter; (2) affecting or impairing the authority of the Secretary of the Army (A) to **maintain navigation** or (B) under the Act of March 3, 1899 (30 Stat. 1112); except that any permit issued under section 1344 of this title shall be conclusive as to the effect on water quality of any discharge resulting from any activity subject to section 403 of this title, or (3) affecting or impairing the provisions of any treaty of the United States.

33 U.S.C. § 1371(a) (1974) (emphasis added).

In December 1977, Congress amended the CWA to add section 404(t),

addressing discharges of dredged or fill material by federal agencies. Section 404(t)

provides:

>(t) Navigable waters within State jurisdiction

>Nothing in this section shall preclude or deny the right of any State or interstate agency to **control the discharge of dredged or fill material** in any portion of the navigable waters within the jurisdiction of such State, including any activity of any Federal agency, and each such agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge

8

of dredged or fill material to the same extent that any person is subject to such requirements. **This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation.**

33 U.S.C. § 1344(t) (1977) (emphasis added).

Also in December 1977, Congress added section 313 to the CWA to provide that

federal facilities "shall be subject to, and comply with, all Federal, State, interstate, and

local requirements, administrative authority, and process and sanctions regarding the

**control and abatement of water pollution** in the same manner, and to the same

extent as any nongovernmental entity including the payment of reasonable service

charges." 33 U.S.C. § 1323(a) (emphasis added). Congress explained in the House

bill that

> [t]he preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law.

See PL 95-217, 1977 HR 3199 (Dec. 27, 1977) (emphasis added). The relevant

Senate bill addressed both the changes to sections 313 and 404(t), as follows.

> The act has been amended to indicate unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws. Though this was the intent of the Congress in passing the 1972 Federal Water Pollution Control Act Amendments, the Supreme Court, encouraged by Federal agencies, has misconstrued the original intent.
>
> Since the substantive requirements of the act and of State and local law would be unenforceable unless procedural provisions were also met section 313 is amended to specify that, as in the case of air pollution, a Federal facility is subject to any Federal, State, and local requirement respecting the control or abatement of water pollution, both substantive and procedural, to the same extent as any person is subject to these requirements. . . .

9

The amendment to section 404 clarifies the intent of Congress relative to the dredging activities of the U.S. Army Corps of Engineers. To maintain navigation on the Nation's waterways is in the national interest. **However, corps dredging activities, like any municipal or industrial discharge to the Nation's waters, or any private dredging activities, should be conducted in compliance with applicable State water quality standards.** The corps, like other Federal agencies, should be bound by the same requirements as any other discharger into public waters.

* * *

By this amendment, the committee clarifies that corps dredging activities are not exempt from State pollution abatement requirements. . . . The intention of the 1972 act was not to exempt the corps or any other public or private agency from State water quality standards and the interpretation of section 404 by the courts is at variance with the intent of Congress. In fact, Congress intended that section 404 in the 1972 act would in its initial implementation end the open water disposal of dredge spoil. Quite the contrary has been the case.

* * *

This amendment to section 404 is neither intended nor expected to result in compromising the ability of the corps to maintain navigation. The States that have taken administrative and judicial action to seek corps compliance with water quality standards have a comparable interest in the movement of commerce on waterways maintained by corps dredging. The committee expects that such States will act both to ensure compliance with water quality standards and continued corps dredging activities.

S. Rep. 95-370 at *67-69 (emphasis added).[7]

## III. STANDARDS

### A. APA

Under the APA, a court reviewing the final decision of an administrative agency

"shall decide all relevant questions of law, interpret constitutional and statutory

provisions, and determine the meaning or applicability of the terms of [the] agency

_____

[7]*Judge – This history may move to the discussion if it is necessary to address legislative intent; it could possibly be omitted otherwise.*

10

action." 5 U.S.C. § 706. "Accordingly, the issue is whether the administrative determination was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anker Energy Corp. v. Consolidation Coal Co.*, 177 F.3d 161, 169 (3d Cir. 1999) (quoting 5 U.S.C. § 706(2)(a)). This scope of review is narrow and the court should not substitute its judgment for that of the agency unless the agency's determination is "plainly erroneous or inconsistent with the regulation." *Motor Vehicle Mfrs. Assn. v. State Farm Mutual*, 463 U.S. 29, 43 (1983); *Leia v. Ashcroft*, 393 F.3d 427, 432 (3d Cir. 2005) (internal citations omitted).

## B. Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts

11

and all reasonable inferences therefrom in the light most favorable to the party

opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The

mere existence of some evidence in support of the nonmoving party, however, will not

be sufficient for denial of a motion for summary judgment; there must be enough

evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails

to make a sufficient showing on an essential element of its case with respect to which it

has the burden of proof, the moving party is entitled to judgment as a matter of law.

*See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. The Secretary's Determination to Invoke the Navigation Exception

#### 1. Applicability of the exception

The threshold issue presented to the court on the parties' motions is whether the

limited exception to the sovereign immunity waiver contained in CWA § 404(t) was

properly invoked by the Secretary with respect to the Deepening Project. Put another

way, is the dredging of the Delaware River from 40 to 45 feet a matter of navigational

"expansion" or "enhancement" as plaintiffs claim, or of "maintenance," as contemplated

by section 404(t)? The question is one of first impression.

In invoking the navigation exception, the Secretary has indicated that the Army

interprets "maintenance" to encompass deepening under the present circumstances.

> When a court reviews an agency's construction of the statute which it
> administers, it is confronted with two questions. First, always, is the question
> whether Congress has directly spoken to the precise question at issue. If the
> intent of Congress is clear, that is the end of the matter; for the court, as well as

12

the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,

842-43 (1984). The CWA does not explicitly define "maintenance," nor does the

legislative history speak to the issue. The court is tasked, therefore, with determining

whether section 404(t) may permissibly be construed as applicable to the Deepening

Project.[8]   The court previously found "no reason (or caselaw) to suggest that Congress

intended such a narrow meaning" as plaintiffs advocate.[9]

_____

[8]At the preliminary injunction stage, the court stated that a high degree of deference is "attributable to the factual findings underpinning the [Secretary's] decision to invoke the navigation exception." *Prelim. Inj. Op.*, 681 F. Supp. 2d at 559. Here, the court is asked to evaluate whether the exception may apply in the first instance. The court disagrees with DNREC's assertion that the Secretary's interpretation is "informal" and, therefore, not entitled to *Chevron* deference. (D.I. 99 at 4) As stated in his April 30, 2009 memorandum, Mr. Wooley believes that this is only the second instance where any Army official has invoked the navigation exception at issue here. (AR030957) The court does not interpret as "informal" such a determination. (*See id.* (stating that the action "should not be undertaken lightly by the Federal government."))

[9]As discussed in the court's prior opinion,

Merriam-Webster's Online Dictionary includes among its definitions of "maintain," "preserve from failure or decline." http:// www. merriam- webster. com/ dictionary/ maintain (last visited January 21, 2010). "Navigation" is a fluid concept, referring to "the science of getting ships . . . from place to place." *Id.*, http:// www. merriam-webster.com/ dictionary/ navigation (last visited January 21, 2010). As vessel design continues to change, the science of moving vessels from place to place must adapt as well. It follows that as navigation acquires a new meaning over time, so too must any efforts to prevent the failure or decline of such. Nothing in this factual scenario suggests that the Deepening Project is the result of anything other than the Corps' assessment that, in order to prevent the failure or decline of navigation, the Delaware River must be dredged to the

13

Plaintiffs have presented some additional evidence on summary judgment. Plaintiffs cite the dictionary meaning of "maintain," which supports the court's conclusion insofar as the Deepening Project will "preserve from failure or decline" the navigability of the river in view of the expanding size of carrier vessels.  (D.I. 86 at 12) DNREC also cites language from the declaration of Jerry Pasquale, the Chief of Environmental Resources Branch in the Planning Division of the Corps for the Philadelphia district, that

> specifically, with regard to the 45' deepening in Reach C of the Delaware River that is scheduled to be initiated in December 2009 or January 2010,[10] this work will be identical to the 40' maintenance dredging that has been occuring since 1973, with two exceptions:  (1) the channel will be deepened an additional five feet; and (2) at three locations, where the river bends, the channel will be slightly widened.

(Id., citing D.I. 33, ex. 3 at ¶ 5)  This statement does not constitute an admission that the Deepening Project is not "maintenance dredging," only that it differs from prior maintenance dredging.

Plaintiffs point to several other statements made by the Corps in which it characterized the Deepening Project differently than its typical maintenance dredging (to 40 feet).  In the "economic benefits" section of the 2009 EA, the Corps provided that: (1) "[t]he 45 foot channel depth will improve the economic efficiency of ships moving

---

new depth of [45] feet.

*Prelim. Inj. Op.*, 681 F. Supp. 2d at 559, n.20.

[10]As indicated previously, the Corps has more recently represented to the court that it plans to start work in Reach B in December 2010.  DNREC argues that the Corps' changing of its plans demonstrates why Delaware permits and regulatory oversight on the Deepening Project is necessary.

through the Delaware River ports. . . [The largest vessels] will continue to carry the same tonnage from the foreign origin ports but will be able to operate more efficiently in the Delaware River with a deepened channel from reduced lightering"[11] (D.I. 68 at AR024931.0037); (2) such factors, among others, will "more efficiently apportion operating costs over a greater amount of tonnage and further reduce total vessel trips through the port" (id.; AR024931.0039); and (3) "[d]eeper channels would allow some vessels that cannot currently load to their design draft to more fully load their vessels, resulting in reduced per unit operating costs" (id.). (D.I. 90 at 12-13) The benefits to deeper dredging, therefore, relate to reduced costs – not an increase in patronage. (See also D.I. 68 at AR025710 ("The economic basis for the federal project was to increase the efficiency of the fleet currently calling area ports. There is no anticipated increased tonnage as a result of the federal project.") (Nov. 2009 Draft Statement of Conformity (CAA)) The Corps noted in November 2009 that "[t]he future volume of cargo and the fleet is determined by macroeconomic factors that are not affected in any measurable way by channel depth." (Id.) According to the PRPA,

> [i]n today's world of increased trade and deeper draft vessels, maintaining the 40 foot channel is no longer adequate. As international trade grows and the capacity of our existing Port facilities is now reached, the need for improved infrastructure becomes vital if we are to capture these new categories for our region. By deepening the channel, we will enable the Ports of Southeastern Pennsylvania, Delaware and Southern New Jersey to compete for the current generation of larger container ships and other cargo carriers. Our ports' full

---

[11]Lightering is generally the transfer of goods from a larger to a smaller vessel to convey cargo from ship to shore. See, gen., Infomarine On-Line Practical Maritime Vocabulary, available at http://www.maritimeterms.com. Where a port facility is able to accomodate very large vessels, the ships may enter port without having to undergo lightering to decrease its draft, or the distance between the waterline and the bottom of the hull.

15

> participation in that market has the potential to dramatically enhance the volume
> of seaborne trade that traverses our region. . . The Deepening Project [also]
> offers the opportunity to create literally thousands of good paying, blue-collar
> jobs at the Ports and the ancillary industries for the residents of the Delaware
> Valley.

(D.I. 68 at AR024273)[12] Citing the foregoing, environmental plaintiffs argue that the

purpose behind the Deepening Project is not to maintain the current volume of traffic in

and to the Delaware Valley ports, but to expand navigation therein beyond the ports'

present capacity.

Plaintiffs' arguments are not without merit, but they are off-point. The Corps'

subjective view of the Deepening Project does not bear on the issue of whether CWA

§ 404(t) may be permissibly read to encompass the present circumstances. Nor does

the Corps' decision to apply for state permits inform the court's review of the

Secretary's interpretation of the applicability of § 404(t).

As discussed previously, the ordinary meaning of "maintain" is broad and

encompasses the notion of preventing the failure or decline of the status quo. The

concept of "navigation" is also fluid in nature. See Prelim. Inj. Op., 681 F. Supp. 2d at

559, n.20 ("As vessel design continues to change, the science of moving vessels from

place to place must adapt as well. It follows that as navigation acquires a new meaning

over time, so too must any efforts to prevent the failure or decline of such.").

Plaintiffs have not presented evidence tending to demonstrate that "maintain

navigation" must be read narrowly, for example, maritime or military literature bearing

on the conventional understanding of "navigation," or documents relating to the

---

[12]Letter from the PRPA chairman to the Corps, dated December 31, 2008.

"maintenance" of infrastructure. In support of its narrow reading of "maintain navigation," plaintiffs point to the Congressional intent behind the enactment of § 404(t). (D.I. 86 at 11, citing S. Rep. No. 95-370 at 68-69; see also D.I. 90 at 10-11) This argument addresses whether, if properly invoked, the "maintain navigation" exception operates to excuse the Corps' compliance with the CWA – not whether the exception applies in the first instance.

In view of the foregoing, the court finds that CWA § 404(t) may be permissibly read to encompass the Deepening Project. That is, in view of the progression to larger vessels, deepening the Delaware River channel to 45 feet – consistent with other American ports – may be viewed as dredging designed to "maintain" the current level of "navigation" into the area's ports. Having so found, the court next addresses the Secretary's decision to invoke the navigation exception.

## 2. Review of the Secretary's decision

The Secretary's decision to invoke the navigation exception must stand absent evidence that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Anker Energy Corp., 177 F.3d at 169 (3d Cir. 1999). DNREC asserts that the Secretary's decision to invoke the navigation exception has no legitimate basis, because Secretary O'Mara has committed DNREC to "an efficient, timely and transparent permitting process, which is well underway[.]" (D.I. 86 at 15) Environmental plaintiffs parrot this argument, and add that the Corps has not demonstrated that it cannot be successful in obtaining the relevant permits, because DNREC has provided opportunities to "correct, supplement or reapply" for the state permits. (D.I. 90 at 14-15) Although DNREC is correct that the Corps' navigation

17

maintenance responsibilities on the four remaining reaches of the project have not yet been frustrated, it is not clear to the court that DNREC anticipates issuing its final decision prior to December 1, 2010 – the date work on Reach B is scheduled to commence.

Notwithstanding the foregoing, the court is not tasked with reviewing speculation with respect to future delay, but whether the Secretary's decision had a rational basis when it was made. At the preliminary injunction stage, the court found that the Secretary's decision to invoke the navigation exception did not appear at that time to be arbitrary or capricious.[13] The record at bar does not support a deviation from that finding.

The Secretary issued his decision following a 5-year period of inaction on the Corps' 2001 application. Plaintiffs proffer no evidence in support of their argument that

---

[13]The court stated:

> Regardless of the high degree of deference attributable to the factual findings underpinning the decision to invoke the navigation exception, the record does not suggest that the decision itself was arbitrary or capricious. The Corps maintains a national presence, invariably working within the diverse regulatory schemes present in each of the fifty states. That the navigation exception has received such sparse judicial treatment emphasizes the infrequency with which a serious conflict arises between the Corps' Congressional mandate and these regulatory schemes. And contrary to DNREC's assertion otherwise, this scenario should assuage any lingering doubts that the Corps, pursuant to its Congressional grant of authority, lightly engages in activities that would result in the frustration of state policy. Nor does it seem that, on the basis of DNREC's unexplained and prolonged delay, the Secretary of the Army's decision to invoke the navigation exception defies logic. In sum, DNREC has failed to demonstrate the absence of a rational connection between the finding of delay and the decision to invoke the navigation exception contained in CWA section 404(t).

*Prelim. Inj. Op.*, 681 F. Supp. 2d at 559 (citation omitted).

18

the Secretary's decision to invoke federal supremacy following the lengthy delay was arbitrary and capricious. Environmental plaintiffs stress that blame for the delay should not be automatically attributed to DNREC because, in December 2003 and again in 2008, DNREC identified additional information needed in order to evaluate the Corps' application. (D.I. 90 at 18-19) Conspicuously absent from DNREC's papers is an explanation for the 5-year delay between these DNREC communications.[14] In sum, the Secretary's invocation of the navigation exception found in CWA § 404(t) is affirmed insofar as it was based on a permissible reading of the statute and there is insufficient evidence of record demonstrating that the decision itself was an abuse of discretion.

### 3. Effect of the invocation of the navigation exception

The court next addresses whether, despite having properly invoked the navigation exception of CWA § 404(t), the Corps must still comply with the CWA. Plaintiffs' argument in this regard is that the legislative history of the 1977 amendment evidences Congress's intent for the Corps to comply with all state pollution abatement requirements notwithstanding the exception. This same argument was rejected by the Eighth Circuit in *In re Operation of Missouri River System Litigation*, 418 F.3d 915 (8th Cir. 2005) (hereinafter, "*Missouri River Litigation*"), *cert. denied*, 457 U.S. 1018 (2006). In that case, the Eighth Circuit heard an appeal in a dispute between North Dakota and

---

[14]DNREC mentions that the Corps could not have moved forward without first having contracted with a party such as the PRPA, which it did not do until 2009, but does not address the delay on its part. There is no evidence that the Corps could not have secured a partner prior to 2009 had the appropriate permits issued.

19

the Corps involving the application of CWA § 404(t). 418 F.3d at 916. North Dakota[15]

sued to enjoin the Corps from releasing water from Lake Sakakawea into the Missouri

River to support downstream navigation in accord with the goals of the Flood Control

Act of 1944 (the "FCA"). *Id.* North Dakota argued that lowering the level of the lake

would violate state-law water quality standards established by the CWA. The Eighth

Circuit affirmed the district court's dismissal of the complaint, on the basis that the

Corps was immune from suit:

> On its face, § 1371(a) exempts the Corps, which operates under the authority of
> the Secretary of the Army, from complying with the CWA when its authority to
> maintain navigation would be affected. It is also clear from the face of North
> Dakota's complaint that North Dakota is attempting to use its state water-quality
> standards to affect the Corps' authority to release water from Lake Sakakawea
> to support navigation. There are no exceptional circumstances here to indicate
> that Congress would not have intended the § 1371(a) "navigation exception" to
> the waiver of sovereign immunity to apply in this case.

*Id.* at 918. Further, the Court stated that

> the CWA was amended in 1977 to emphasize that it applies to discharges from
> the Corps' channel-dredging operations. North Dakota argues that the legislative
> history from the 1977 amendment evidences Congress' intent for the Corps to
> comply with the CWA in all its operations, in spite of the navigation-based
> limitation in § 1371(a). This argument fails because the 1977 amendment, while
> emphasizing that the limited waiver of sovereign immunity in § 1323(a) applied to
> the Corps, left the clearly worded navigation exception in § 1371(a) intact.
> Absent some ambiguity in the statute, we have no occasion to look to legislative
> history. There is nothing ambiguous about the admonition of § 1371(a) that the
> CWA "shall not be construed as . . . affecting or impairing the authority of the
> Secretary of the Army . . . to maintain navigation." As a result, we do not reach
> the legislative history in this case.

*Id.* (internal citation omitted).

The court finds the foregoing persuasive. Here, the sovereign immunity waiver

---

[15]Nebraska and South Dakota, downstream of North Dakota, also filed
complaints as intervenors.

of CWA § 313(a) (33 U.S.C. § 1323(a)) is clearly limited by the "maintain navigation" exception of CWA § 511(a) (33 U.S.C. § 1371(a)).  Legislative history cannot overcome sovereign immunity clearly provided by statute. *Id.; see also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text . . . A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text[.]") (citations omitted).[16]

DNREC fears that, under such a holding, the Corps could remove all of its projects from state control by invoking the "maintain navigation" exception.  The court neither condones nor anticipates such a result.  As Mr. Wooley stated in his Memorandum of Record, the present invocation of federal supremacy presents only the second instance of the Secretary's utilization of the navigation exception in history; it is not a course of action "undertaken lightly."  (AR030957)  Rather, it has been invoked only to "protect interstate navigation" and, here, to "prevent a downstream state (Delaware) from interfering with interstate navigation needed by upstream states (Pennsylvania and New Jersey.)"  (*Id.*)  In this case, the Corps participated in the Delaware permitting process until it determined that such participation was no longer

---

[16]DNREC cites two decisions by the U.S. Comptroller General on this issue concerning the applicability of state permit fees.  (D.I. 86 at 11-12)  In both cases, the Comptroller General discussed Congress's purpose in adding CWA § 404(t) to clarify that federal facilities are subject to state permitting requirements. *See Application for Permit to Dredge in National Forest – State of Michigan*, 2002 WL 1782692 (Comp. Gen. Jan. 10, 2002); *In the Matter of Payment of State Permit Fee by Federal Agency Under Section 404(t), Federal Water Pollution Control Act*, 1979 WL 14900 (Comp. Gen. Jan. 4, 1979).  The court finds this authority unpersuasive for the reasons provided above.

practicable.  The court anticipaties that the comity between the Corps and the State will continue.[17]

Nor should the court's conclusion be interpreted as its authorizing the Corps to avoid its obligations under the CWA.  According to DNREC,

> [n]ot once . . . has the [Corps] ever applied for a Delaware subaqueous lands permit or water quality certification to maintenance dredge the main channel. Nor has the [Corps] ever complied with the CZMA, CAA or [the National Environmental Policy Act ("NEPA")] in connection with such maintenance dredging.

(D.I. 86 at 13-14) (internal citation omitted)  In contrast to its historical approach to maintenance dredging, the Corps did comply with its environmental obligations in connection with the Deepening Project.  With respect to the CZMA, the Corps undertook a consistency determination in which DNREC and NJDEP concurred in early 1997.  As the court has previously explained, these concurrences are irrevocable.  *See Prelim. Inj. Op'n*, 681 F. Supp. 2d at 560.  Notwithstanding, the Corps prepared the 2009 EA "to evaluate the impacts of changes to the Congressionally authorized project for the [Deepening Project] . . . as well as changes to the existing conditions in the project area from those described in the 1992 [EIS], 1997 [SEIS], and 1998 [ROD] and to consolidate in one document the results of post-SEIS monitoring and data collection efforts."  (AR025147-48)  It was based on these efforts that the Corps concluded that: "(1) none of the changes to the proposed project are 'substantial;' and (2) there are no new circumstances or information that can be considered 'significant'" such as to

---

[17]It is the Corps' position that, although it could have invoked the exception earlier, and currently does not need to engage the permitting process, it has done so "as a matter of comity [and] as a means of allowing Delaware to evaluate potential environmental impacts through its own processes."  (D.I. 97 at 10-11) (citation omitted)

warrant a supplemental consistancy determination pursuant to 15 C.F.R. §

930.46(a)(1).[18]  (AR025148)  The parties now appear to concur that the Corps has

complied with the CAA.[19]  The court does not reach the merits of environmental

plaintiffs' disagreement with the quality of the Corps' 2009 reassessment in view of its

holding,[20] but simply notes the benefit of the Corps' efforts in this regard.

### 4. Conclusion

Having determined that the navigation exception of CWA § 404(t) is applicable

here, and that plaintiffs have not demonstrated that the Secretary's invocation of the

---

[18]Supplementation is required "if the proposed activity will affect any coastal use or resource **substantially different** than originally described" in the coordination process.

[19]Plaintiffs sought judgment that the 2009 EA is incomplete and that the Corps has violated the CAA for failing to account for indirect emissions.  The primary dispute concerned whether the Corps purchased sufficient Emission Reduction Credits ("ERCs") from the appropriate Air Quality Control Region ("ACQR").  In its answering papers, the Corps provides declarations and other evidence documenting that the ERCs have been purchased and their transfers approved.  Plaintiffs do not address the CAA in their reply briefs and, consequently, the court presumes the Corps' evidence sufficiently demonstrates complaince in this regard.

[20]Interestingly, DNREC Secretary O'Mara (or his predecessor) did not ask the Corps to provide a supplemental consistency determination prior to 2009; O'Mara's request was in response to the 2009 EA.  Notwithstanding, environmental plaintiffs assert that the Corps' refusal to provide a supplemental consistency determination is arbitrary and capricious because: (1) only a "limited, surface-level discussion of project changes" is provided; (2) corresponding to three issues (the quantity and placement of dredged material, Athos oil spill and expansion in the number of shortnose sturgeon); and (3) the 2009 EA does not "certify to DNREC's satisfaction that the Main Channel Deepening Project is consistent with Delaware's Coastal Management Program and, therefore, by extension, federal law." (D.I. 90 at 30-31)  Plaintiffs do not clearly articulate how any project changes create a "substantially different" effect on any coastal use or resource.  That plaintiffs disagree with the Corps' conclusion does not indicate an arbitrary or capricious action on the Corps' part.  The court does not make any findings in this regard.

exception constitutes an abuse of discretion, the Corps is exempt from compliance with

the CWA, CZMA and CAA and judgment must be entered in its favor.

## B. The Corps Need Not Comply with CWA § 404(r)

Environmental plaintiffs seek judgment that the Deepening Project is subject to

CWA § 404(r) (13 U.S.C. § 1344(r)), which provides an alternative method by which the

Corps could seek exception from state regulation. (D.I. 100 at 7) Environmental

plaintiffs assert that the Corps must comply with the very specific process for exception

provided by § 404(r). (*Id.*) Specifically:

> (r) Federal projects specifically authorized by Congress.
>
> The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, **is not prohibited by or otherwise subject to regulation under this section, or a State program approved under this section,** or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title), **if** information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

(emphasis added) Having found that the Corps is excempt from state regulation

pursuant to the navigation exception of § 404(t), which contains no comparable

requirements, the court need not determine whether the Corps must pursue exemption

through other statutory means.

24

## C. Motion to Stay

On October 26, 2010, environmental plaintiffs filed a motion to stay these

proceedings.[21] (D.I. 102) Environmental plaintiffs advise the court that, on October 6,

2010, the National Marine Fisheries Service ("NMFS") proposed to list Atlantic sturgeon,

a fish native to the Delaware River channel, as endangered under the Endangered

Species Act ("ESA"). This may result in the Atlantic sturgeon's gaining protected status

under the ESA "within the next twelve months." (D.I. 103 at 13) In its Proposed Rule,

NMFS made specific findings, as follows:

> Dredging and filling operations can impact important features of Atlantic sturgeon habitat because they disturb benthic fauna, eliminate deep holes, and alter rock substrates necessary for spawning. Deposition of dredge sediment has been shown to affect the distribution of Atlantic sturgeon. Dredging can also result in direct takes (killing and injuring) of Atlantic sturgeon. Such takes have the potential to affect the range of Atlantic sturgeon if the takings contribute to the extirpation of a [distinct population segment].

(75 Fed. Reg. 61,872, 2010 WL 3881904 at *61,883) (citations omitted). With respect

to the Deepening Project, NMFS provided:

> While the seasonal restrictions imposed by the Delaware River Fish and Wildlife Management Cooperative may help to reduce or prevent direct take of important resident fish species (primarily the federally endangered shortnose sturgeon and other species of diadromous fishes), there is still the potential for direct impacts

---

[21]DNREC also requested that the court stay a decision on the merits pending its completion of the Delaware administrative permitting process. (D.I. 86 at 16-18) DNREC alternatively argued that the court should defer to DNREC under the doctrine of primary jurisdiction. (Id. at 18) The court declined to stay in view of the impending December 1 start date for Reach B and absence of evidence that a final decision would issue prior to December 1, 2010. The court disagreed that "decision-making is divided" between itself and DNREC in this case such as would justify judicial abstention. See Global Naps, Inc. v. Bell Atlantic-N.J., Inc., 287 F. Supp. 2d 532, 549 (D.N.J. 2003). The court was tasked in this APA case with reviewing the Secretary's reading of CWA § 404(t) and decision to invoke the navigation exception therein – legal determinations outside of DNREC's purview.

of [the Deepening] [P]roject on Atlantic sturgeon as they may be found in the
project area throughout the year.  There is the potential for indirect effects as
well, such as changes in hydrology of the river, which may affect possible
spawning habitat (e.g., salt water intruding further into the river).  The location of
spawning habitat for Atlantic sturgeon in the Delaware River has not been
confirmed.

*Id.* at *61,884 (citation omitted).  Environmental plaintiffs submit that the foregoing

triggers new obligations for the Corps to:  (1) conference with NMFS on the impacts of

the Deepening Project on Atlantic sturgeon in the Delaware River pursuant to 16 U.S.C.

§ 1536(a)(4);[22] and (2) conduct a supplemental EA or EIS on the impacts of the

Deepening Project on the species.  (D.I. 103 at 3)

Motions to stay invoke the broad discretionary powers of the court.  *See Cost*

*Bros., Inc. v. Travelers Indent. Co.*, 760 F.2d 58, 60 (3d Cir. 1985).

In determining how to exercise its discretion with respect to a motion to stay, a
court considers such factors as:  (1) the length of the stay requested; (2) the
"hardship or inequity" that the movant would face in going forward with the
litigation; (3) the injury that a stay would inflict upon the non-movant; and (4)
whether a stay will simplify issues and promote judicial economy.  *See Landis* [*v.*
*North Am. Co.*], 299 U.S. [248,] 254-55 [(1936)].  Generally, if there is a chance
that a stay would damage the non-moving party, the party requesting a stay must
make out a clear case of hardship or inequity in being required to go forward with
the litigation.  *See id.* at 255.

---

[22]That statute provides:

(4) Each Federal agency shall confer with the Secretary [of the Interior or the
Secretary of Commerce] on any agency action which is likely to jeopardize the
continued existence of any species **proposed to be listed** under section 1533 of
this title or result in the destruction or adverse modification of critical habitat
proposed to be designated for such species.  This paragraph does not require a
limitation on the commitment of resources as described in subsection (d) of this
section.

16 U.S.C. § 1536(a) (emphasis added); *see also* 16 U.S.C. § 1532 (defining
"Secretary").

26

*St. Clair Intellectual Property Consultants, Inc. v. Samsung Electronics Co., Ltd.*, Civ.

Nos. 04-1436, 06-403, 06-404, 08-371, 08-373, 2010 WL 1213367, *3 (D. Del. Mar. 28,

2010). That is, in deciding whether to enter a stay, a court must "weigh competing

interests and maintain an even balance." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55

(1936).

The Corps has previously stated that shortnose sturgeon were not jeopardized

by the Deepening Project.[23] Environmental plaintiffs argue that the "no jeopardy"

finding with respect to the shortnose sturgeon cannot automatically be attributed to the

Atlantic sturgeon insofar as NMFS has noted that "Atlantic sturgeon do not have the

---

[23]In the November 2009 Memorandum of Record, the Corps provided that:

> Based on recent surveys an expansion in the number and distribution of the
> shortnose sturgeon in the Delaware River appears likely. Consequently, there is
> potential for shortnose sturgeon to be in the vicinity of the Marcus Hook rock
> blasting area. The Philadelphia District prepared an updated Biological
> Assessment for the entire Delaware River Main Stem and Channel Deepening
> Project and formal consultation under Section of the Endangered Species Act
> was initiated with the National Marine Fisheries Service in letter dated 21
> January 2009. NMFS provided Final Biological Opinion, dated 17 July 2009,
> which requires various forms of monitoring for hopper dredging, cutterhead
> pipeline dredging, bucket dredging, and blasting. **NMFS concluded in their
> Biological Opinion that the project construction is likely to adversely affect
> but not likely to jeoardize the continued existence of the shortnose
> sturgeon**. The Corps will implement all terms and conditions that the NMFS has
> made in its Biological Opinion to minimize potential adverse effects on the
> shortnose sturgeon. The discovery and capture of sturgeon within the project
> area in itself is a new development, however it does not constitute significant
> new circumstance and is not a substantial change in the estuary, but the result of
> more intense efforts to study sturgeon within the project area. It has been known
> for decades that the sturgeon utilize the Delaware River as its habitat, and
> provisions have been made to account for, and avoid their presence in the
> channel.

(AR025151) (emphasis added)

same temporal and spatial distribution [as shortnose sturgeon]."  (D.I. 103 at 12, citing 2010 WL 3881904 at *61884) (*see also* 2010 WL 3881904 at *61,897, stating that "there may be less than 300 spawning adults per year for the Delaware subpopulation[.]")  This is an important substantive consideration for the Corps, not the court.

Upon careful review, environmental plaintiffs do not present any ripe claims for the court's consideration.[24]  The proposed listing has just recently occurred and the Corps has yet to render any determinations.  A formal conference is required if the Deepening Project is "likely to jeopardize the continued existence" of the Atlantic sturgeon, 16 U.S.C. § 1536(a)(4) – a finding yet to be made by the Corps.  The Corps states that it is presently conferring with NMFS to determine its obligations under the ESA in light of the proposed listing of the Atlantic sturgeon, and may request a formal conference as discussions progress.  (D.I. 104 at 5)  Secondly, the Corps has not yet determined whether a SEIS is appropriate.[25]  Until this occurs, and unless the Corps

---

[24]Judge Pisano has very recently reached the same conclusion in his order denying a similar stay in the concurrent New Jersey litigation involving these parties. (*See* United States District Court for the District of New Jersey ("D.N.J.") Civ. Nos. 09-5591 & 09-5589, D.I. 105)

[25]As the Third Circuit has stated,

a [SEIS] is not necessary every time new information comes to light after the [EIS] is finalized. The new circumstance must present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned.  Thus, the key to whether a [SEIS] is necessary is not whether the area has undergone significant change, but whether the proposed [project] will have a significant impact on the environment in a manner not previously evaluated and considered.

*South Trenton Residents Against 29 v. Federal Highway Admin.*, 176 F.3d 658, 663 (3d

determines that it will not supplement, environmental plaintiffs do not have a claim that the Corps has violated NEPA in this regard.

Environmental plaintiffs admit that the "full protections of the ESA do not apply until a species is actually listed," but suggests that the Corps should "fully engage in a formal conference process with NMFS to ensure that the next phase of the Deepening Project does not jeopardize Atlantic sturgeon in violation of ESA Section 7 or unlawfully take[26] the species directly or through habitat destruction in violation of ESA Section 9," or, "out of prudence determine to alter or modify the Deepening Project to avoid jeopardy to the [ ] Atlantic sturgeon even prior to the species' final listing." (D.I. 103 at 10, 13)  It is not within the purview of the court to compel the Corps to formally conference with NMFS or to alter or modify the Deepening Project, nor will the court issue an advisory opinion on these matters.  The Secretary of Commerce has one year to render a final decision regarding the Atlantic sturgeon, which may be extended by up to six months if there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned."  16 U.S.C. § 1533(b)(6).  There is no indication that the Corps is ignoring its present obligations. Environmental plaintiffs' claims will ripen should the Corps fail to meet these or future obligations.

---

Cir. 1999) (internal quotations and citations omitted).

[26]Section 9 of the ESA makes it unlawful to "take" any endangered species of fish or wildlife without permission from the appropriate federal agency.  16 U.S.C. §§ 1538(a)(1)(B); 1539.  A "take" includes any action that may "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect" such species "or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

While plaintiffs' claims are premature at this juncture, defendants have articulated compelling reasons why a stay should not issue.   The PRPA is an agency of the Commonwealth of Pennsylvania with a mission to foster and to promote the economic vitality of the Port of Philadelphia and other regional ports.  *See* 55 PA. STAT. ANN. §§ 697.1-697.24.  As discussed in the court's prior opinion, the combined Delaware River ports "currently support an estimated 75,000 jobs, generate billions in terms of economic revenue and payroll wages, and contribute more than $150 million in state and local taxes." *See Prelim. Inj. Op'n*, 681 F. Supp. 2d at 549.  Shipping companies are investing in fleets of deeper draft ships; accommodation of such vessels will require shipping channels to be at least 45 feet deep.  *See id.* at 550, n.2.  Other east coast ports have already conducted deepening projects in this regard.  *Id.*  As Judge Pisano has stated,

> shippers are at this time determining whether to continue conducting business at ports that cannot accommodate the deeper draft vessels, such that further delaying the deepening project by staying the proceedings would have a real adverse impact on the economic vitality of the PRPA's constituents.  Similarly, a stay of proceedings would harm the Corps by delaying its Congressionally-authorized deepening of the Delaware shipping channel.

(D.N.J. Civ. Nos. 09-5591 & 09-5589, D.I. 105)  Based on the foregoing, the court finds that plaintiffs have not met their burden of persuasion that, on balance, a stay is favored in this case.[27]  Plaintiffs' motion is denied.

---

[27]In reaching the same conclusion, Judge Pisano also factored in this court's injunction preventing the Corps from proceeding with dredging until the summary judgment motions were decided.  Because the court has denied plaintiffs' motions for summary judgment, the court does not consider the injunction in its balancing of facts but, nevertheless, finds that a stay is unwarranted under the present circumstances.

## V. CONCLUSION

For the foregoing reasons, the court denies DNREC's motion for summary judgment or, in the alternative, for a stay of proceedings (D.I. 85); denies environmental plaintiffs' motion for summary judgment (D.I. 89); grants PRPA's cross-motion for summary judgment (D.I. 94); and denies environmental plaintiffs' motion to stay proceedings (D.I. 102).  The court will remove the injunction entered on January 27, 2010 with respect to the remaining reaches of the Deepening Project.  An appropriate order shall issue.